ORIGINAL

Kenneth L. Lawson
3362 Loulu Street
Honolulu, Hawai'i, 96822
808-542-7978

Pro-Se Plaintiff

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

APR 15 2024

at 9 o'clock and 00 min. __ M
Lucy H. Carrillo, Clerk

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAI'I

| | |
|---|---|
| KENNETH L. LAWSON,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF HAWAI'I,<br><br>DAVID LASSNER; in his official and individual capacities;<br><br>MICHAEL BRUNO; in his official and individual capacities;<br><br>CAMILLE NELSON; in her official and individual capacities;<br><br>NICHOLAS A. MIRKAY; in his official and individual capacities;<br><br>JANE/JOHN DOES 1-10, in their official and individual capacities<br><br>Defendants. | CIV. NO. **CV24 00172**LEK RT<br><br>VERIFIED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF; DECLARATION UNDER PENALTY OF PERJURY; DEMAND FOR JURY TRIAL<br><br>42 U.S.C. 1983 – FIRST AMENDMENT VIEWPOINT DISCRIMINATION<br>42 U.S.C. 1983 – FIRST AMENDMENT RETALIATION<br>42 U.S.C. 1983 – FIRST AMENDMENT RETALIATION<br>42 U.S.C. 1983 – FIRST AMENDMENT PRIOR RESTRAINT<br>42 U.S.C. 1983 –FACIAL & AS APPLIED CHALLENGE<br>42 U.S.C. 1983 –FACIAL & AS APPLIED CHALLENGE<br>VIOLATION OF 14TH AMENDMENT DUE PROCESS<br>42 U.S.C. 1986 –NEGLECT TO PREVENT CIVIL RIGHTS:<br>42 U.S.C. § 2000(e) TITLE VII DISCRIMINATION |

42 U.S.C. § 2000(e) TITLE VII
RETALIATION
INJUNCTIVE AND DECLARTORY
RELIEF

## VERIFIED COMPLAINT

COMES NOW Professor Lawson KENNETH L. LAWSON (hereinafter referred to as "Plaintiff" and/or "Professor Lawson" and/or "Lawson") alleges and claims against Defendants above-named as follows:

## NATURE OF ACTION

1.      This is a civil action wherein Professor Lawson seeks injunctive and other relief to restrain Defendants from retaliatory actions that violate his First and Fourteenth Amendment rights by summarily forbidding his presence on the William S. Richardson School of Law ("WSRSL" or "Richardson") campus at the University of Hawai'i at Mānoa ("UH") and summarily issuing no-contact orders and forbidding him from using the WSRSL listservs to communicate with other members of the WSRSL community; and threatening additional sanctions, thereby effectively chilling his right to free speech on matters of public concern, limiting his freedom of association, and denying him academic freedoms allowed to all other

2

WSRSL professors.

## **JURISDICTION AND VENUE**

2.      Professor Lawson brings this action pursuant, but not limited to, the First and Fourteenth Amendment to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. §§1343, 1983, 1985, 1986, and 1988; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq, (2009).

3.      Specifically, Professor Lawson seeks declaratory and emergency injunctive relief against the official-capacity Defendants and a ruling that Defendants both violated Professor Lawson's right to free speech and unconstitutionally retaliate against Professor Lawson for expressing unpopular views on matters of public concern. Professor Lawson also seeks compensatory and punitive damages against the individual-capacity Defendants for conspiracy to violate Professor Lawson's civil right to free speech.

4.      This Court has subject matter jurisdiction over federal claims under U.S.C. §§ 1331 and 1343.

5.      Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because all events and actions done by the below-named Defendants occurred within the District of Hawai'i and Defendants are subject to personal jurisdiction in the District of Hawai'i.

6.     The Court has jurisdiction under the 42 U.S.C. §§1985 and 1986 against all of the individual Defendants sued in their individual capacities. Professor Lawson is not alleging an intra-corporate conspiracy. Lawson is not alleging that these individuals conspired with Defendant U.H. or any Defendant acting in their official capacity as a UH Employee.

**PARTIES**

7.     At all times relevant herein, Professor Lawson was and is a tenured faculty member at the WSRSL and was at all times relevant herein a citizen of the United States and resident of the City and County of Honolulu, State of Hawaiʻi. Lawson's race is Black, and he is part of a protected class for purposes of 42 U.S.C. §1983 et. seq. civil rights laws. Lawson filed a complaint of retaliation against Defendant UH based on race with E.E.O.C. and H.C.R.C. and Lawson received his right-to-sue letter on June 7, 2023, February 8, 2024, and March 25, 2024.

8.     Defendant UNIVERSITY OF HAWAIʻI ("U.H.") is and was at all times relevant herein, Plaintiff's employer and a Hawaiʻi state corporation existing under the laws of the State of Hawaiʻi. Defendant U.H. is a public university system with one of its ten general campuses, U.H. Mānoa, located in the City and County of Honolulu, State of Hawaiʻi.

9.     Defendant, DAVID LASSNER, (hereinafter, "Defendant Lassner"), was and is employed by UH, and was at all times domiciled in in the State of Hawaiʻi

4

and thus a citizen and resident of the State of Hawai'i. Defendant Lassner is the President of UH. He is responsible for UH's administration and policy-making and has the authority approve the policies and procedures challenged herein that were applied to deprive Professor Lawson of his constitutional rights. Professor Lawson sues Lassner for injunctive relief in his official capacity. Defendant Lassner will be included when referenced as "Defendant" or "Defendants", unless excluded and as the context implies.

10.    Defendant, MICHAEL BRUNO (hereinafter, "Defendant Bruno"), was and is employed by UH and was at all relevant times domiciled in the State of Hawai'i and thus a citizen and resident of the State of Hawai'i. Defendant Bruno is the Provost of UH. Defendant Bruno is delegated the powers, duties, and responsibilities assigned to him by President Lassner, including the responsibility for implementing and disseminating the policies and procedures challenged herein that were applied to deprive Professor Lawson of his constitutional rights. Professor Lawson sues Bruno both individually and in his official capacity. Bruno will be included when referenced as "Defendant" or "Defendants", unless excluded and as the context implies.

11.    Defendant, CAMILLE NELSON (hereinafter "Defendant Nelson"), was and is employed by UH and was at all relevant times domiciled in the State of Hawai'i and thus a citizen and resident of the State of Hawai'i. Defendant Nelson is

the Dean at WSRSL. Professor Lawson sues Defendant Nelson both individually and in her official capacity. Nelson will be included when referenced as "Defendant" or "Defendants", unless excluded and as the context implies.

12. Defendant, NICHOLAS MIRKAY, hereinafter "Defendant Mirkay"), was and is employed by UH and was at all relevant times domiciled in the State of Hawai'i and thus a citizen and resident of the State of Hawai'i. Defendant Mirkay is an Associate Dean at WSRSL. Professor Lawson sues Defendant Mirkay both individually and in his official capacity. Mirkay will be included when referenced as "Defendant" or "Defendants", unless excluded and as the context implies.

13. JOHN AND JANE DOES 1-10, WILLIAM S. RICHARDSON SCHOOL OF LAW FACULTY MEMBERS AND/OR INDIVIDUALS WHO WORK FOR DEFENDANT UH AND ALL ARE BEING SUED IN THEIR INDIVIDUAL CAPACITIES AND THEY are sued herein under fictitious names because their true names, identities and capacities are unknown to Professor Lawson, except that they are connected in some manner with Defendants, and are/were agents, servants, employees, employers, representatives, co-venturers, associates, or independent contractors of Defendants herein, and were acting with the permission and consent and within the course and scope of said agency and employment and/or were in some manner presently unknown to Professor Lawson engaged in the activities alleged herein and/or were in some way responsible for the injuries or

damages to Professor Lawson, which activities were a proximate cause of said injuries or damages to Professor Lawson. Professor Lawson has made good faith and diligent efforts to identify said Defendants, including interviewing individuals with knowledge of the claims herein. At such time as their true names and identities become known, Professor Lawson will amend this Complaint accordingly. Defendants have given Plaintiff statements by John, and Jane Does with names redacted. Once Plaintiff receives the unredacted copies in discovery, he can name several other Defendants.

14.   All Defendants will be collectively referred to as "Defendants".

## STATEMENT OF FACTS

### *Background*

15.   Professor Lawson is a sixty-year-old Black male of African American descent.

16.   Professor Lawson is presently the only self-identified Black American-born male employee on the WSRSL faculty. He is also the only Black male employed at the WSRSL in any capacity. He serves as the Faculty Advisor to the Black Law Students Association ("BLSA") by the choice of its members.

17.   In 1989, Professor Lawson became a licensed attorney in Ohio where he went on to establish a successful criminal defense and civil rights law firm, and became a well-known civil rights advocate.

18.   Though once a respected attorney, Lawson's personal life and law practice unraveled when he succumbed to a drug addiction that led to his disbarment and imprisonment.

19.   In 2007, Professor Lawson went to a detox facility and has not used drugs or alcohol since.

20.   In 2010, Professor Lawson was released from prison and relocated to a halfway house in Honolulu, Hawai`i.

21.   Shortly thereafter, Professor Lawson was hired as an office manager for the Hawaii Innocence Project ("HIP") at the WSRSL.

22.   After volunteering for and successfully co-teaching Professor Randall Roth's Professional Responsibility course, Professor Lawson received glowing student evaluations and similarly positive input from judges and lawyers who had heard Professor Lawson speak. Professor Lawson was then invited to teach additional courses as an adjunct professor at the WSRSL.

23.   In 2012, WSRSL Dean Aviam Soifer asked Professor Lawson to teach the Professional Responsibility course on his own, to serve as the Associate Director of the HIP, to engage in legal scholarship, and to teach several additional law courses. At that time, Professor Lawson was a casual hire and paid significantly less than members of the WSRSL J-faculty.

