UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| KENNETH L. LAWSON,<br><br>            Plaintiff,<br><br>     vs.<br><br>UNIVERSITY OF HAWAI`I, DAVID LASSNER, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES; MICHAEL BRUNO, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES; CAMILLE NELSON, IN HER OFFICIAL AND INDIVIDUAL CAPACITIES; NICHOLAS A. MIRKAY, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES; AND JANE/JOHN DOES 1-10, IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES;<br><br>            Defendants. | CIV. NO. 24-00172 LEK-RT |

**ORDER DENYING PLAINTIFF'S EX PARTE
MOTION FOR TEMPORARY RESTRAINING ORDER**

Before the Court pro se Plaintiff Kenneth L. Lawson's ("Lawson" or "Plaintiff") Ex Parte Motion for Temporary Restraining Order ("TRO Motion"), filed on April 19, 2024. [Dkt. no. 20.] On April 26, 2024, Defendants University of Hawai`i, Mānoa ("the University"), David Lassner, Michael Bruno, Camille Nelson, and Nicholas Mirkay (collectively "Defendants") filed their opposition to the TRO Motion ("Opposition"). [Dkt. no. 22.] This matter came on for hearing on May 3, 2024.

Lawson's TRO Motion is hereby denied for the reasons set forth below.

**BACKGROUND**

The incident originally giving rise the claims in this case occurred during a February 17, 2023 faculty meeting at the University's William S. Richardson School of Law ("WSRSL" or "the law school"). Lawson expressed his objections to the February 23, 2023 Black History Month event that was planned by the law school's Diversity, Equity, and Inclusion ("DEI") committee ("the Event"). Lawson was alleged to have been disruptive, intimidating, and threatening when speaking about the Event, but he denies those allegations. See generally Verified Complaint, filed 4/15/24 (dkt. no. 1).

The next day, he sent an email to Defendant Camille Nelson, the Dean of the law school ("Nelson"); Professor Susan Serrano ("Serrano");[1] Defendant Nicholas A. Mirkay, Assistant Dean of the law school ("Mirkay"); and other law school faculty and staff. The email continued to express the sentiments Lawson expressed at the meeting. [Motion for Preliminary Injunction and Request for Expedited Hearing ("Preliminary Injunction Motion"),

---

[1] Professor Susan Serrano was involved in the organization of the Event. [Opposition, Declaration of Susan Serrano ("Serrano Decl.") at ¶ 7.]

filed 4/15/24 (dkt. no. 14), Declaration of Kenneth L. Lawson ("Lawson Decl."), Exh. 11.]

On February 21, 2023, Lawson sent an email to law students, law school faculty, and law school staff, using the law school's listserv. The email stated Lawson and the members of the law school's chapter of the National Black Law Students Association ("BLSA") were calling for a boycott of the Event. [Id., Exh. 14 (boycott email sent by Lawson and replies that he received) at PageID.249-54.]

On February 27, 2023, Defendant Michael Bruno, Provost of the University of Hawai`i at Mānoa ("Bruno"), sent Lawson a letter notifying him of allegations that were raised to the University regarding Lawson's conduct at the meeting and his statements in the related emails in the days after the meeting ("Bruno's 2/27/23 Letter"). [Opposition, Decl. of Michael S. Bruno ("Bruno Decl."), Exh. 1.] Bruno's 2/27/23 Letter informed Lawson of the following actions taken while a fact-finding investigation was conducted:

-Lawson was assigned to work from home for thirty days, during which time, the course he was teaching would be held online;

-he was prohibited from coming on to the law school grounds, but he was permitted to access the University's public facilities;

-he was prohibited from sending emails using the law school's listservs, unless he obtained prior approval; and

3

-he was prohibited contacting Nelson, various law school
    faculty, including Serrano, and other persons associated
    with the law school.

These restrictions have been renewed every thirty days, with

some modifications. See, e.g., Bruno Decl., Exh. 2 (letter dated

11/1/23 to Lawson from Bruno, informing Lawson of a thirty-day

extension through 11/1/23, granting Lawson permission to use the

moot courtroom on certain days and times to meet with BLSA

members, and noting that arrangements had been made for Lawson

to utilize office space in another building on the University

campus); id., Exh. 4 (letter dated 12/2/23 to Lawson from Bruno,

noting that Bruno informed Lawson in a 11/1/23 letter of the

extension through 12/1/23).