24.   During this time, Hawaii's newspapers, radio stations, and TV

8

programs began to treat Professor Lawson as their go-to legal expert.

25. In 2015, Professor Lawson was promoted to Interim Co-Director of HIP when that clinic's longtime Director retired.

26. As Interim Co-Director of HIP, Professor Lawson was required to perform every job responsibility previously required of his J-faculty predecessor, including legal scholarship and her teaching assignments. These courses were in addition to what he was already teaching.

27. At that time, he already had the heaviest teaching load at WSRSL, largest number of students, highest student rankings, and most student organizations asking him to be their faculty advisor. He was chosen by the graduating class two years in a row to give their commencement address. The following year, the faculty voted to limit the number of consecutive times a professor could be chosen.

28. In 2016, at the culmination of a national search for the best possible candidate, the WSRSL selected Professor Lawson to serve as the HIP Co-Director and to teach related courses as a full-time, tenure-track member of the WSRSL faculty. For unexplained reasons, Professor Lawson was designated as S-faculty even though the hiring criteria used in conducting the national search and hiring Professor Lawson had been identical to criteria applicable when J-Faculty members are hired, specifically, a promise of excellence in 1) classroom teaching, 2) legal scholarship, and 3) community service.

9

29.    Despite maintaining an exceptionally heavy teaching load and his new HIP duties, Professor Lawson continued to excel. Professor Lawson consistently taught significantly more credit hours and had much higher student enrollment than other professors at the WSRSL. Professor Lawson also engaged in an extraordinary amount of community service and legal scholarship.

30.    Professor Lawson's personal 'come-back' story contributed to him becoming highly sought-after for his ability to impart legal expertise and insight within the unique context of his life. The Dean at that time, Aviam Soifer, was quoted in a 2014 WSRSL publication as saying, "Ken Lawson is an invaluable asset to our Law School."

31.    Some faculty members who did not mind when the Dean allowed Professor Lawson to teach courses as an adjust professor, expressed concern when Lawson joined the full-time faculty. They did not view him as scholarly enough to join their ranks. Unlike them, he talks in a blunt and unprofessorial manner, regularly using works like "shit" and "hell." He showed little interest in the type of legal scholarship they valued, and because he was attracting so many students to his courses, certain niche or pet courses had to canceled due to lack of enrollment.

32.    Throughout his fourteen years at Richardson, Professor Lawson has remained steadfast in his commitment to calling out discrimination and speaking truth to power. When he learned that a dear friend and colleague, Associate Director

of HIP, Faculty Specialist Jennifer Brown ("Jen"), had been wrongly misclassified and was being underpaid, he spoke out against her discriminatory treatment. Jen is an accomplished and exceptionally talented attorney, but Richardson was paying her like a secretary, and delaying the process of having her properly classified. In an email to Defendant Nelson and Defendant Mirkay, Professor Lawson called "bullshit" on their misconduct and discriminatory treatment. Jen and Professor Lawson pushed for nearly a year to rectify her salary and classification issues.

33.    Professor Lawson also spoke up against discriminatory treatment towards him when he challenged Richardson's faculty classification system that was being used to deny Professor Lawson equal pay for equal work.

34.    When he was initially hired as S-Faculty, Professor Lawson was assured that he would be paid equitably based on his hiring criteria, which was identical to J-Faculty hiring criteria, his assigned duties, and his job performance.

35.    Since being hired as S-Faculty, Professor Lawson has taught more law courses, had more student enrollment in his courses, and counseled more students than any other faculty. Professor Lawson regularly teaches thirty (30) to (40) forty credit hours annually while many non-Black colleagues teach six (6) to twelve (12).

36.    While serving as Co-Director of HIP, Professor Lawson, Jen, and his students secured the exoneration of Ian Schweitzer. Additionally, Professor Lawson helped develop Richardson's new Beyond Guilt Hawai'i clinic.

37.     Defendant Nelson has told Professor Lawson that tuition funds cannot be used to support his clinics and that he must raise additional funds to cover Jen's salary. Professor Lawson and Jen raised $1.5 million in federal grants and an unprecedent sum of donations from individuals and foundations.

38.     Professor Lawson's two clinics are the only clinics that Richardson requires to secure additional funds to pay faculty salaries and operating costs despite HIP's overwhelming popularity.

39.     Despite carrying the heaviest teaching load, successfully running two popular clinics, and raising $1.5 million in outside funding, Professor Lawson had never received a merit or equity raise in his fourteen years at Richardson.

40.     Professor Lawson first became aware of the discriminatory and disparate salary payment when he saw a salary database of all state employees. He learned that he was being paid substantially less than every non-Black J-Faculty at Richardson and many non-Black S-Faculty.

41.     Professor Lawson, along with several other S-Faculty, consulted with UH and Richardson to rectify the salary and misclassification issues.

42.     In May 2020, Professor Lawson filed a formal grievance addressing the pay inequity and misclassification issues. Lawson believed he was being underpaid and discriminated against based on his race, color, status as a recovering drug addict, and arrest record, especially considering his disparate workload.

12

43.    But before he filed the grievance, Lawson met with the other S-Faculty to let them know about his intention to file a grievance on the issue of misclassification. He told them that if they felt him filing a grievance on this issue would hurt the S-Faculty as a group, he wouldn't file it. Lawson comes from a family and upbringing where people work together and look out for one another. The S-Faculty agreed and gave Lawson permission to file the grievance. Lawson met with Beverly McCreary, UH Assistant Vice Chancellor for Academic Personnel and Provost's Designee. Lawson was told this issue was "not grievable."

44.    After Defendant Nelson was appointed as Dean at Richardson, Professor Lawson and other S-Faculty met with Nelson, McCreary, and Dan Barnett, Associate Dean of Academic Affairs, to discuss the options available for reclassification. Believing that Nelson was sincere when she stated that she intended to help resolve the misclassification and salary issues for S-Faculty, Lawson suspended pursuing his grievance.

45.    During this time, Defendant Nelson Doe Defendants resurrected and modified the previously abrogated reclassification process that Dean Soifer previously told them was no longer an option after 2006 in order to allow one favored S-faculty member to convert to J-faculty status.

46.    Shortly before the September 10, 2021 Department Personnel Committee ("DPC") meeting, Professor Lawson became aware of what Defendants

13

were doing and that there was no written conversion process or criteria for conversion. Professor Lawson sent a letter to Defendant Nelson, Defendant Mirkay, and one Doe Defendant explaining his objection to the use of this process. (August 29, 2021 email).

47. Professor Lawson informed Defendant Nelson, Defendant Mirkay, and Doe Defendants that their conversion process violated state law, the CBA, and UH's policies. Lawson filed a grievance in October 21 in response to this practice.

48. Professor Lawson did not object to the creation of a conversion process, but he was concerned about the lack of due process in the conversion process they created. Defendant Nelson, Defendant Mirkay, and Doe Defendants understood that Lawson and other S-Faculty were seeking reclassification but did not tell them about their plan. Instead, Lawson found out about their backroom scheming when the conversion was placed on the agenda for an upcoming DPC meeting.

49. During the September 10, 2021 DPC meeting Professor Lawson voiced his disagreement with how Defendants' handled the situation and the lack of fundamental fairness and due process.

50. Before the following DPC meeting, Doe Defendants and a Vice-Chancellor of Academic Affairs, Noelani Goodyear, provided a written set of "guidelines" that commemorated their newly created conversion process.

51. In October 2021, Lawson filed a grievance alleging this conversion

14

process violated state law and the CBA. His grievance was rejected at the Step 1 and Step 2 levels, but in May 2022, Lawson entered into a Settlement Agreement with Defendants regarding this grievance.

52.    After 2022, Defendants rescinded their "guidelines" and discontinued this illegal conversion process.

53.    Defendant Lassner and Bruno knew that Professor Lawson contested the illegal conversion process because Lawson filed his grievance and appeals with both. Defendant Lassner, Bruno, and Nelson signed Lawson's Settlement Agreement.

54.    Defendants told Professor Lawson that he must file a Special Salary Adjustment ("SSA") pursuant to the procedures in the Collective Bargaining Agreement to receive an equity or merit increase. Lawson followed these procedures, the faculty reviewed Lawson's SSA request and presentation, and they voted that Lawson deserved both an equity and merit raise.

55.    Around January 2023, Defendants Bruno and Nelson denied Lawson's SSA request that had been voted on and approved by the Richardson faculty.

56.    Defendant Nelson did not expect faculty to approve Professor Lawson's SSA request and later told Defendant Bruno that if the voting faculty knew of Lawson's Settlement Agreement, a majority would not have voted in favor of his SSA request.

57.     Defendant Nelson and Bruno's email exchanges about Lawson's SSA request show that they flagrantly disregarded an express term of the Settlement Agreement in vetoing Lawson's SSA. In negotiations, this term was highlighted as a dealbreaker for Lawson and it was included in the Settlement Agreement at his insistence.

58.     Defendant Nelson knew about the Settlement Agreement at the time she directed Professor Lawson to go forward with his SSA request.

59.     Defendant Nelson's emails denying Platinff's SAA, demonstrate she intended to veto Plaintiff's request regardless of how the faculty voted on it.

60.     On or about February 11, 2023, Professor Lawson filed a complaint against Defendants Nelson and Bruno with the HCRC (FEPA No. 22561) citing discrimination and retaliation regarding the vetoing of his SSA approval.

61.     Shortly thereafter, Defendant Bruno launched an investigation against Professor Lawson, supposedly based on claims by Nelson and unnamed others that Professor Lawson had created a hostile work environment while speaking at a faculty meeting on February 17, 2023.