        Bruno issued another letter, dated March 28, 2023,

notifying Lawson of additional allegations that would be part of

the investigation ("Bruno's 3/28/23 Letter"). [Opposition,

Declaration of Teresa Kono ("Kono Decl."), Exh. 20.[2]]

        Dr. Clementina Ceria-Ulep, Dean of the University's

nursing school ("Dean Ceria-Ulep"), was designated as the

Decision Maker. Dean Ceria-Ulep sent Lawson a letter, dated

12/1/23, informing Lawson of her decision ("Decision Maker's

12/1/23 Letter"). [Bruno Decl., Exh. 3.] Dean Ceria-Ulep found

---

        [2] Teresa Kono is the Director of Faculty Excellence, in the
University's Office of the Vice Provost for Academic Excellence.
Prior to February 24, 2024, she was the Interim Program Officer
for Academic Personnel. [Kono Decl. at ¶ 1.]

that most of the allegations against Lawson were substantiated, at least in part. Dean Ceria-Ulep recommended that Bruno impose the following against Lawson:

- One-month suspension without pay;

- Mandatory one-on-one training with the Office of the Vice Provost for Academic Excellence on EP 9.210, the University's Workplace Non-Violence Policy;

- Mandatory training with the Office of Equity Assurance on both EP 1.202, Nondiscrimination, Equal Opportunity and Affirmative Action and EP 1.204, Sex and Gender Based Misconduct; and

- Mandatory anger management training to provide Lawson with tools and resources to engage in conversations in a collegial manner.

[Id. at PageID.588.]

The extensions of the restrictions in Bruno's 2/27/23 Letter were extended while the review process continued. See, e.g., Bruno Decl., Exh. 4 (letter dated 12/2/23 to Lawson from Bruno, informing Lawson of the extension through 1/1/23, although this appears to be a typographic error that should refer to 1/1/24); id., Exh. 7 (letter dated 3/2/24 to Lawson from Bruno, informing Lawson of the extension through 4/2/24 because all of the processes under the applicable collective bargaining agreement ("CBA") had not been completed, and no final action had been taken).

Bruno rendered his final decision in a letter dated March 8, 2024 ("Bruno's 3/8/24 Letter"). [Id., Exh. 9.] Lawson had previously informed Bruno that he intentionally did not object to Dean Ceria-Ulep's recommendation. Bruno confirmed Dean Ceria-Ulep's decision and adopted the recommended actions. [Id. at PageID.599.] Bruno offered Lawson two options for the timing of the suspension:

> **Option 1**
> Have your suspension effective April 1, 2024 to April 30, 2024, complete the above training before and after the suspension (no work or trainings will be authorized during your dates of suspension), and return to the WSRSL campus upon the fulfillment of the required suspension and training. Associate Dean Mirkay will find an instructor to take over your courses while you are carrying out the suspension.
>
> **Option 2**
> Start the internal training now while a service provider is identified for your anger management training, continue to work from home (or your temporary alternate office), have your suspension begin on May 16, 2024 to June 15, 2024, and return to the WSRSL campus upon the fulfillment of the required suspension and training.

[Id. (emphases in original).] Bruno instructed Lawson to inform Bruno of his decision between the two options before the close of business on March 18, 2024. Bruno stated that, if Lawson did not do so, the University would proceed with Option 2. [Id.] Bruno also stated that the no-contact restriction would remain in place as to Serrano, even after Lawson was allowed to return to the law school campus. [Id. at PageID.599-600.] Bruno stated

6

the restriction would "be revisited as necessary." [Id. at

PageID.599.] Bruno's 3/8/24 Letter concluded with:

> . . . . Please be mindful that any future
> violations of University policy of similar nature
> may result in disciplinary action, up to and
> including discharge.
>
> In accordance with Article XVIII.B.2., this
> action is final and binding.

[Id. at PageID.600.]