### Professor Lawson Engages in Protected Speech About Black History Month Event During Faculty Meeting

62.     Sometime prior to February 17, 2023, WSRSL's Diversity, Equity, and Inclusion ("DEI") committee sent out a flyer announcing a Black History Month

program on the U.S. Black Civil Rights Movement and Dr. Martin Luther King's Letter from the Birmingham Jail.

63.     The flyer included an image of a Black fist raised in a Black power salute.

64.     The DEI Committee did not include any Black law students, Black civil rights attorneys, Black activists, or any other Black person as an organizer, panelist, or facilitator.

65.     At a faculty meeting on February 17, 2023, Professor Lawson raised his hand during the open-forum time of the meeting and was recognized by Defendant Nelson, who gave Professor Lawson the floor to speak.

66.     Professor Lawson asked the DEI Committee why no Black people were asked to serve on the panel or to facilitate the event. Professor Lawson described it as an example of unconscious racial bias.

67.     Professor Lawson explained why this slight had been hurtful, particularly to WSRSL's Black students, even if done innocently. He called it an example of "Nice Racism," described academic research that he believed would help the DEI Committee members appreciate the hurt they had caused, and encouraged them to rethink the Black History Month event, as currently planned.

68.     Defendant Nelson repeatedly interrupted Professor Lawson, each time saying, "Ken, we made a mistake," as though there was no point in discussing how

17

it happened, the hurt it had caused, or the need to make some kind of adjustment to the Black History Month program, which was only six days away (which was prior to the next scheduled faculty meeting). Eventually, Defendant Nelson added, "as a Black woman, I can understand [discrimination and racism]."

69.     Professor Lawson suggested to Defendant Nelson that because she had been born and raised in Jamaica and Canada, respectively, she and her family did not personally experience the U.S. Black Civil Rights Movement, Jim Crow segregation, or forced busing, which is the legacy that Black History Month is all about.

70.     Professor Lawson explained that Black people who have personally experienced the U.S. Black Civil Rights Movement have a unique perspective that should have been considered and consulted for this event, and he provided the names of several local Black figures who could provide this important perspective.

71.     To help colleagues understand his frustration, Professor Lawson described the physical beatings and discrimination his parents and other close family members endured as victims of racism at the height of the U.S. Black Civil Rights Movement. Professor Lawson then quoted Dr. King's letter and shared relevant personal stories he had been using for years when teaching Criminal Procedure classes. Professor Lawson had also shared these and similar anecdotes during a WSRSL-sponsored Implicit Racial Bias Symposium that included scholars from

other law schools, in the WSRSL Civil Rights course, and in many public talks he has given over the past several decades.

72.    Professor Lawson explained that some of his family members had belonged to the Black Panther Party and how he also followed the teachings of Malcolm X who believed in protesting peacefully but using self-defense if attacked. While Dr. King promoted non-violence in all situations, Malcolm X's philosophy was that Black people are entitled to use lawful self-defense in response to un'awful violence.

73.    Such thinking accords with the law and common sense—it is perfectly legal and intelligent to defend oneself against unlawful violence. A non-violent and reasonable person would not consider it threatening.

74.    Professor Lawson never engaged in violence while protesting; never said that he had done so; and never threatened anyone with violence.

75.    A White female faculty member, Carole Peterson, interjected that she did not see any reason for a Black person to feel hurt, because even though there were no Black panelists or facilitators, Black people could attend the event and participate from the audience.

76.    Professor Lawson responded by describing her statement as another example of "Nice Racism," an academic term for racism resulting from unconscious racial bias.

19

77. No one at the faculty meeting ever said to Professor Lawson the equivalent of, "Ken, you need to calm down," "Ken, you are behaving badly," "Ken, you are frightening me," or "Ken, lower your voice." Nor did anyone say they could not continue to participate in the Faculty meeting because of anything Professor Lawson had said or the manner in which he said it.

78. After Professor Lawson finished speaking, the meeting moved on to the faculty-hiring agenda item and lasted more than four hours. No one left the room while Professor Lawson was speaking or afterward because of Professor Lawson's remarks.

79. No one accused Professor Lawson of name-calling or inappropriate behavior at any time during the meeting.

80. No one tried to contact campus security during the meeting.

81. During the February 17, 2023 faculty meeting, a WSRSL student and two faculty members who witnessed Professor Lawson's speech offered their condolences during the meeting to Professor Lawson for the pain and hurt others had caused him. Several additional faculty members reached out to Professor Lawson after that meeting, specifically to express their support of Professor Lawson's willingness to point out and stand up against discrimination.

82. The day after the faculty meeting, on February 18, 2023, Lawson sent an email to Defendant Nelson and DEI Committee members reiterating his concerns

about the Black History Month event.

### *Defendant Nelson Alleges Violations of University Policy to Initiate Investigation*

83.   After reading Professor Lawson's email on February 18, 2023, Defendant Nelson forwarded that email to Defendant Bruno and UH counsel, making racial discrimination claims against Professor Lawson and requesting that he be required to undergo anger management training. She did this instead of filing a complaint with UH's EEO.

84.   Defendant Nelson was aware that UH has both an EEO and Title IX office and complaints for violations of UH's policies should be directed to the designated Coordinator at the appropriate office.

85.   After reading and forwarding Professor Lawson's email on February 18, 2023, Defendant Nelson happened upon Professor Lawson at a nonwork-related public event, seated next to his wife. Defendant Nelson approached Professor Lawson and they exchanged greetings and chatted briefly. Defendant Nelson exhibited no fear of Professor Lawson.

86.   Defendant Nelson encouraged or solicited others to make complaints with the people employed in Defendant's Bruno's office or under his control rather than making complaints to UH EEO office. Keeping the "investigation" within Bruno's control would help assure that Defendants would be able to successfully

retaliate and punish Professor Lawson for engaging in free speech and publicly exposing their racism and hypocrisy.

### *Defendant Mirkay Meets with Doe Defendants and Alleges Violations of University Policy to Initiate Investigation as Part of the Conspiracy to Violate Professor Lawson's Civil Rights*

87.     On Monday, February 20, 2023, Defendant Nick Mirkay met with Doe Defendants and sent an email alleging violations of the University's Workplace Non-Violence policy and Title IX on behalf of Defendant Nelson and the DEI Committee.

88.     The entire basis for this complaint is Defendants' disagreement with Professor Lawson's viewpoint. In his email, Defendant Mirkay never said or even suggested that Professor Lawson had threatened violence or that he used intimidating or threatening gestures.

89.     Defendant Mirkay acknowledges an adversarial and existing relationship when he files the bogus complaint against Plaintiff, as he claims to assert that he's submitting the complaint under attorney-client privilege. It is not.

### *Professor Lawson Engages in Protected Speech Via Email*

90.     After receiving no response to his February 18, 2023, email, Professor Lawson used the WSRSL listserv on February 21, 2023, to call for a boycott of the Black History Month event that was still scheduled to proceed on Thursday, February 23, 2023.

91. No reasonable person would view Professor Lawson's emails on February 18, 2023, and February 21, 2023, as veiled threats of violence.

92. Professor Lawson had previously discussed the boycott with the President and Vice President of the WSRSL chapter of BLSA, and they had expressed total agreement.

93. Several other students responded positively to Lawson's email, expressing solidarity and support.

94. Many students responded to Professor Lawson privately and a couple students "replied all." Lawson only responded publicly to the two students who "replied all." Lawson did not forward any emails sent to him privately.

95. On February 22, 2023, a faculty member reached out to Professor Lawson to acknowledge his hurt and frustration. After hearing Professor Lawson express support for a solution that would allow the event to continue without his personal involvement, this faculty member reached out to the DEI Committee chair to see if about the DEI Committee would be open to a win-win compromise. This faculty member explained that he had spoken to Professor Lawson and was hopeful a positive path forward for the event was eminently possible. Unfortunately, the DEI Committee chair was unreceptive to this proposal.

96. Later that day, DEI Committee members responded to Professor Lawson's email by using the WSRSL listserv to distribute a "gaslighting" memo

23

portraying themselves as misunderstood victims.

97.    The DEI Committee's memo claimed, for the first time, that their Black History Month event had been intended as a "book club" event, as if that explained the absence of Black panelists or facilitators.

98.    After insisting there was absolutely nothing wrong with the design of the upcoming Black History Month event, the DEI Committee's memo announced that the event had been cancelled.

99.    One faculty member believed the meeting was canceled to avoid acknowledging that Professor Lawson raised legitimate concern, and because "the organizers seemed to be defensively attacking the messenger." When this faculty member learned that another faculty member had described Professor Lawson's speech as "abusive and belligerent,"   he said it made him think they had attended different meetings.

100.    A student responded publicly to the DEI Committee's email saying that the DEI Committee's "defensiveness and explaining away this issue by saying that our intentions were righteous likely makes it worse." This student also stated, "I believe we are witnessing the unsettling nature of a true race discussion …." This student thanked Professor Lawson and shared part of her message to Professor Lawson:

I was personally planning on attending because I (sometimes blindly)  seek

24

to engage in constructive dialogue surrounding race and my        responsibility in recognizing privilege and lack thereof. I cannot thank      you enough for cancelling the book club event that would have      faltered me in my intention and I see your message as the necessary    dialogue that I crave. I am humbled and grateful.

101.   Another student responded to Professor Lawson privately with similar

concern that the DEI Committee's defensiveness and refusal to acknowledge any

wrongdoing was unhelpful and "totally missed the point":

I feel that the response sent out regarding your email totally missed the point. By not including you or other black members of our law school, the implication is that their understanding of your experience is greater than your own. It's essentially mansplaining but with race instead of gender. By predictably cancelling the event rather than making changes to address your valid concerns, they've essentially punished you, the black students at our school, and anyone who actively supports you folks. It eerily resembles the imbalance of power that is so necessary to maintain white supremacy and the system of racism. I send this email because I know that many people will not understand your position because they have never experienced racism and/or discrimination...