Lawson responded in a letter to Bruno, dated March 18,

2024. Lawson expressed his disagreement with many portions of

Bruno's 3/8/24 Letter, and he criticized both Option 1 and

Option 2, without choosing either option. [Bruno Decl.,

Exh. 10.] Lawson stated he "ha[s] chosen to fight back

vigorously in this matter." [Id. at PageID.604.]

Lawson filed a formal step 2 grievance of Bruno's

3/8/24 Letter to University of Hawai`i President David Lassner

("Lasser" "Grievance of 3/8/24 Letter"). [Opposition, Exh. 25.[3]]

Lawson stated he was not challenging the disciplinary actions in

---

[3] Defendants did not submit a declaration authenticating
Exhibit 25. However, the Grievance of 3/8/24 Letter appears to
be the March 20, 2024 grievance referred to in the April 9, 2024
letter to Lawson from Jeffrey Long, Director, UH System Office
of Human Resources. See Opposition, Declaration of Jeffrey Long
("Long Decl."), Exh. 26 (4/9/24 letter and emails dated from
4/3/24 to 4/10/24 between Lawson and Long) at PageID.838; see
also id. at PageID.843-44 (4/4/24 email to Lawson from Long that
included Lawson's 3/20/24 email to Lasser transmitting his
grievance). Defendants are cautioned that the future submission
of exhibits without an authenticating declaration may result in
the striking of the exhibits.

the Decision Maker's 12/1/23 Letter because he acknowledged they are final. However, he argued they are final, not because of Bruno's 3/8/24 Letter, but because the appeal hearing officer rendered a decision dated February 2, 2024. Id. at PageID.831; see also Opposition, Exh. 21 (letter dated 2/2/24 to Lawson from Chad Walton, Ph.D. ("2/2/23 Appeal Denial Letter")). Lawson stated his grievance was limited to the additional disciplinary actions imposed in Bruno's 3/8/24 Letter. See Opposition, Exh. 25 at PageID.838. However, Lawson subsequently withdrew this grievance because he believed the University was refusing to follow the CBA. See id. at PageID.839 (noting Lawson's 4/6/24 email to Lasser withdrawing the grievance).

On October 25, 2023, Lawson, through counsel, filed an action in state court against the University, Nelson, in her individual capacity, and Bruno, in his individual capacity. See Lawson v. Univ. of Hawai`i at Mānoa et al., 1CCV-23-0001391 (Hawai`i 1st Cir. Ct.) ("State Court No. 23-1391"). The First Amended Complaint in that case was filed on April 17, 2024, and it alleges: claims sounding in contract related to the alleged breach of a settlement agreement reached during Lawson's salary and misclassification grievance; Hawai`i Revised Statutes Section 378-2 discrimination and retaliation claims based on race, color, arrest, court record, and disability; and Hawai`i Revised Statutes Section 378-62 whistleblowers' claims based on

8

his complaints about what he believed was an illegal conversion of his faculty position. See Opposition, Exh. 34 (State Court No. 23-1391 First Amended Complaint). State Court No. 23-1391 appears to be unrelated to the events that gave rise to the instant case.

On March 14, 2024, Lawson, through counsel, filed an action in state court against the University, Nelson, in her individual capacity, and Bruno, in his individual capacity. See Lawson v. Univ. of Hawai`i at Mānoa et al., 1CCV-24-0000340 (Hawai`i 1st Cir. Ct.) ("State Court No. 24-340"). The First Amended Complaint in that case was filed on April 17, 2024, and it alleges: discrimination and retaliation claims pursuant to Sections 378-2 and 378-62 based on race, color, arrest, court record, and disability. See Opposition, Exh. 35 (State Court No. 24-340 First Amended Complaint). The State Court No. 24-340 First Amended Complaint contains extensive allegations regarding the events that gave rise to the claims in this case. See id. at ¶¶ 85-174.