102.   UH's workplace non-violence procedures indicate that incidents of

workplace violence should be immediately reported to campus security. At no point

from the time of the February 17, 2024 faculty meeting to the time of his banishment

from the WSRSL campus did any of the Defendants alert campus security.

103.   No students expressed fear of Professor Lawson, or even suggested that

his boycott email contained any threats or veiled threats of violence.

***Overt Acts in Furtherance of Conspiracy: Individual Defendants Falsely Allege Title IX Violations to Initiate Investigation and Get Professor Lawson Banned From Campus***

25

104.   On Thursday February 23, 2023, two days after Professor Lawson's boycott email and seeing several students respond in solidarity with Professor Lawson and criticize the DEI Committee's handling of the event, Doe Defendants sent emails alleging violations of Title IX to give Defendant Bruno a basis to issue no-contact orders, ban Professor Lawson from the WSRSL campus, and prevent criticism of them via the listserv.

105.   The entire basis for their Title IX claim is that Professor Lawson said they had exhibited "nice racism," and they were female. They cited no evidence that Professor Lawson's speech was directed at them because of their gender.

106.   In their email, these Doe Defendants express concern that Professor Lawson will violently and physically attack them.

107.   Yet, all Doe Defendants appeared on campus and taught classes in person *after* Professor Lawson's speech during the February 17, 2023 faculty meeting without incident.

108.   Professor Lawson had responded to an email sent by three female colleagues, not because they were female, but because they had falsely accused him of "name-calling" at the February 17, 2023 faculty meeting.

109.   It wasn't until students had publicly expressed support for Professor Lawson that Doe Defendants filed a Title IX claim, nearly a week after the faculty meeting and two days after the boycott email.

110. Professor Lawson has been employed full-time at the WSRSL since 2010 and no one had ever accused him of discrimination, or threatening words or behavior prior to his speech at the February 17, 2023, faculty meeting.

### *Defendants Take Adverse Employment Action Against Professor Lawson & Defendant Bruno Appoints Himself Coordinator*

111. UH's Administrative Procedure 1.202 ("AP 1.202") outlines the process for filing, investigating, and adjudicating complaints alleging violations of UH's policies; AP 1.202 states the procedure is meant to "ensure due process in the investigation and resolution of complaints."

112. AP 1.202 provides for a Coordinator who, upon acceptance of Complaint, selects Investigators to engage in Fact Finding and a Decision Maker; and sends the accused individual a Notice of Investigation identifying the parties, accusations, and applicable policies and procedures.

113. The Coordinator for a UH investigation is normally a trained professional from UH's EEO or Title IX Office. Federal law requires UH to publicize the names and contact information of their Coordinators.

114. In February of 2023, Dee Uwono was UH's publicly designated EEO and Title IX Coordinator for employees. She was later superseded by Jennifer Rose.

115. Defendant Bruno was not and is not a University-designated EEO or Title IX Coordinator, but for unexplained reasons he appointed himself as the

27

Coordinator in Professor Lawson's case. Acting as a self-appointed Coordinator, Defendant Bruno selected the Investigators and Decision Maker, and issued Notices of Investigation that banned Professor Lawson from the WSRSL campus for an indefinite period of time.

116.   Defendant Bruno named himself Coordinator fully aware that Professor Lawson had a pending grievance and complaint against both him and Defendant Nelson for discrimination and breach of settlement agreement. Despite this pre-existing adversarial relationship, Defendant's Bruno appointed himself Coordinator and maintained tight control a University-initiated investigation against Professor Lawson instead of allowing the complaints to be handled by Coordinators from UH's EEO or Title IX office.

117.   On February 27, 2023, Defendant Bruno sent Lawson a "Notice of Investigation" announcing an effort to determine if his speech and behavior at the February 17, 2023 faculty meeting and his subsequent use of the WSRSL listserv to call for a boycott of the event had created a hostile work environment.

118.   On March 28, 2023, Defendant extended Professor Lawson's banishment from the WSRSL campus and restrictions on his use of the WSRSL listserv for another month, and informed Professor Lawson that he was now also being investigated for misogyny, because he supposedly had directed his comments only to women, not men. This allegation is factually inaccurate, discriminatory, and

retaliatory in nature.

119. Defendant Bruno made it clear in his Notices of Investigations to Professor Lawson that Defendants were investigating all of the complaints against him by using the "Administrative Complaint Procedure for Students, Employees.." to investigate the allegations made in the complaints. This means that the Defendants were not investigating the complaint through the disciplinary process under the CBA, Article XVIII B, et al. *See D'Andrea v Univ. Of Haw.* 686 F. Supp. 2d 1079; 2010 U.S. Dist. LEXIS 15031 (2010).

120. Defendant Bruno unilaterally banned Professor Lawson from the WSRSL campus indefinitely and restricted his use of the WSRSL listserv, pending the outcome of Defendant Bruno's investigation of Professor Lawson.

121. Both Notices of Investigation were on Office of the Provost letterhead—no one from UH's EEO or Title IX office was cc'd on this correspondence.

122. Professor Lawson was notified by Defendant Bruno that Dean Jonathan Osorio ("Dean Osorio") would be the "Decision Maker" for the investigation into Professor Lawson's speech and conduct.

123. At the time, Defendant Bruno, Defendant Nelson, and Dean Osorio had for at least the preceding two years been working together to acquire legislative approval and funding for Hoʻokaulike, a clinic that would be located on the WSRSL

29

campus where it would overlap in mission and compete for resources with clinics managed by Professor Lawson.

124. Accordingly, Defendant Bruno knew of the potential bias that Dean Osorio would reasonably be expected to have in favor of Defendant Nelson and against Professor Lawson.

125. Defendant Bruno appointed Dean Osorio as the Decision Maker despite Dean Osorio's conflicts of interests. This behavior indicates that the investigation was never intended to be fair or impartial; that instead it has always been a pretext for retaliation against Professor Lawson for having filed grievances against Defendants Bruno and Nelson prior to Professor Lawson's speech and actions at and following the February 17, 2023 faculty meeting.

126. Professor Lawson periodically asked for reasonable accommodations during the investigation, including: 1) working in his WSRSL office during evenings and weekends when none of the complainants were likely to be there, 2) accessing confidential files in his WSRSL office between the hours of 10 p.m. and 6 a.m. when the WSRSL would probably be deserted, and 3) being escorted on and off campus by the WSRSL Associate Dean or someone from campus security before and after his scheduled classes, so Professor Lawson could teach his students in person rather than remotely from his home. None of these requests for accommodations were granted.

30

127.   Professor Lawson, through his previous attorney, William Harrison, requested that Defendant UH replace the conflicted Defendant Bruno as the self-appointed Coordinator of the investigations into Professor Lawson, and to remove the conflicted Dean Osorio as the Decision Maker.

128.   Defendant Bruno refused to remove himself as the Coordinator and initially denied Professor Lawson's request to replace Dean Osorio as the Decision Maker. On September 29, 2023, however, shortly before a status conference, Defendant Bruno notified Professor Lawson that Defendant Bruno had just replaced Dean Osorio as Decision Maker with Clementina Ceria-Ulep ("Dean Ceria-Ulep"), Dean of the University of Hawai'i's School of Nursing.

### *Dean Ceria-Ulep's Decision and Preliminary Discovery Reveals Viewpoint Discrimination & Defendants Control Over Investigation*

129.   A few months prior to selecting her as Decision Maker, Defendant Bruno had selected Ceria-Ulep to be permanent Dean of the University of Hawai'i School of Nursing. A Decision Maker under UH AP. 1.202 has sanctioning and decision making authority. So does the AP 1.202 Appeal Hearing Officer.

130.   On December 1, 2023, Professor Lawson received the Decision.

131.   The Fact-Finder's report Dean Ceria-Ulep used in preparing the Decision reveals that the investigation of Professor Lawson had been entirely under the supervision of Defendant Bruno and people in his office. The Fact-Finder's report

31

was prepared by Investigators and Factfinders appointed by Defendant Bruno.

132.   Each time Professor Lawson raised the issue of discrimination in his grievances that Professor Lawson had submitted prior to speech and actions that supposedly prompted an investigation of Professor Lawson, Defendant Bruno's office had told Professor Lawson that the appropriate place for discrimination complaints is with UH's EEO. Yet, Defendant Bruno and members of his office kept control of the discrimination and Title IX complaints against Professor Lawson, rather than referring them to UH's EEO.

133.   UH employees Teresa Kono, Laura Lyons, and Linda Voong work in Defendant Bruno's office or are subject to his direction and have been personally involved for years in Professor Lawson's four years and counting ongoing efforts to be properly classified and to prove discrimination against him by Defendants Bruno, Nelson, and UH.

134.   Despite also being intimately involved in the denial of Lawson's SSA request, which was the subject of his February 11, 2023 grievance, Teresa Kono, Linda Voong, and Laura Lyons were intimately involved in the investigation into Professor Lawson.

135.   When Professor Lawson submitted his SSA request, Linda Voong provided analysis to Laura Lyons and Defendant Bruno that Lyons relied on in recommending that Lawson's SSA request be denied even though they all knew their

32

denial was a blatant breach of their settlement agreement with Plaintiff.

136.   Linda Voong offered Dean Ceria-Ulep the option a "ghostwriter" write the Decision and assisted Dean Ceria-Ulep in drafting the Decision. When Professor Lawson later requested discovery to appeal the Decision, Teresa Kono provided only part of the correspondence between Voong and Dean Ceria-Ulep. They have reused to give the complete email conversation about who actually ghostwrote the Decision.