Lawson filed his Verified Complaint on April 15, 2024. [Dkt. no. 1.] He alleges the following claims: a Title 42 United States Code Section 1983 claim alleging content and viewpoint discrimination, in violation of his First Amendment rights; Section 1983 claims alleging retaliation for the exercise of his First Amendment rights; a Section 1983 claim alleging prior

9

restraint, in violation of his First Amendment rights;
Section 1983 claims asserting facial and as-applied challenges
to University Executive Policy 1.202 and to University Executive
Policy 9.210; a Section 1983 claim alleging violation of his
Fourteenth Amendment due process rights; a Title 42 United
States Code Section 1985 claim alleging conspiracy to violate
civil rights; a Title 42 United States Code Section 1986 claim
alleging failure to prevent violation of civil rights; a
discrimination claim under Title VII of the Civil Rights Act of
1964 ("Title VII"), Title 42 United States Code Section 2000e *et
seq.*; and a Title VII retaliation claim.

        In the TRO Motion, Lawson requests a temporary
restraining order ("TRO") that would remain in effect until the
June 14, 2024 hearing on the Preliminary Injunction Motion.[4] [TRO
Motion at 1.] Lawson requests a TRO that would: require
Defendants to lift the ban on Lawson's entry on to the law
school campus, which would allow Lawson to resume in-person
teaching, student counseling, and directing law school
organizations; preclude Defendants from enforcing the sanctions
in the Decision Maker's 12/1/23 Letter; precluding them from

---

[4] The Preliminary Injunction Motion included a request for
an expedited hearing, but that request has been denied. [Minute
Order – EO: Court Order Setting Hearing on Plaintiff's Motion
for Preliminary Injunction and Denying Plaintiff's Request for
an Expedited Hearing, [filed 4/19/24 (dkt. no. 19).]

taking or threatening disciplinary action against him for speaking out on matters of public concern; require Defendants to cease using University policies to regulate speech and conduct, unless the speech and conduct rise to the level of harassment; [id. at 5-7;] and require Defendants to "[c]ease using Article XVIII, B.6. of the Unit 7 collective bargaining agreement to weaponize Administrative Procedure AP 1.202," [id. at 7]. The TRO Motion seeks the rescission of the disciplinary actions in both the Decision Maker's 12/1/23 Letter and Bruno's 3/8/24 Letter. [Id. at 6.]

Lawson argues Bruno's 3/8/24 Letter threatens "possible/probable termination if Plaintiff raises anti-Black racism again at WSRSL," and Lawson argues this threat

> has a chilling effect on Plaintiff's right to continue to use his history in the U.S. Black Civil Rights movement to teach and lecture on 4th Amendment and civil rights violations and the threat of future investigations and discipline against him for his constitutionally protected speech violates his First Amendment rights to freedom of speech and academic freedom.

[TRO Motion at 5.]

## STANDARD

Lawson must "carry a heavy burden" to obtain the extraordinary relief of a TRO. See DLMC, Inc. v. Flores, CV. NO. 18-00352 DKW-KSC, 2018 WL 6682986, at *2 (D. Hawai`i Dec. 19, 2018) (citing Winter v. Nat. Res. Def. Council, Inc.,

555 U.S. 7, 22 (2008)). "[T]he legal standards applicable to TROs and preliminary injunctions are 'substantially identical.'" Washington v. Trump, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (citation omitted).

> A party moving for preliminary injunctive relief must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) that the balance of harm tips in the movant's favor, and (4) that the injunction is in the public interest. See All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011). "The first factor — likelihood of success on the merits — is the most important factor." California by & through Becerra v. Azar, 950 F.3d 1067, 1083 (9th Cir. 2020) (en banc) (citation and quotation marks omitted). Additionally, when a party seeks a preliminary injunction against the government, as is the case here, the balance of the equities and public interest factors merge. See Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing Nken v. Holder, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009)).

Chamber of Com. of the U.S. v. Bonta, 62 F.4th 473, 481 (9th Cir. 2023).

> The Ninth Circuit also employs a "sliding scale" approach to preliminary injunctions, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011). The issuance of a preliminary injunction may be appropriate when there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Id. at 1135.

O'Hailpin v. Hawaiian Airlines, Inc., 583 F. Supp. 3d 1294, 1301 (D. Hawai`i 2022) (alteration in O'Hailpin).