137.   The Decision confirmed that Defendants lied when they claimed that Plaintiff made threatening and intimdating gestures and slammed his hands on the desk:

> In light of the evidence gathered, there is no evidence that supports the allegation that Lawson used intimidating gestures, pointed or waved his hands at Nelson or slammed his hands on the desk and it is unlikely that he did so.

138.   The Decision confirmed, like Plaintiff said in his email, he did not call anyone names.

139.   The Decision confirms that allegations in the March 28, 2023 Notices of Investigation were baseless and Defendant Nelson and Doe Defendants were aware of this when they filed Title IX claims. Yet, the Decision Maker's sanctions include gender bias training, which is further evidence of retaliation.

**140.   Because there was no evidence that Professor Lawson had engaged in any violent or threatening conduct (i.e., he did not make any threatening or**

intimidating physical gestures), the Decision Maker was left with the content

and viewpoint of Lawson's speech to find violations of UH's policies.

141.   The Decision includes several findings that reveal a bias against

Professor Lawson and a lack of impartiality in Dean Ceria-Ulep's characterization

of the facts in order to sustain a finding that Lawson's speech violated UH's policies.

142.   For example, despite having the full text of Professor Lawson's emails

for review, Dean Ceria-Ulep selectively quotes Professor Lawson, saying that he

"repeatedly" told another faculty member to "come at me" in order to sustain a

finding that Lawson's speech contained "veiled threats" of violence. The full text of

Professor Lawson's email reads as follows:

> Let's be clear. I did not call anyone names. I did say that some of your
> statements and actions have been defined as Nice Racism. Since you all like
> scholarship so much I even quoted the name of the scholar that coined the
> phrase. I did not call anyone names. **Come at me all you want, but don't
> lie**.

143.   Another faculty member responded saying, "Kapu Aloha please.

You've been to the Mauna and know all of what that entails and why." Professor

Lawson replied to this faculty member saying:

> I know what it means when I lend support to the struggle of my Native
> Hawaiian brothers and sisters. But when it comes to the struggle for Black
> Civil Rights I learned to speak truth to power. **As I said, come at me all you
> want but don't lie on me and expect me to be silent**."

144.   Pulling out three words—"come at me"—while ignoring the full

context of Professor Lawson's statements shows partiality and a lack of good faith in the analysis of the facts. When these statements are taken in their entirety, rather than selectively quoted, there is no "veiled threat" of violence.

145. The Decision does the same thing with regard to Professor Lawson's comments about his experience in the Black Civil Rights Movement, thereby stripping his comments of all meaningful context.

146. Professor Lawson's speech at the February 17, 2023. faculty meeting took place in a large meeting room with 28 people physically present and another 5 listening via a speaker phone

147. As described in the Decision: "on a scale of 1 (whispering) to 10 (yelling), nineteen (19) of the witnesses rated the volume of Lawson's voice as 7 while nine (9) rated it as 8." No numerical rating was provided for the five witnesses who attended the meeting via Zoom.

148. Despite most of the witnesses indicating that Professor Lawson did not yell, the Decision says that Professor Lawson was yelling and shouting.

149. The Decision claims that Professor Lawson was cursing and she uses this as factor in her Decision that Lawson created a hostile work environment. Yet, the in over 30 interviews, only two people said Lawson cursed. Nelson said Lawson may have used the word "shit." Another witness was not sure but said that Lawson may have used the word "shit" but then acknowledged that she had heard Lawson

had use curse words in presentations before.

150.   Lawson admitted that he may have used the word "shit". None of the witnesses said Lawson cursed "at" anyone. None of the other 30 witnesses even mentioned that Lawson cursed while speaking.

151.   Lawson uses the words shit or bullshit during class, during presentations, during faculty meetings, and during regular conversation--neither Defendants nor anyone in UH's administration had ever raised any concern that Lawson's use of the words shit or bullshit in any of these contexts was a violation of UH's policies or could create a hostile work environment.

152.   The Decision indicates that Professor Lawson's use of terms like "nice racism" and "white fragility" constitutes workplace violence because "these are emotionally charged terms and were perceived as disparaging by some."

153.   The Decision Maker's finding that Professor Lawson's use of the terms "white fragility" and "nice racism" violated the University's EP 9.210 workplace violence policy, makes little sense for several reasons, including that the DEI Committee has hosted training events where such terms were actually embraced.

154.   In 2022 during one DEI sponsored training, the presenter said if someone finds the term "settler" offensive, that is a manifestation of "white fragility." The Decision Maker was aware of the prior accepted use of such "emotionally charged" terms because this training event was described in detail in

36

the fact-finding report.

155.   Other faculty members have freely used the WSRSL listserv to send emails containing controversial speech. One such email included a statement characterizing Trump supporters as racists, KKK members, purveyors of hate, and misogynists. This email called for faculty members to speak out against the Trump administration, including through protests. The faculty member who used the WSRSL listserv in this way was not admonished nor was her access to the listserv limited as a result of that email.

156.   Although some faculty members were Trump supporters, the controversial request for a faculty-supported anti-Trump protest was raised and discussed at a faculty meeting, with most of the faculty voting for the WSRSL to support the protest against Trump and his supporters. No one was disciplined or even just investigated for this, nor were there any claims that this created a hostile work environment.

157.   The selective application of an unwritten listserv policy against Professor Lawson shows that Defendants object to his viewpoint, not his use of words like "white fragility and "racism."

158.   In several instances, Dean Ceria-Ulep's Decision confuses her interpretation of Professor Lawson's words with his actual words.

159.   Dean Ceria-Ulep's Decision states that Professor Lawson said

37

Defendant Nelson is "not Black enough" and that Professor Lawson continued this narrative in his boycott email. But none of Professor Lawson's emails say Defendant Nelson is "not Black enough," nor did he ever say those words. The fact finders never told Professor Lawson he had been accused of saying that, nor did they ask if he had said those words. The allegations are not contained in either Notices of Investigation. Plaintiff did not become aware of the "not Black enough" issue when he read the Decision.

160.   Ironically, even if he had said those words, or words to that effect, it simply would have parroted comments sometimes made about conservative Black Americans, such as Justice Clarence Thomas, and would qualify as protected speech under the First Amendment.

161.   In her scholarship, Defendant Nelson unambiguously and proudly identifies her heritage, culture, and community as Jamaican. None of this makes her less of a person nor does it mean that she has not experienced racism, but Professor Lawson believes it might help explain why she reacted differently than Professor Lawson to the WSRSL's DEI committee organizing a program on the Black U.S. Civil Rights Movement without any input from Black individuals who personally participated in the Black U.S. Civil Rights Movement.

162.   UH and the WSRSL regularly acknowledge the unique identities and experiences of Native Hawaiians and Americans of Japanese Ancestry.

38

163.   Because the Decision Maker disagreed with the content of Professor Lawson's speech and his viewpoint, she wrongly concluded that Professor Lawson said Defendant Nelson was "not Black enough" and engaged in "discriminatory harassment" by "questioning Nelson's Black experience." Professor Lawson questioned Defendant Nelson personal experience with the Black U.S. Civil Rights Movement, not her own "Black experience."

164.   The Decision relies on unreliable hearsay to support the allegation that Professor Lawson's speech upset students, and directly contradicts what the two students who were at the faculty meeting actually said about Professor Lawson's speech and their support of Professor Lawson's email expressing solidarity.

165.   One student who attended the February 17, 2023 faculty meeting had been moved to tears by Professor Lawson's speech. The student later indicated that Defendant Nelson had tried to "cap" the conversation. The student was "glad that the [February 18, 2023] email went out so there could be a discussion as opposed to keeping it secret from the students."

166.   The other student who was at the faculty meeting indicated that she was not uncomfortable during Professor Lawson's speech. She stated that she was not personally upset by the situation.

167.   Neither student said that Professor Lawson was in any way threatening violence nor were they concerned that his subsequent email contained threats of

violence.

168. Further, in September 2023, several months after the boycott, Richardson's BLSA chapter released a letter in which they expressly stated that it was the DEI Committee's actions that hurt them, not Professor Lawson's speech:

> Simply put, the handful of Black law students were unequivocally excluded from the one and only Black History Month Event, coordinated by the Diversity, Equity, and Inclusion Committee, which further highlights the diminished value of Black people we perceive at Richardson…A sincere apology and an administration-initiated plan to address the pain would have been the salve necessary to begin healing. Instead, we were met with resistance, as though our feelings were invalid… We are deeply hurt and saddened still by the lack of communication, acknowledgment, and continued invalidation of our experience.

169. The Decision Maker's Decision makes no mention of the First Amendment nor does it consider whether Professor Lawson's speech was protected by the First Amendment.

170. The Decision Maker recommended to the Investigation Coordinator, Bruno, that the following corrective actions be taken against Professor Lawson: "One-month suspension without pay; Mandatory one-on-one training with the Office of the Vice Provost for Academic Excellence on EP 9.210, the University's Workplace Non-Violence Policy; Mandatory training with the Office of Equity Assurance on both EP 1.202, Nondiscrimination, Equal Opportunity and Affirmative Action and EP 1.204, Sex and Gender Based Misconduct; and Mandatory anger management training to provide Lawson with tools and resources

to engage in conversations in a collegial manner."

171.   The Decision Maker's Decision called for corrective actions that were significantly harsher than other UH faculty members who were previously found to have violated EP 9.210 or EP 1.202.

172.   Another UH faculty member was given a 10-day suspension pursuant to EP 9.210 because he yelled at the complainant, physically advanced on her, used profanity when demanding that she leave his office, used his senior faculty position to intimate and bully a junior faculty member, and chronically engaged in abusive behavior towards not just her but various students as well.