## DISCUSSION

### I.   **Irreparable Harm**

"A plaintiff seeking preliminary relief must 'demonstrate that irreparable injury is likely in the absence of an injunction.'" California v. Azar, 911 F.3d 558, 581 (9th Cir. 2018) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22, 129 S. Ct. 365 (2008) (emphasis omitted)). "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053, 1068 (9th Cir. 2014) (citation omitted). "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting Elrod v. Burns, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)). The Ninth Circuit does "not require a strong showing of irreparable harm for constitutional injuries." Cuviello v. City of Vallejo, 944 F.3d 816, 833 (9th Cir. 2019).

Lawson argues "he is being deprived of his Constitutional right to free speech and unabridged assembly," and "[t]his daily, continuous, and unending deprivation of his

13

First Amendment rights has caused[ and] continues to cause, each day, irreparable harm." [TRO Motion at 2.] However, the mere fact that Lawson alleges violations of his First Amendment rights does not automatically constitute the establishment of irreparable harm. The Ninth Circuit has stated that:

> Irreparable harm is relatively easy to establish in a First Amendment case. "[A] party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury . . . by demonstrating the existence of a colorable First Amendment claim." Sammartano v. First Judicial District Court, 303 F.3d 959, 973 (9th Cir. 2002) (citation omitted), *abrogated on other grounds by* Winter v. Nat. Res. Def. Council., 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). . . .

> "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Id. (citing Elrod v. Burns, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)). But the mere assertion of First Amendment rights does not automatically require a finding of irreparable injury. **It is the "purposeful unconstitutional suppression of speech [that] constitutes irreparable harm for preliminary injunction purposes.**" Goldie's Bookstore v. Superior Ct., 739 F.2d 466, 472 (9th Cir. 1984). . . .

CTIA - The Wireless Ass'n v. City of Berkeley, 928 F.3d 832, 851 (9th Cir. 2019) (some alterations in CTIA) (emphasis added).

Here, Lawson's speech was not suppressed. He was not prevented from teaching his class; he was assigned to work-from-home status and allowed to teach his class online. Although Lawson was banned from the law school campus, he was later

provided with an office in a different part of the University campus. He was also approved to use the moot courtroom at the law school to help the BLSA members prepare for a moot court competition. Lawson was prohibited from using the law school's listserv to communicate with law school students, faculty, and staff, but he was not prohibited from communicating directly with specific students, faculty members, or staff members, except for the ones identified in the no-contact sections of Bruno's 2/27/23 Letter and Bruno's 3/8/24 Letter.[5] Thus, Lawson still had the opportunity to meet with students in person, contact them through email, and advise the law school organizations he was working with. Lawson was subjected to reasonable restrictions on his speech and assembly while fact-finding, decision-making, and review processes were ongoing. The restrictions will be lifted upon the completion of Lawson's suspension and the required trainings. See Bruno Decl., Exh. 9 at PageID.599. There is only one restriction that would remain in effect indefinitely, which is the no-contact order regarding Serrano. Id. at PageID.599-600. While Lawson objects, in principle, to the continuing no-contact order, he has not identified any harm suffered because he is prohibited from

---

[5] At the time of Bruno's 3/8/24 Letter, the no-contact order only remained in effect as to Serrano. [Bruno Decl., Exh. 9 at PageID.599-600.]

contacting Serrano. <u>See, e.g.</u>, Opposition, Exh. 25 (Grievance of 3/8/24 Letter) at 2 ("While the thought of no contact with Susan [Serrano] is not troubling for me, its unilateral and unexplained imposition follows a troubling pattern.").

This Court must reject Lawson's allegation that Bruno's 3/8/24 Letter "threatened Plaintiff with possible termination if he exercises his right to whistle-blow and expose anti-Black racism that Defendants, to this very day, continue to inflict on him." [TRO Motion at 2.] Bruno's 3/8/24 Letter stated:

> As Dean Ceria-Ulep noted in her decision, "the University promotes differences of opinion and the ability to raise concerns when there are perceptions of impropriety; however, it is also expected that faculty engage in such discussions with professionalism and collegiality." Please be mindful that any future violations of University policy of similar nature may result in disciplinary action, up to and including discharge.