173.   Despite finding that Professor Lawson did not violate EP 1.204, Dean Ceria-Ulep recommended Professor Lawson be sanctioned with mandatory training on EP 1.204.

174.   On or about December 6 and 7, 2023, Professor Lawson filed grievances in response to the Decision Maker's December 1, 2023 Decision.

175.   On December 7, 2023, Professor Lawson appealed the Decision Maker's Decision.

176.   On January 30, 2024, UH notified Professor Lawson that it determined there no merit to Professor Lawson's December 6 and 7, 2023, grievances.

177.   On February 2, 2024, in response to Professor Lawson's appeal, Defendant Bruno or someone in his office notified Professor Lawson that the

Decision Maker's Decision had been upheld by the Appeal Officer. According to AP.1.202 and the Appeal Hearing Officer made the Decision is final and binding within the University, but the rules did not stop the defendants from further retaliating against Plaintiff.

### *Defendants Take Additional Adverse Action Against Professor Lawson*

178.   Although the Appeal Officer had correctly indicated that the sanctions provided in the Decision were final, six days later, on March 8, 2024, Defendant Bruno notified Professor Lawson that Bruno was in fact the final decisionmaker, and so additional sanctions were possible.

179.   Defendant Bruno indicated that he was adopting the corrective actions against Professor Lawson described in the Decision Maker's Decision, but unilaterally determined that additional sanctions were warranted, including a no-contact order and continued banishment from the WSRSL campus. Neither of these had even been mentioned, much less decided upon, by the Decision Maker or Appeal Officer.

180.   Defendant Bruno gave Professor Lawson the option of (1) being suspended for the last month of the semester, during which another professor would cover his classes, or (2) serving his suspension during the summer, but submitting himself immediately to re-education and continued banishment until re-education was complete, which could take several additional months.

42

181.   Defendant Bruno's March 8, 2024 letter is further retaliation against Professor Lawson as he threatens Lawson more harsh consequences including termination of employment if he exercises his first amendment rights and protests against anti-Black racism again.

182.   Professor Lawson is now afraid to speak pubically about anti-Black racism, he is afraid to teach about 4th Amendment violations and his experience in civil rights in those areas as he has done in criminal law and criminal procedure classes every year and almost every semester.

183.   Plaintiff would like to freely associate with his students, but he remains banned now and going forward, from exercising his First Amendment right to associate with BLSA and other groups at the Law School.

184.   Based on information and belief, UH has not conducted any investigation into any of Professor Lawson's complaints of discrimination and retaliation or any complaints he made on behalf his female colleague who works with him in the Hawai'i Innocence Project clinic.

### *Preliminary Discovery Reveals False Allegations in Interview Statements*

185.   The limited and redacted discovery Professor Lawson has obtained includes the Fact-Finding report and its addendum, upon which the Decision Maker relied, and emails. The Fact-Finding addendum includes the interview statements of 31 faculty and two students who attended the February 17, 2023 faculty meeting.

186.   Four faculty declined to be interviewed.

187.   Defendant Nelson, Defendant Mirkay, and six Doe Defendants were all interviewed in April or early May 2023. One Doe Defendant was interviewed in September 2023 but did not sign her interview statement.

188.   The submission dates on many of the remaining interview statements are redacted. But for those where the submission date is provided, the interview statements are submitted either on the same day as the interview or within a few weeks. Defendants' interview statements were the *only ones* submitted several months after the interview date and after Professor Lawson filed his well-publicized lawsuit.

189.   In their interview statements, and in further effort to retaliate against Professor Lawson,  Defendants go on for several pages about their personal gripes with Professor Lawson, particularly their disagreement with Professor Lawson's speech in the September 10, 2021 DPC meeting and his objections to the discriminatory conversion process they created.

190.   Defendants' interview statements are noteworthy for the extent to which they attempt to associate Professor Lawson with violence despite never pointing to a single instance in which Lawson became violent with anyone.

191.   For example, one Doe Defendant starts off her interview statement by complaining that Professor Lawson used to bring his German Shepard with him to

44

work at the clinic building, describing the dog as a "police dog" that might be "trained or predisposed to attack people." This person does not mention that the dog was a puppy at the time.

192. Defendants give more words to their personal grievances and fear-fantasies about Professor Lawson than to their accounting of the February 2023 faculty meeting and emails, which was what the interviews were supposed to be about.

193. These individuals were aware of Professor Lawson's lawsuit and his argument that one incident cannot create a hostile work environment.

194. Another act in furtherance of the conspiracy and retaliation was for these individuals to amend their interview statements after this lawsuit was filed to include additional false allegations about Professor Lawson's speech during the September 10, 2021 meeting and his objections to the discriminatory conversion process they created.

195. One Doe Defendant, who was interviewed on April 27, 2023, amended her statement on September 17, 2023, nearly a month after this lawsuit was filed, to include "some of the missing facts and context." This person was directly quoted in Richardson BLSA's September 2023 letter, which was circulated several weeks before she submitted her amended interview statement. Despite being aware that BLSA directly and unambiguously stated that the DEI Committee's actions were

45

harmful to Black students, this faculty member claims that Lawson's boycott email was what upset BLSA students. This Doe Defendant also goes on for several pages about Professor Lawson's speech during the September 10, 2021 DPC meeting.

196. The factfinders never asked Professor Lawson about or gave him an opportunity to respond to the allegations Defendants raised about his speech during the September 10, 2021 DPC meeting or the basis for his objections to the conversion process Doe Defendants created. His speech during this meeting and his objections to the conversion process were not the subject of either Notice of Investigation.

197. Defendants' characterization of Lawson's speech in the September 10, 2021 meeting and his objections to the discriminatory conversion process are false.

198. Professor Lawson brings this lawsuit to protect his constitutional rights and to prevent Defendants from continuing to retaliate against and discriminate against him.

## COUNT I
### Violation of Professor Lawson's First Amendment Rights: Content and Viewpoint Discrimination
**(Defendants Nelson, Bruno, Mirkay, and Doe Defendants in Their Individual Capacities)**
**(42 U.S.C. § 1983)**

199. Professor Lawson realleges and incorporates each allegation set forth in the preceding paragraphs by reference.

200. It is clearly established that viewpoint discrimination is "an egregious

46

form of content discrimination" that violates the First Amendment. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

201. It is clearly established that while a government may categorically prohibit all political speech as a valid administrative interest, it cannot do so in a manner that favors or disfavors a particular view. *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 787 (2022). "[E]ven in a nonpublic forum, state actors may not suppress speech because of its point of view." *Rodriguez v. Maricopa County Cmty. College Dist.*, 605 F.3d 703, 710 – 711 (2009).

202. UH has encouraged and permitted political speech about race and racism, including DEI sponsored trainings where terms like "white fragility" were used.

203. Several faculty members at WSRSL have used the listserv to speak against racism and express controversial political beliefs.

204. During the faculty meeting and in his subsequent emails, Professor Lawson spoke as a private citizen.

205. His comments addressed anti-Black racism at Richardson, which is inherently a matter of personal opinion and public concern.

206. Defendants Nelson, Mirkay, Bruno, and Doe Defendants initiated an investigation into Professor Lawson on the basis of his dissenting viewpoint on issues of public concern.

47

207. Defendants Nelson, Mirkay, Bruno, and Doe Defendants knew that Professor Lawson's speech was not a true threat, did not constitute unlawful harassment, and there was no evidence to support the claim that he discriminated against anyone on the basis of gender.

208. Several students, including the WSRSL's BLSA chapter, have clearly indicated that the DEI Committee's actions, reaction to their criticism of those actions, lack of communication, and failure to acknowledge any wrongdoing has adversely affected them and contributed to the marginalization of Richardson's small population of Black students.

209. Richardson has no interest in shutting down a community discussion and shielding the DEI Committee from criticism simply because the feelings of its individual members might be hurt as a result.

210. As a direct and proximate result of Defendants' viewpoint-discriminatory actions, Professor Lawson has suffered irreparable injury, including deprivation of his First Amendment right to free expression, which is an injury *per se*.

211. As a direct and proximate result of Defendants' actions, Professor Lawson has suffered emotional distress and injury to his reputation. UH has banned him from the campus for more than a year under the threat of termination while they pursued an "investigation" based on speech that Defendants know is protected by

the First Amendment. The additional sanctions UH seeks to impose require further suppression of Professor Lawson's protected speech under the threat of termination.

212.   Professor Lawson has consequently suffered damages, as set forth above.

## COUNT II
### First Amendment Retaliation
### (Defendants Nelson, Bruno, and Mirkay in Their Individual Capacities)
### (42 U.S.C. § 1983)

213.   Professor Lawson realleges and incorporates each allegation set forth in the preceding paragraphs by reference.

214.   It is clearly established that a government employer cannot prohibit or sanction protected speech simply because others find it objectionable and it "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983); *Dodge*, 56 F.4th at 782.

215.   As described above, Defendants Nelson, Mirkay, Bruno, and Doe Defendants initiated a disciplinary investigation into Professor Lawson for engaging in protected speech.

216.   Defendant Bruno refused to recuse himself as Coordinator; denied Lawson's requests for accommodation; banned Lawson from the WSRSL campus; issued no-contact orders; restricted Lawson's use of the listserv; and formally

49

sanctioned Lawson for engaging in protected speech.

217. Accordingly, Defendants took adverse employment action against Professor Lawson in retaliation for his protected speech.

218. Defendants' actions are sufficient to deter a person of ordinary fitness from continuing to engage in protected speech.

219. As a direct and proximate result of Defendants' actions as described above, Professor Lawson was and continues to be deprived of his constitutional rights, which is an irreparably harm *per se*.