[Bruno Decl., Exh. 9 at PageID.600.] The plain language of the letter is void of any threat of disciplinary action if Lawson speaks out against racism at the law school. Rather, Dean Ceria-Ulep stated the expectation for faculty members (presumably including Lawson) to engage in discussions in a professional and collegial manner, and that failure to do so may result in disciplinary action. Thus, the exercise and content of speech is not suppressed here because of the University's requirement that

16

speech must be engaged in with professionalism and collegiality. This requirement is reasonable for a non-public forum. See OSU Student All. v. Ray, 699 F.3d 1053, 1062 (9th Cir. 2012); Camenzind v. Cal. Exposition & State Fair, 84 F.4th 1102, 1109 (9th Cir. 2023) ("Nonpublic fora . . . are areas that do not, by tradition or designation, serve as a forum for public communication." (citation and internal quotation marks omitted)). Lawson therefore has failed to establish that he is suffering irreparable harm because of the actions and omissions at issue in this case.

## II.  **Likelihood of Success on the Merits**

"To establish a substantial likelihood of success on the merits, [a plaintiff] must show 'a fair chance of success.'" In re Focus Media, Inc., 387 F.3d 1077, 1086 (9th Cir. 2004) (quoting Republic of the Philippines v. Marcos, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc)). Lawson argues he is likely to succeed on the merits of his First Amendment retaliation claim, but he argues that, at a minimum, he has established serious questions regarding the merits of his claim. [TRO Motion, Mem. in Supp. at 6-7.]

The Ninth Circuit has stated that, in the public employment context,

[a] First Amendment retaliation claim turns on a sequential five-step series of questions:

17

(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009). The plaintiff bears the burden on the first three questions. See id. at 1070-71. If the plaintiff meets this burden, the burden shifts to the defendant on the last two questions. See id. at 1071-72. When a constitutional violation has been established, a plaintiff may recover damages that are proximately caused thereby. See County of Los Angeles v. Mendez, --- U.S. ----, 137 S. Ct. 1539, 1548-49, 198 L. Ed. 2d 52 (2017). The plaintiff must also establish that the defendant's retaliatory conduct was a but-for cause of the defendant's damages. See Mendez v. County of Los Angeles, 897 F.3d 1067, 1074 (9th Cir. 2018).

Greisen v. Hanken, 925 F.3d 1097, 1108 (9th Cir. 2019).

### A.   **Matter of Public Concern**

Whether speech is on a matter of public concern is a question of law, determined by the court, and reviewed by us de novo. See Berry v. Dep't of Soc. Servs., 447 F.3d 642, 648 (9th Cir. 2006). The speech need not be entirely about matters of public concern, but it must "substantially involve" such matters. Johnson v. Multnomah County, 48 F.3d 420, 425 (9th Cir. 1995). "[S]peech warrants protection when it 'seek[s] to bring to light actual or potential wrongdoing or breach of public trust.'" Barone v. City of Springfield, 902 F.3d 1091, 1098 (9th Cir. 2018) (second alteration in original)

18

(quoting <u>Connick v. Myers</u>, 461 U.S. 138, 148, 103
S. Ct. 1684, 75 L. Ed. 2d 708 (1983)). The
"misuse of public funds . . . [is a] matter[] of
inherent public concern." <u>Johnson</u>, 48 F.3d at
425.

"Whether an employee's speech addresses a
matter of public concern must be determined by
the content, form, and context of a given
statement, as revealed by the whole record."
<u>Connick</u>, 461 U.S. at 147–48, 103 S. Ct. 1684.
"[T]he content of the speech is generally the
most important." <u>Karl v. City of Mountlake
Terrace</u>, 678 F.3d 1062, 1069 (9th Cir. 2012). In
reviewing form and context, "we focus on the
point of the speech, looking to such factors as
the employee's motivation and the audience chosen
for the speech." <u>Ulrich v. City & County of San
Francisco</u>, 308 F.3d 968, 979 (9th Cir. 2002)
(citation and internal quotation marks omitted).
This analysis seeks to determine whether the
employee aimed "'to bring wrongdoing to light,'
not 'merely to further some purely private
interest.'" <u>Id.</u> (quoting <u>Havekost v. U.S. Dep't
of Navy</u>, 925 F.2d 316, 318 (9th Cir. 1991)).
"[S]peech that deals with 'individual personnel
disputes and grievances' and that would be of 'no
relevance to the public's evaluation of the
performance of governmental agencies' is
generally not of 'public concern.'" <u>Coszalter v.
City of Salem</u>, 320 F.3d 968, 973 (9th Cir. 2003)
(quoting <u>McKinley v. City of Eloy</u>, 705 F.2d 1110,
1114 (9th Cir. 1983)).