220. Professor Lawson has consequently suffered damages, as set forth above.

<u>**COUNT III**</u>
<u>**First Amendment Retaliation**</u>
**(Defendants Nelson, Bruno, Mirkay, and Doe Defendants in Their Official Capacities)**
**(42 U.S.C. § 1983)**

221. Professor Lawson realleges and incorporates each allegation set forth in the preceding paragraphs by reference.

222. As described above, Defendants Nelson, Bruno, and Mirkay unconstitutionally sought or took adverse employment action against Professor Lawson in retaliation for his protected speech.

223. Defendants continue to take adverse actions against Professor Lawson by continuing his banishment from the WSRSL campus; unilaterally imposing no-

50

contact orders with indefinite duration and scope; and threatening to impose additional sanctions based on his protected speech.

224.   Absent preliminary and permanent injunctive relief enjoining Defendants from retaliating against Professor Lawson based on his protected speech, Defendants will continue violating Professor Lawson's First Amendment rights.

## COUNT IV
### Violation of Professor Lawson's First Amendment Rights: Prior Restraint
### (Defendants Lassner and Bruno in Their Official Capacities)
### (42 U.S.C. § 1983)

225.   Professor Lawson realleges and incorporates each allegation set forth in the preceding paragraphs by reference.

226.   Prior restraints are presumptively unconstitutional and may only be upheld when there are no less restrictive alternatives available.

227.   Viewpoint-based prior restraints are presumptively unconstitutional, even in limited or nonpublic forums.

228.   Provisions that allow state actors unbridled discretion to permit or prohibit expressive conduct based are facially invalid.

229.   Defendant Bruno unilaterally issued no-contact orders and restricted Professor Lawson's use of the listserv, renewing these restrictions every month since February 28, 2023.

230.   On March 8, 2024, Defendant Bruno unilaterally issued another no-

51

contact order.

231.   Defendants' no-contact orders and listserv ban are unconstitutional prior restraints because they prohibit Professor Lawson from engaging in protected speech without prior approval and subject Professor Lawson to content and viewpoint-based restrictions.

232.   Defendants' no-contact orders and listserv ban are not limited in duration or scope.

233.   Defendants' Administrative Procedures violate the First Amendment to the extent it grants Defendants unbridled discretion to suppress Professor Lawson's speech by issuing no-contact orders and banning him from the listserv.

234.   Defendants' no-contact orders and listserv ban restrict Professor Lawson from engaging in protected speech in the same manner that all other WSRSL faculty are permitted and have been permitted to do, even and especially on matters of public concern.

235.   As a direct and proximate result of Defendants' actions as described above, Professor Lawson was and continues to be deprived of his constitutional rights, which is an irreparably harm *per se*.

236.   Absent preliminary and permanent injunctive relief enjoining Defendants from retaliating against Professor Lawson based on his protected speech, Defendants will continue violating Professor Lawson's First Amendment rights.

## COUNT V
### Facial & As-Applied Challenge to Executive Policy 1.202
**(Defendants Lassner and Bruno in Their Official Capacities)**
**(42 U.S.C. § 1983)**

237.   Professor Lawson realleges and incorporates each allegation set forth in the preceding paragraphs by reference.

238.   A policy violates the First Amendment for overbreadth when "a substantial number of its applications are unconstitutional judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotations and citations omitted).

239.   A policy violates the First Amendment for vagueness when it denies fair notice of the standard of conduct to which the citizen is accountable and if it is an unrestricted delegation of power that invites "arbitrary, discriminatory, and overzealous enforcement." *Leonardson v. East Lansing*, 896 F.2d 190, 196 (6th Cir. 1990).

240.   Further, content and viewpoint-based limitations on speech render a policy facially unconstitutional even when the policy is aimed towards prohibited otherwise unprotected speech. *R.A.V. v. St. Paul*, 505 U.S. 377, 391-93 (1992).

241.   Under Executive Policy 1.202, the Defendants have the authority to prohibit and discipline pure speech including "Offensive remarks about a person's, race, color, age, disability, pregnancy, breastfeeding, national origin, religion or

53

other protected category." This policy is facially unconstitutional on three independent grounds: (1) overbreadth, (2) vagueness, and (3) content and view-point discrimination.

242.   Firstly, this policy is facially unconstitutional because it results in a substantial number of unconstitutional applications where students and professors may be disciplined for engaging in pure speech protected by the First Amendment when a complainant and UH find the speaker's viewpoint to be offensive—a substantial number of "offensive remarks," even about a protected characteristic, are protected by the First Amendment.

243.   Secondly, this policy is facially unconstitutional because it does not define the parameters of what constitutes an "offensive remark" and invites arbitrary, capricious, and view-point discriminatory application. The policy lists "racial slurs, racial epithets, or name-calling" and "intimidation and threats of harm" as separate categories of prohibited speech—thus, "offensive remarks" cannot be narrowly construed as a restriction on fighting words or true threats.

244.   Finally, this policy is facially unconstitutional because it constitutes a content and viewpoint limitation on protected speech—it necessarily requires UH to assess the content of the "offensive remark" as it relates to the complainant's protected characteristic to determine if the policy has been violated.

245.   The policy does not prohibit "offensive remarks" used against a person

54

based on a non-protected characteristic and it does prohibit "offensive remarks" based on the non-expressive quality of the remark.

246.   The policy is overbroad and vague as applied to Professor Lawson because it has been used to suppress his protected speech based on Defendants' disagreement with his viewpoint and does not provide fair notice as to what constitutes an "offensive remark."

247.   Professor Lawson's speech does not constitute unlawful harassment for the reasons described above.

248.   As a direct and proximate result of Executive Policy 1.202, Professor Lawson and other speakers in the community continue to be deprived of constitutional rights, which is an irreparably harm *per se*.

249.   Absent preliminary and permanent injunctive relief enjoining Defendants from retaliating against Professor Lawson based on his protected speech, Defendants will continue violating Professor Lawson's First Amendment rights.

### COUNT VI
### Facial and As-Applied Challenge to Executive Policy 9.210
### (Defendants Lassner and Bruno in Their Official Capacities)
### (42 U.S.C. § 1983)

250.   Professor Lawson realleges and incorporates each allegation set forth in the preceding paragraphs by reference.

251.   Executive Policy 9.210 disclaims any specific or unique definitions,

and it does not provide any time, manner, or place limitations.

252. Executive Policy 9.210 prohibits "any work related or workplace violence against its students, faculty, staff, visitors and contract employees which materially and substantially interferes with an individual's work, academic performance, and/or workplace safety and/or otherwise subjectively and objectively creates a hostile environment. Such prohibited violent acts may involve physical attack, property damage, as well as written or verbal statements or non-verbal gestures that, to a reasonable person, express or suggest the intent to cause physical or mental harm to another person including but not limited to: shouting or yelling in a threatening or hostile manner; threatening gestures or remarks; disruptive or hostile actions; abusive or belligerent language."

253. This provision of the policy is facially unconstitutional on three independent grounds: (1) overbreadth, (2) vagueness, and (3) content and view-point discrimination.

254. Firstly, it is unconstitutionally overbroad because it prohibits mere speech that does not rise to the level of a true threat. The use of and "and/or" in this provision expands the range of possible permutations to includes a substantial amount of protected speech, including speech that does not actually interfere with workplace safety.

255. The forms of "violence" prohibited under this policy includes written

56

or verbal statements. And it is not limited to unlawful expressions of intent to cause harm (i.e., true threats).

256.    This provision prohibits a professor or student from speaking about lawful self-defense. For example, this policy prohibits a professor or student from saying: "If a person broke into my home, I would retrieve my firearm and shoot to kill" or "I will use lethal force against anyone who threatens my life." These statements are clear expressions of an intent to cause physical harm to another person, they are threatening remarks, and they would interfere with the safety of anyone using unlawful violence against the speaker. But they are expression of the speaker's lawful right to use lawful violence in self-defense.

257.    This provision is also overbroad to the extent that it sweeps in otherwise protected speech that is expressed above a certain decibel, in a manner that the University deems "disruptive," or using language that the University finds "abusive or belligerent."

258.    Secondly, this policy is unconstitutionally vague because it does not provide fair notice of prohibited conduct and invites arbitrary and capricious enforcement. There are no definitions or limiting principles applied to terms like "threatening" "hostile" "disruptive" "abusive" and "belligerent." And there are no time, manner, and place restrictions narrowing the construction of these terms.

259.    This policy is unconstitutionally overbroad as applied to Professor

Lawson because it has been used to suppress his protected speech based on Defendants' disagreement with his viewpoint and manner of expression.

260.  It is also unconstitutionally vague as applied to Professor Lawson because it does not provide fair notice that the single use of a curse word could fall within the purview of a policy prohibiting workplace violence, especially when Defendants were well aware that Lawson regularly uses curse words in public settings and had never objected to it previously.

261.  As a direct and proximate result of Executive Policy 9.210, Professor Lawson and other speakers in the community continue to be deprived of constitutional rights, which is an irreparably harm *per se*.

262.  Absent preliminary and permanent injunctive relief enjoining Defendants from retaliating against Professor Lawson based on his protected speech, Defendants will continue violating Professor Lawson's First Amendment rights.

## COUNT VII
### Violation of the Fourteenth Amendment: Right to Due Process of Law
**(Defendants Lassner, Bruno, Nelson, Mirkay, and Does I-VII in Their Individual Capacities)**
**(42 U.S.C. § 1983)**

263.  Professor Lawson realleges and incorporates each allegation set forth in the preceding paragraphs by reference.

264.  It is clearly established that before a public university may seriously discipline or sanction a tenured professor it must comply with the terms of the Due

Process Clause of the Fourteenth Amendment. *Nat'l Collegiate Ath. Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988).

265.   Due process generally requires a notice of charges, an explanation of the evidence, an opportunity to present his/her evidence before an impartial tribunal, and a pre- or post-deprivation hearing.