<u>Id.</u> at 1109 (alterations in <u>Greisen</u>).

At the February 17, 2023 faculty meeting, Lawson

criticized the Event and questioned why the DEI committee "had

not included any Black individuals as facilitators or panelists"

for the Event. [Lawson Decl. at ¶ 12.] Lawson stated the

exclusion "was an example of what academic scholar and author

Robin DiAngelo addressed at length in her book 'Nice Racism.'"

[Id. at ¶ 14.] The Event, which was to occur within a week after the faculty meeting, was publicized to the entire law school community. See id. at ¶ 3; see also id., Exh. 1 (flyer for the Event that was sent using the law school's listserv). This Court concludes that the general subject of Lawson's speech at the February 17, 2023 faculty meeting – whether the Event was appropriate - addressed a matter of public concern. However, during his speech about a matter of public concern, Lawson made some remarks that expressed individual disputes and grievances, such as his comparison of his Black experience with Nelson's.

**B.   Private Citizen**

In Garcetti v. Ceballos, 547 U.S. 410, 421, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006), the Supreme Court held that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." "[S]tatements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008) (alterations, citation and internal quotation marks omitted). We look to three non-exhaustive factors to make this assessment: (1) whether "the employee confined his communications to his chain of command"; (2) whether "the subject matter of the communication" fell within the plaintiff's regular job duties; and (3) whether the "employee sp[oke] in direct contravention to his supervisor's order[]." Dahlia v. Rodriguez, 735 F.3d 1060, 1074-75 (9th Cir. 2013) (en banc). The

> scope and content of a plaintiff's official
> duties are questions of fact, but a court must
> "independently . . . evaluate the ultimate
> constitutional significance of the facts as
> found." Posey, 546 F.3d at 1129.

Greisen, 925 F.3d at 1111 (alterations in Greisen). Although

Lawson attended the February 17, 2023 faculty meeting in the

course of his job duties, it does not appear that the

organization of the Event was within his job duties. This Court

therefore concludes that Lawson spoke as a private citizen.

      C.    **Adverse Employment Action and Causation**

      "In a First Amendment retaliation case, an adverse

employment action is an act that is reasonably likely to deter

employees from engaging in constitutionally protected speech."

Greisen, 925 F.3d 1097, 1113 (citation and quotation marks

omitted). In this case, it is clear that Bruno's 2/27/23 Letter

and Bruno's 3/8/24 Letter each imposed one or more adverse

employment actions on Lawson. However, he has failed to

establish that his protected speech as a substantial or

motivating factor in the adverse employment decisions. The

allegations against Lawson show that it was his conduct that was

at issue, not his protected speech.

          ●    You engaged in an abusive/hostile verbal
                attack on the Black History Month event and
                organizers because they did not invite you
                or outside Black community members to speak;

- You accused the organizers and other faculty members of engaging in "white fragility" and racism;

- You responded to those who spoke out with derision and vitriol and with your voice raised;

- You swore and yelled at, belittled and berated Camille Nelson, Dean, William S. Richardson School of Law (WSRSL) when she tried to calmly respond to you;

- You questioned Dean Nelson's "black experience" as someone not raised in the United States and referred to her as a nice racist;

- You referred to Carole Petersen, Professor, WSRSL as a "woke liberal", stated that her perspective on the Black History Month discussion was racist, pointed at her and with a raised voice said that this was "exactly what is wrong with the Law School";

- You repeatedly interrupted Dean Nelson when she tried to speak;

- You utilized intimidating gestures, pointed and waved your hands at Dean Nelson, and slammed the desk;

- Both in the meeting and in subsequent emails after the meeting, you utilized words perceived as veiled threats, such as informing meeting attendants, students and staff via a listserv that you were not non-violent, and repeatedly inviting another faculty member who submitted a proposal for ground rules for future faculty meetings to "come at me";

- Your threatening and belittling words and actions created an unsafe space for discussion and silenced the room;

- You continued to attack Dean Nelson in an email to a listserv distributed to all WSRSL students and faculty and to external parties as well; and

- Your actions in the meeting and subsequent email communications have created a hostile work environment for several of your colleagues.