266.   Administrative Procedure 1.202 proclaims that the University is committed to "ensuring due process in the investigation and resolution of complaints."

267.   Defendants did not give Professor Lawson prior notice or an opportunity before an impartial tribunal before issuing the no-contact orders or restricting his use of the listserv.

268.   Defendants also did not provide a hearing after the no-contact orders or listserv restrictions were in place to determine whether they should remain in effect.

269.   Defendants failed to provide Professor Lawson with the opportunity to a fair investigation process before an impartial tribunal due to Defendant Bruno's personal involvement with the investigation, decision-making, and his unilateral imposition of sanctions.

270.   Defendant Bruno has had a glaring conflict of interest from the beginning of the investigation, yet he refused to recuse himself as Coordinator.

271.   From the beginning of the investigation Defendant Bruno has had a

direct pecuniary and personal interest in an outcome that would harshly sanction Professor Lawson and limit his presence on the WSRSL campus.

272.    Defendant Bruno's participation in the investigation and role as the ultimate decisionmaker against Professor Lawson tainted the investigation and violates due process. *Stivers v. Pierce*, 71 F.3d 732, 748 (1995) ("Whether actual or apparent, bias on the part of a single member of a tribunal taints the proceedings and violates due process."); *Chen v. Albany Unified Sch. Dist.*, 56 F.4th 708, 725 (2022).

273.    Defendants have violated Professor Lawson's clearly established constitutional rights of which all reasonable college administrators and staff shown have known, rendering them liable to Professor Lawson under 42 U.S.C. § 1983.

274.    As a direct and proximate result of Defendants' actions as described above, Professor Lawson was and continues to be deprived of his constitutional rights, which is an irreparably harm *per se*.

275.    Absent preliminary and permanent injunctive relief enjoining Defendants from retaliating against Professor Lawson based on his protected speech, Defendants will continue violating Professor Lawson's First Amendment rights.

## COUNT VIII
### (Conspiracy To Violate Civil Rights: 42 U.S. C. §1985)
### (Against All Individual Defendants)

276.    Professor Lawson realleges and incorporates each allegation set forth in the preceding paragraphs of this Complaint by reference.

60

277.    Defendants Nelson, Bruno, Mirkay and Individual Defendants John and Jane Does, acting in concert, deprived Professor Lawson of his constitutional rights to freedom of speech and due process, and the acts mentioned in the allegations above are evidence of their conspiracy to deprive Professor Lawson of equal privileges and immunities under laws on violation of 42 U.S.C. § 1985 (3).

278.    Defendants knowingly and intentionally abused the UH complaint and investigation processes and policies to retaliate against Professor Lawson for accusing Defendants, both privately and publicly, of engaging in anti-Black racism and for calling for a public boycott of their racist event.

279.    Professor Lawson is not alleging that the individual Defendants were acting in concert with the University of Hawaii.

280.    Professor Lawson is not alleging intra-corporate conspiracy. Each of the individual Defendants, Bruno, Nelson, Mirkay, John, and Jane Doe Defendants, conspired to violate Lawson's civil rights in their personal and individual capacities based on their personal animus against Lawson.

281.    The intra-corporate immunity doctrine does not apply when co-conspirators have a personal stake independent of their relationship to their employer. *See* Order on Partial Motion to Dismiss, May 16, 2023, ECF No. 19, *McAlister v. Alaska,* (D. Alaska 2023) (No. 3:23-cv-0029-HRH); Order on Motion to Dismiss, October 18, 2019, ECF No. 79, *Naini v. King County Hosp. Dist. No. 2.*

(W.D. Wash. 2019) (No. C19-0886-JCC).

282.   Due to their involvement in Professor Lawson's claims of discrimination and anti-Black racism at WSRSL, both prior to and during the February 17, 2023 faculty meeting, Defendants' actions were motivated by their personal animus against Lawson.

283.   They met to discuss their "options" prior to filing false claims against Professor Lawson alleging violations of UH's policies.

284.   After this lawsuit was filed, Defendants amended their interview statements to bolster their defense and add additional allegations that Professor Lawson never had an opportunity to respond to. Out of 31 faculty and students interviewed, Defendants are the only ones who went back several months later to amend their interview statements.

285.   Defendants' statements are also noteworthy for the extent to which they invoke the "scary Black man" trope and attempt to associate Professor Lawson with extreme acts of violence yet never point to a single instance in which Lawson every became physically violent with anyone.

286.   Defendants' allegations about Professor Lawson's stance against discrimination during the September 2021 faculty meeting highlight their existing animus against him for opposing and exposing anti-Black racism at WSRSL.

287.   Lawson has consequently suffered damages, as set forth above.

## COUNT IX
### Neglect to Prevent Violation of Civil Rights
### (42 U.S.C. §1986)

288.   Professor Lawson realleges and incorporates each allegation set forth in the preceding paragraphs of this Complaint by reference.

289.   Under 42 U.S.C. §1986 a person who has actual or constructive Knowledge of but neglects to prevent acts prohibited by 42 U.S.C. §1983 is liable for damages resulting from the acts.

290.   Each individual Defendant, including Lassner, being sued in his/her personal and individual capacity was aware, actually or constructively, of the discriminatory and retaliatory actions of the other Defendants or their employees and had the ability to prevent the actions and failed to prevent the actions, in violation of 42 U.S.C. §1986.

291.   Lawson has consequently suffered injury and damages, as set forth above.

## COUNT X
### Discrimination Pursuant to Title VII of the Civil Rights Act of 1964
### (42 U.S.C. § 2000(e))

292.   Professor Lawson realleges and incorporates each allegation set forth in the preceding paragraphs of this Complaint by reference.

293.   Professor Lawson is a member of a protected class on the basis of color and race.

63

294.   Defendants' unlawful actions taken against Professor Lawson violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq, (2009). Defendants' conduct justifies an award, inter alia, of back pay, front pay, benefits, and compensatory, consequential, and liquidated damages against the Defendants.

295.   As a direct and proximate result of the above described unlawful employment practices, Professor Lawson has suffered extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself, harm to his employability and earning capacity, damage to his good reputation, disruption of his personal life, and loss of enjoyment of the ordinary pleasures of everyday life, and he will continue to suffer additional losses in the future.

296.   By reason of the foregoing, Professor Lawson has sustained special and general damages in an amount to be shown at trial.

## COUNT XI
### Retaliation Pursuant to Title VII of the Civil Rights Act of 1964
### (42 U.S.C. § 2000(e))

297.   Professor Lawson realleges and incorporates each allegation set forth in the preceding paragraphs of this Complaint by reference.

298.   Professor Lawson is a member of a protected class on the basis of color and race.

299.   Defendants' unlawful action taken against Professor Lawson for

opposing discrimination violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq, (2009). Defendants' conduct justifies an award, inter alia, of back pay, front pay, benefits, and compensatory, consequential, and liquidated damages against the Defendants.

300.   As a direct and proximate result of the above described unlawful employment practices, Professor Lawson has suffered extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself, harm to his employability and earning capacity, damage to his good reputation, disruption of his personal life, and loss of enjoyment of the ordinary pleasures of everyday life, and he will continue to suffer additional losses in the future.

301.   By reason of the foregoing, Professor Lawson has sustained special and general damages in an amount to be shown at trial.

## **PRAYER FOR RELIEF**

302.   WHEREFORE, Professor Lawson prays for Judgment in his favor and against Defendants, jointly and severally, as follows:

303.   For an emergency preliminary injunction enjoining and restraining the Defendants, their superiors, agents, servants, employees, successors in office, and all persons acting in concert with them from failing and refusing to restore Professor Lawson to the same position and location at WSRSL as of February 26, 2023, and from subjecting him to further punishment in the future for speaking on issues of

public concern.

304.   For an emergency preliminary injunction enjoining and restraining the Defendants, their superiors, agents, servants, employees, successors in office, and all persons acting in concert with them from enforcing the sanctions provided in the Decision Maker's December 1, 2023, Decision and Defendant Bruno's March 8, 2023 letter, on the basis of Professor Lawson's constitutionally protected speech.

305.   For a permanent  injunction enjoining and restraining the Defendants, their superiors, agents, servants, employees, successors in office, and all persons acting in concert with them from enforcing the sanctions provided in the Decision Maker's December 1, 2023, Decision and Defendant Bruno's March 8, 2023 letter, on the basis of Professor Lawson's constitutionally protected speech.

306.   Because the threat of future investigations and discipline has a chilling effect on Professor Lawson's, a declaration that Professor Lawson can continue to use his history in the US Black Civil Rights movement to teach and lecture on Fourth Amendment and civil rights violations and the threat of future investigations and discipline against him for his constitutionally protected speech violates his First Amendment rights to freedom of speech and academic freedom.

307.  Special damages in an amount to be determined at a trial or hearing hereof;

308.   General damages in an amount to be determined at a trial or hearing

hereof;

309.   Compensatory damages against all Defendants sued in their individual capacities in an amount to be determined at a trial or hearing hereof;

310.   Punitive damages against all Defendants in their individual capacities in an amount to be determined at a trial or hearing hereof;

311.   Reasonable attorneys' fees and costs;

312.   Pre-judgment interest and post-judgment interest; and

313.   Any and all other relief as may be deemed just and equitable by the Court.

## <u>DECLARATION UNDER PENALTY OF PERJURY</u>

I, Kenneth L. Lawson, a citizen of the United States and a resident of the State Of Hawai'i, declare under penalty of perjury under 28 U.S.C. §1746 and hereby verify that the above allegations in my Third Amended Complaint are true and correct to the best of my knowledge.

Executed this 15th Day of April, 2024 at Honolulu, Hawai'i.

Kenneth L. Lawson