[Bruno Decl., Exh. 1 (Bruno's 2/27/23 Letter) at PageID.568-69.]

- Your verbal attack in the February 17 meeting was perceived as "misogynistic" and targeted towards your female colleagues;

- While you were speaking, you were "staring down" only female colleagues;

- You attacked a female colleague when she tried to provide a different perspective;

- Your actions towards your female Dean in the meeting and in subsequent communications were unlike communications you had with the prior male Dean; and

- You quickly reacted and attacked your female colleagues when they requested the establishment of ground rules in faculty conversations, but when your male colleagues spoke out against your actions in the meeting, you did not respond.

[Kono Decl., Exh. 20 (Bruno's 3/28/23 Letter) at PageID.817.]

Dean Ceria-Ulep found that most of the allegations were substantiated, at least in part, but she found that the following were unsubstantiated: the allegation that Lawson "used intimidating gestures"; [Bruno Decl., Exh. 3 (Decision Maker's 12/1/23 Letter) at PageID.580;] the allegation that Lawson's "verbal attack . . . was perceived as 'misogynistic'"; [id. at

PageID.586;] and the allegation that Lawson's actions toward
Nelson at the meeting were unlike the way he acted toward the
former dean, who was a male; [id. at PageID.587]. Lawson
appealed Dean Ceria-Ulep's decision, and it was upheld. See
Opposition, Exh. 21 (2/2/24 Appeal Denial Letter). Lawson has
acknowledged that the 12/1/23 Decision Maker's Letter is final
and binding. See id., Exh. 25 (Grievance of 3/8/24 Letter) at
PageID.831. This Court therefore accepts the findings in the
12/1/23 Decision Maker's Letter. In light of those findings,
Lawson has failed to establish that his protected activity was a
substantial or motiving factor in the adverse employment
decisions. To the extent that Lawson is now attempting to
challenge any of the findings 12/1/23 Decision Maker's Letter
and the disciplinary actions that were imposed in response to
that decision, he cannot do so in federal court. It is an
employment dispute that should be, or should have been,
addressed through the applicable administrative and/or state-law
procedures.

   **D.**  **Ruling on the Merits**

   Lawson has failed to carry his burden of proof as to
the first three requirements of the First Amendment retaliation
claim analysis. Therefore, it is unnecessary for Defendants to
address the last two parts of the analysis. See Greisen, 925
F.3d at 1108. Lawson has not established a substantial

likelihood of success on the merits. Even if the "serious questions going to the merits" standard were applied, see All. for the Wild Rockies, 632 F.3d at 1135, Lawson has not met that standard.

## III. **Balancing of the Equities and Public Interest**

As previously noted, the balancing of the equities factor and the public interest factor merge because Lawson is suing a state university and its officials. See Bonta, 62 F.4th at 481. "Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." Preminger v. Principi, 422 F.3d 815, 826 (9th Cir. 2005) (citation omitted); see also Melendres, 695 F.3d at 1002 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quotation marks and citation omitted)). Because Lawson has not established that his First Amendment rights have been violated, and based upon the current record as a whole, the balancing of the equities factor and the public interest factor weigh against the issuance of a TRO.

Thus, Lawson has failed to establish any of the requirements for a TRO.

<u>**CONCLUSION**</u>

For the foregoing reasons, Lawson's Ex Parte Motion for Temporary Restraining Order, filed April 19, 2024, is HEREBY DENIED.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAI`I, May 3, 2024.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**KENNETH L. LAWSON VS. UNIVERSITY OF HAWAI`I, ET AL; CV 24-00172 LEK-RT; ORDER DENYING PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER**