Kenneth L. Lawson
3362 Loulu Street
Honolulu, Hawaiʻi, 96822
808-542-7978
*Plaintiff*, pro se

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | |
|---|---|
| KENNETH L. LAWSON, | CIV. NO. 24-00172 LEK-RT |
| *Plaintiff*, | FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES, DECLARATORY AND EMERGENCY TRO AND PRELIMINARY INJUNCTIVE RELIEF; DECLARATION UNDER PENALTY OF PERJURY; DEMAND FOR JURY TRIAL CERTIFICATE SERVICE |
| v. | |
| UNIVERSITY OF HAWAII, | |
| DAVID LASSNER; in his official and individual capacities; | |
| MICHAEL BRUNO; in his official and individual capacities; | 42 U.S.C. 1983 – FIRST AMENDMENT VIEWPOINT DISCRIMINATION |
| CAMILLE NELSON; in her official and individual capacities; and, | 42 U.S.C. 1983 – FIRST AMENDMENT RETALIATION 42 U.S.C. 1983 – FIRST AMENDMENT RETALIATION |
| NICHOLAS A. MIRKAY; in his official and individual capacities; | 42 U.S.C. 1983 – FIRST AMENDMENT PRIOR RESTRAINT 42 U.S.C. 1983 –FACIAL & AS APPLIED CHALLENGE |
| *Defendants*. | 42 U.S.C. 1983 –FACIAL & AS APPLIED CHALLENGE VIOLATION OF 14TH AMENDMENT DUE PROCESS 42 U.S.C. 1986 –NEGLECT TO PREVENT CIVIL RIGHTS: EMERGENCY INJUNCTIVE AND DECLARATORY RELIEF |

## FIRST AMENDED VERIFIED COMPLAINT

1.    COMES   NOW   Professor   Lawson   KENNETH   L.   LAWSON
(hereinafter referred to as "Plaintiff" and/or "Professor Lawson" and/or "Lawson").
On May 13, 2024, Defendants filed a Partial Motion to Dismiss (Dkt. 32). Pursuant
to Fed. R. Civ. P. 15(a)(1)(B), Plaintiff submits this First Amended Complaint as a
matter of right to amend the parties and claims raised in the Complaint (Dkt. 1). The
Complaint (Dkt. 1) and all pending motions related to it are hereby rendered a legal
nullity. *Falck N. Cal. Corp. v. Scott Griffith Collaborative Sols*., LLC, 25 F.4th 763,
765 (9th Cir. 2022); *Valadez-Lopez v. Chertoff*, 656 F.3d 851, 857 (9th Cir. 2011)
("[I]t is well established that an 'an amended complaint supersedes the original, the
latter being treated thereafter as non-existent.'"). Plaintiff alleges and claims against
Defendants above-named as follows:

## NATURE OF ACTION

2.    This is a civil action wherein Professor Lawson seeks injunctive and
other relief to restrain Defendants from retaliatory actions that violate his First and
Fourteenth Amendment rights by summarily forbidding his presence on the William
S. Richardson School of Law ("WSRSL" or "Richardson") campus at the University
of Hawaii at Mānoa ("UH") and summarily issuing no-contact orders and forbidding
him from using the WSRSL listservs to communicate with other members of the
WSRSL  community;  and  threatening  additional  sanctions,  thereby  effectively

chilling his right to free speech on matters of public concern, limiting his freedom of association, and denying him academic freedoms allowed to all other WSRSL professors.

3.        This case is related to *Lawson v. U.H. Bruno and Nelson et al.*, No. 1:23 cv-00348-LEK-RT. On December 27, 2023, Judge Kobayashi stayed the proceedings in No. 1:23 cv-00348-LEK-RT. On April 11, 2024, Judge Kobayashi lifted the stay, permitting Plaintiff to file an emergency motion for injunctive relief. The operative complaint at that time was filed on October 19, 2023 and did not include facts about subsequent developments that were relevant and necessary to include in Plaintiff's emergency motion for injunctive relief. Seeking leave to amend the complaint would have taken several weeks. Plaintiff voluntarily dismissed No. 1:23 cv-00348-LEK-RT on April 15, 2024. On the same day, five minutes later, Plaintiff immediately opened this case to file a new complaint and emergency motion for injunctive relief.

## **JURISDICTION AND VENUE**

4.        Professor Lawson brings this action pursuant, but not limited to, the First and Fourteenth Amendment to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. §§1343, 1983, 1985, 1986, and 1988; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

5.        Specifically, Professor Lawson seeks declaratory and emergency,

preliminary and permanent injunctive relief against the official-capacity Defendants and a ruling that Defendants both violated Professor Lawson's right to free speech and unconstitutionally retaliated against Professor Lawson for expressing unpopular views on matters of public concern. Professor Lawson also seeks compensatory and punitive damages against the individual-capacity Defendants.

6.    This Court has subject matter jurisdiction over federal claims under U.S.C. §§ 1331 and 1343.

7.    Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because all events and actions done by the below-named Defendants occurred within the District of Hawaii and Defendants are subject to personal jurisdiction in the District of Hawaii.

## PARTIES

8.    At all times relevant herein, Professor Lawson was and is a tenured faculty member at the WSRSL and was at all times relevant herein a citizen of the United States and resident of the City and County of Honolulu, State of Hawaii. Lawson's race is Black, and he is part of a protected class for purposes of 42 U.S.C. §1983 et. seq. civil rights laws.

9.    At all times relevant herein, Defendant UH was and is a state entity which at all relevant times employed all individual Defendants mentioned and referenced in this Complaint.

10.   Defendant, DAVID LASSNER, (hereinafter, "Defendant Lassner"),

was and is employed by UH, and was at all times domiciled in in the State of Hawaii and thus a citizen and resident of the State of Hawaii. Defendant Lassner is the President of UH. He is responsible for UH's administration and policy-making and has the authority approve the policies and procedures challenged herein that were applied to deprive Professor Lawson of his constitutional rights. Professor Lawson sues Lassner for injunctive relief in his official capacity. Defendant Lassner is sued in his individual and official capacity. Defendant Lassner will be included when referenced as "Defendant" or "Defendants", unless excluded and as the context implies.

11.    Defendant, MICHAEL BRUNO (hereinafter, "Defendant Bruno"), was and is employed by UH and was at all relevant times domiciled in the State of Hawaii and thus a citizen and resident of the State of Hawaii. Defendant Bruno is the Provost of UH. Defendant Bruno is delegated the powers, duties, and responsibilities assigned to him by President Lassner, including the responsibility for implementing and disseminating the policies and procedures challenged herein that were applied to deprive Professor Lawson of his constitutional rights. Professor Lawson sues Bruno in his individual and official capacity. Bruno will be included when referenced as "Defendant" or "Defendants", unless excluded and as the context implies.

12.    Defendant, CAMILLE NELSON (hereinafter "Defendant Nelson"),

was and is employed by UH and was at all relevant times domiciled in the State of Hawaii and thus a citizen and resident of the State of Hawaii. Defendant Nelson is the Dean at WSRSL. Professor Lawson sues Defendant Nelson in her individual and official capacity. Nelson will be included when referenced as "Defendant" or "Defendants", unless excluded and as the context implies.

13.     Defendant, NICHOLAS MIRKAY, hereinafter "Defendant Mirkay"), was and is employed by UH and was at all relevant times domiciled in the State of Hawaii and thus a citizen and resident of the State of Hawaii. Defendant Mirkay is an Associate Dean at WSRSL. Professor Lawson sues Defendant Mirkay in his individual and official capacity. Mirkay will be included when referenced as "Defendant" or "Defendants", unless excluded and as the context implies.

14.     All Defendants will be collectively referred to as "Defendants".

## STATEMENT OF FACTS

### *Background*

15.     Professor Lawson is a sixty-one-year-old Black male of African American descent.

16.     Professor Lawson is presently the only self-identified Black American-born male employee on the WSRSL faculty. He is also the only Black male employed at the WSRSL in any capacity. He serves as the Faculty Advisor to the Black Law Students Association ("BLSA") by the choice of its members.

17.    In 1989, Professor Lawson became a licensed attorney in Ohio where he went on to establish a successful criminal defense and civil rights law firm, and became a well-known civil rights advocate.

18.    Though once a respected attorney, Lawson's personal life and law practice unraveled when he succumbed to a drug addiction that led to his disbarment and imprisonment.

19.    In 2007, Professor Lawson went to a detox facility and has not used drugs or alcohol since.

20.    In 2010, Professor Lawson was released from prison and relocated to a halfway house in Honolulu, Hawai`i.

21.    Shortly thereafter, Professor Lawson was hired as an office manager for the Hawaii Innocence Project ("HIP") at the WSRSL.

22.    After volunteering for and successfully co-teaching Professor Randall Roth's Professional Responsibility course, Professor Lawson received glowing student evaluations and similarly positive input from judges and lawyers who had heard Professor Lawson speak. Professor Lawson was then invited to teach additional courses as an adjunct professor at the WSRSL.

23.    In 2012, WSRSL Dean Aviam Soifer asked Professor Lawson to teach the Professional Responsibility course on his own, to serve as the Associate Director of the HIP, to engage in legal scholarship, and to teach several additional law

courses. At that time, Professor Lawson was a casual hire and paid significantly less than members of the WSRSL J-faculty.

24.    During this time, Hawaii's newspapers, radio stations, and TV programs began to treat Professor Lawson as their go-to legal expert.

25.    In 2015, Professor Lawson was promoted to Interim Co-Director of HIP when that clinic's longtime Director retired.

26.    As Interim Co-Director of HIP, Professor Lawson was required to perform every job responsibility previously required of his J-faculty predecessor, including legal scholarship and her teaching assignments. These courses were in addition to what he was already teaching.

27.    At that time, he already had the heaviest teaching load at WSRSL, largest number of students, highest student rankings, and most student organizations asking him to be their faculty advisor. He was chosen by the graduating class two years in a row to give their commencement address. The following year, the faculty voted to limit the number of consecutive times a professor could be chosen.

28.    In 2016, at the culmination of a national search for the best possible candidate, the WSRSL selected Professor Lawson to serve as the HIP Co-Director and to teach related courses as a full-time, tenure-track member of the WSRSL faculty. For unexplained reasons, Professor Lawson was designated as S-faculty even though the hiring criteria used in conducting the national search and hiring

Professor Lawson had been identical to criteria applicable when J-Faculty members are hired, specifically, a promise of excellence in 1) classroom teaching, 2) legal scholarship, and 3) community service.

29.    Despite maintaining an exceptionally heavy teaching load and his new HIP duties, Professor Lawson continued to excel. Professor Lawson consistently taught significantly more credit hours and had much higher student enrollment than other professors at the WSRSL. Professor Lawson also engaged in an extraordinary amount of community service and legal scholarship.

30.    Professor Lawson's personal 'come-back' story contributed to him becoming highly sought-after for his ability to impart legal expertise and insight within the unique context of his life. The Dean at that time, Aviam Soifer, was quoted in a 2014 WSRSL publication as saying, "Ken Lawson is an invaluable asset to our Law School."

31.    Some faculty members who did not mind when the Dean allowed Professor Lawson to teach courses as an adjust professor, expressed concern when Lawson joined the full-time faculty. They did not view him as scholarly enough to join their ranks. Unlike them, he talks in a blunt and unprofessorial manner, regularly using works like "shit" and "hell." He showed little interest in the type of legal scholarship they valued, and because he was attracting so many students to his courses, certain niche or pet courses had to canceled due to lack of enrollment.

32.    Throughout his fourteen years at Richardson, Professor Lawson has remained steadfast in his commitment to calling out discrimination and speaking truth to power. When he learned that a dear friend and colleague, Associate Director of HIP, Faculty Specialist Jennifer Brown ("Jen"), had been wrongly misclassified and was being underpaid, he spoke out against her discriminatory treatment. Jen is an accomplished and exceptionally talented attorney, but Richardson was paying her like a secretary, and delaying the process of having her properly classified. In an email to Defendant Nelson and Defendant Mirkay, Professor Lawson called "bullshit" on their misconduct and discriminatory treatment. Jen and Professor Lawson pushed for nearly a year to rectify her salary and classification issues.

33.    Professor Lawson also spoke up against discriminatory treatment towards him when he challenged Richardson's faculty classification system that was being used to deny Professor Lawson equal pay for equal work.

34.    When he was initially hired as S-Faculty, Professor Lawson was assured that he would be paid equitably based on his hiring criteria, which was identical to J-Faculty hiring criteria, his assigned duties, and his job performance.

35.    Since being hired as S-Faculty, Professor Lawson has taught more law courses, had more student enrollment in his courses, and counseled more students than any other faculty. Professor Lawson regularly teaches thirty (30) to (40) forty credit hours annually while many non-Black colleagues teach six (6) to twelve (12).

36.     While serving as Co-Director of HIP, Professor Lawson, Jen, and his students secured the exoneration of Ian Schweitzer. Additionally, Professor Lawson co-developed Richardson's new Beyond Guilt Hawaii clinic.

37.     Defendant Nelson has told Professor Lawson that tuition funds cannot be used to support his clinics and that he must raise additional funds to cover Jen's salary. Professor Lawson and Jen raised $1.5 million in federal grants and an unprecedent sum of donations from individuals and foundations.

38.     Professor Lawson's two clinics are the only clinics that Richardson requires to secure additional funds to pay faculty salaries and operating costs despite HIP's overwhelming popularity.

39.     Despite carrying the heaviest teaching load, successfully running two popular clinics, and raising $1.5 million in outside funding, Professor Lawson had never received a merit or equity raise in his fourteen years at Richardson.

40.     Professor Lawson first became aware of the discriminatory and disparate salary payment when he saw a salary database of all state employees. He learned that he was being paid substantially less than every non-Black J-Faculty at Richardson and many non-Black S-Faculty.

41.     Professor Lawson, along with several other S-Faculty, consulted with UH and Richardson to rectify the salary and misclassification issues.

42.     In May 2020, Professor Lawson filed a formal grievance addressing the

pay inequity and misclassification issues. Lawson believed he was being underpaid and discriminated against based on his race, color, status as a recovering drug addict, and arrest record, especially considering his disparate workload.

43.    But before he filed the grievance, Lawson met with the other S-Faculty to let them know about his intention to file a grievance on the issue of misclassification. He told them that if they felt him filing a grievance on this issue would hurt the S-Faculty as a group, he wouldn't file it. Lawson comes from a family and upbringing where people work together and look out for one another. The S-Faculty agreed and gave Lawson permission to file the grievance. Lawson met with Beverly McCreary, UH Assistant Vice Chancellor for Academic Personnel and Provost's Designee. Lawson was told this issue was "not grievable."

44.    After Defendant Nelson was appointed as Dean at Richardson, Professor Lawson and other S-Faculty met with Nelson, McCreary, and Dan Barnett, Associate Dean of Academic Affairs, to discuss the options available for reclassification. Believing that Nelson was sincere when she stated that she intended to help resolve the misclassification and salary issues for S-Faculty, Lawson suspended pursuing his grievance.

45.    During this time, Defendant Nelson Complainants resurrected and modified the previously abrogated reclassification process that Dean Soifer previously told them was no longer an option after 2006 in order to allow one favored

S-faculty member to convert to J-faculty status.

46.     Shortly before the September 10, 2021 Department Personnel Committee ("DPC") meeting, Professor Lawson became aware of what Defendants were doing and that there was no written conversion process or criteria for conversion. Professor Lawson sent a letter to Defendant Nelson, Defendant Mirkay, and Kapua Sproat explaining his objection to the use of this process. (August 29, 2021 email).

47.     Professor Lawson informed Defendant Nelson, Defendant Mirkay, and Complainants that their conversion process violated state law, the CBA, and UH's policies. Lawson filed a grievance on October 21 in response to this practice.

48.     Professor Lawson did not object to the creation of a conversion process, but he was concerned about the lack of due process in the conversion process they created. Defendant Nelson, Defendant Mirkay, and Complainants understood that Lawson and other S-Faculty were seeking reclassification but did not tell them about their plan. Instead, Lawson found out about their backroom scheming when the conversion was placed on the agenda for an upcoming DPC meeting.

49.     During the September 10, 2021 DPC meeting Professor Lawson voiced his disagreement with how Defendants' handled the situation and the lack of fundamental fairness and due process.

50.     Before the following DPC meeting, Complainants and a Vice-

Chancellor of Academic Affairs, Noelani Goodyear, provided a written set of "guidelines" that commemorated their newly created conversion process.

51.    In October 2021, Lawson filed a grievance alleging this conversion process violated state law and the CBA. His grievance was rejected at the Step 1 and Step 2 levels, but in May 2022, Lawson entered into a Settlement Agreement with Defendants regarding this grievance.

52.    After 2022, Defendants rescinded their "guidelines" and discontinued this illegal conversion process.

53.    Defendant Lassner and Bruno knew that Professor Lawson contested the illegal conversion process because Lawson filed his grievance and appeals with both. Defendant Lassner, Bruno, and Nelson signed Lawson's Settlement Agreement.

54.    Defendants told Professor Lawson that he must file a Special Salary Adjustment ("SSA") pursuant to the procedures in the Collective Bargaining Agreement ("CBA") to receive an equity or merit increase. Lawson followed these procedures, the faculty reviewed Lawson's SSA request and presentation, and they voted that Lawson deserved both an equity and merit raise.

55.    Around January 2023, Defendants Bruno and Nelson denied Lawson's SSA request that had been voted on and approved by the Richardson faculty.

56.    Defendant Nelson did not expect faculty to approve Professor

Lawson's SSA request and later told Defendant Bruno that if the voting faculty knew of Lawson's Settlement Agreement, a majority would not have voted in favor of his SSA request.

57.    Defendant Nelson and Bruno's email exchanges about Lawson's SSA request show that they flagrantly disregarded an express term of the Settlement Agreement in vetoing Lawson's SSA. In negotiations, this term was highlighted as a dealbreaker for Lawson and it was included in the Settlement Agreement at his insistence.

58.    Because Defendant Nelson knew about the Settlement Agreement at the time she directed Professor Lawson to go forward with his SSA request, Lawson believed Nelson intended to veto his request regardless of how the faculty voted on it.

59.    On or about February 11, 2023, Professor Lawson filed a complaint against Defendants Nelson and Bruno with the HCRC (FEPA No. 22561) citing discrimination and retaliation regarding the vetoing of his SSA approval.

60.    Shortly thereafter, Defendant Bruno launched an investigation against Professor Lawson, supposedly based on claims by Nelson and unnamed others that Professor Lawson had created a hostile work environment while speaking at a faculty meeting on February 17, 2023.

***Professor Lawson Engages in Protected Speech About Black History Month
Event During Faculty Meeting***

15

61.     Sometime prior to February 17, 2023, WSRSL's Diversity, Equity, and Inclusion ("DEI") committee sent out a flyer announcing a Black History Month program on the U.S. Black Civil Rights Movement and Dr. Martin Luther King's Letter from the Birmingham Jail.

62.     The flyer included an image of a Black fist raised in a Black power salute—the salute of the Black Panther For Self-Defense.

63.     The DEI Committee did not include any Black law students, Black civil rights attorneys, Black activists, or any other Black person as an organizer, panelist, or facilitator.

64.     At a faculty meeting on February 17, 2023, Professor Lawson raised his hand during the open-forum time of the meeting and was recognized by Defendant Nelson, who gave Professor Lawson the floor to speak.

65.     Professor Lawson asked the DEI Committee why no Black people were asked to serve on the panel or to facilitate the event. Professor Lawson described it as an example of unconscious racial bias.

66.     Professor Lawson explained why this slight had been hurtful, particularly to WSRSL's Black students, even if done innocently. He called it an example of "Nice Racism," described academic research that he believed would help the DEI Committee members appreciate the hurt they had caused, and encouraged them to rethink the Black History Month event, as currently planned.

67.     Defendant Nelson repeatedly interrupted Professor Lawson, each time saying, "Ken, we made a mistake," as though there was no point in discussing how it happened, the hurt it had caused, or the need to make some kind of adjustment to the Black History Month program, which was only six days away (which was prior to the next scheduled faculty meeting). Eventually, Defendant Nelson added, "as a Black woman, I can understand [discrimination and racism]."

68.     Professor Lawson suggested to Defendant Nelson that because she had been born and raised in Jamaica and Canada, respectively, she and her family did not personally experience the U.S. Black Civil Rights Movement, Jim Crow segregation, or forced busing, which is the legacy that Black History Month is all about.

69.     Professor Lawson explained that Black people who have personally experienced the U.S. Black Civil Rights Movement have a unique perspective that should have been considered and consulted for this event, and he provided the names of several local Black figures who could provide this important perspective.

70.     To help colleagues understand his frustration, Professor Lawson described the physical beatings and discrimination his parents and other close family members endured as victims of racism at the height of the U.S. Black Civil Rights Movement. Professor Lawson then quoted Dr. King's letter and shared relevant personal stories he had been using for years when teaching Criminal Procedure

classes. Professor Lawson had also shared these and similar anecdotes during a WSRSL-sponsored Implicit Racial Bias Symposium that included scholars from other law schools, in the WSRSL Civil Rights course, and in many public talks he has given over the past several decades.

71.   Professor Lawson explained that some of his family members had belonged to the Black Panther Party and how he also followed the teachings of Malcolm X who believed in protesting peacefully but using self-defense if attacked. While Dr. King promoted non-violence in all situations, Malcolm X's philosophy was that Black people are entitled to use lawful self-defense in response to unlawful violence.

72.   Such thinking accords with the law and common sense—it is perfectly legal and intelligent to defend oneself against unlawful violence. A non-violent and reasonable person would not consider it threatening.

73.   Professor Lawson never engaged in violence while protesting; never said that he had done so; and never threatened anyone with violence.

74.   A White female faculty member interjected that she did not see any reason for a Black person to feel hurt, because even though there were no Black panelists or facilitators, Black people could attend the event and participate from the audience.

75.   Professor Lawson responded by describing her statement as another

example of "Nice Racism," an academic term for racism resulting from unconscious racial bias.

76.    No one at the faculty meeting ever said to Professor Lawson the equivalent of, "Ken, you need to calm down," "Ken, you are behaving badly," "Ken, you are frightening me," or "Ken, lower your voice." Nor did anyone say they could not continue to participate in the Faculty meeting because of anything Professor Lawson had said or the manner in which he said it.

77.    After Professor Lawson finished speaking, the meeting moved on to the faculty-hiring agenda item and lasted more than four hours. No one left the room while Professor Lawson was speaking or afterward because of Professor Lawson's remarks.

78.    No one accused Professor Lawson of name-calling or inappropriate behavior at any time during the meeting.

79.    No one tried to contact campus security during the meeting.

80.    During the February 17, 2023 faculty meeting, a WSRSL student and two faculty members who witnessed Professor Lawson's speech offered their condolences during the meeting to Professor Lawson for the pain and hurt others had caused him. Several additional faculty members reached out to Professor Lawson after that meeting, specifically to express their support of Professor Lawson's willingness to point out and stand up against discrimination.

81.    The day after the faculty meeting, on February 18, 2023, Lawson sent an email to Defendant Nelson and DEI Committee members reiterating his concerns about the Black History Month event.

### *Defendant Nelson Alleges Violations of University Policy to Initiate Investigation*

82.    After reading Professor Lawson's email on February 18, 2023, Defendant Nelson forwarded that email to Defendant Bruno and UH counsel, making racial discrimination claims against Professor Lawson and requesting that he be required to undergo anger management training. She did this instead of filing a complaint with UH's EEO.

83.    Defendant Nelson was aware that UH has both an EEO and Title IX office and complaints for violations of UH's policies should be directed to the designated Coordinator at the appropriate office.

84.    After reading and forwarding Professor Lawson's email on February 18, 2023, Defendant Nelson happened upon Professor Lawson at a nonwork-related public event, seated next to his wife. Defendant Nelson approached Professor Lawson and they exchanged greetings and chatted briefly. Defendant Nelson exhibited no fear of Professor Lawson.

85.    Defendant Nelson encouraged or solicited others to make complaints with the people employed in Defendant's Bruno's office or under his control rather

than making complaints to UH EEO office. Keeping the "investigation" within Bruno's control would help assure that Defendants would be able to successfully retaliate and punish Professor Lawson for engaging in free speech and publicly exposing their racism and hypocrisy.

86.    The small number of faculty that Nelson and Mirkay directed to file complaints with Bruno and employees in his office include: Susan Serrano, Kapua Sproat, Carole Peterson, Dina Shek, Miyoko Pettit, Trisha Nakamura, and Linda Krieger. These faculty will hereinafter be referred to as "complainant(s)".

### Defendant Mirkay Meets with Complainants and Alleges Violations of University Policy to Initiate Investigation as Part of the Conspiracy to Violate Professor Lawson's Civil Rights

87.    On Monday, February 20, 2023, Defendant Nick Mirkay met with Complainants and sent an email alleging violations of the University's Workplace Non-Violence policy and Title IX on behalf of Defendant Nelson and the DEI Committee.

88.    On Monday, February 20, 2023, Defendant Nick Mirkay met with complainants on the DEI Committee and sent an email alleging violations of the University's Workplace Non-Violence policy and Title IX on behalf of Defendant Nelson and the DEI Committee.

89.    The entire basis for this complaint is Defendant and complainant's disagreement with Professor Lawson's viewpoint. In his email, Defendant Mirkay

never said or even suggested that Professor Lawson had threatened violence or that
he used intimidating or threatening gestures.

90.    Defendant Mirkay acknowledges an existing adversarial relationship
when he filed complaint against Plaintiff, as he claimed to be submitting the
complaint under attorney-client privilege.

### *Professor Lawson Engages in Protected Speech Via Email*

91.    After receiving no response to his February 18, 2023, email, Professor
Lawson used the WSRSL listserv on February 21, 2023, to call for a boycott of the
Black History Month event that was still scheduled to proceed on Thursday,
February 23, 2023.

92.    No reasonable person would view Professor Lawson's emails on
February 18, 2023, and February 21, 2023, as veiled threats of violence.

93.    Professor Lawson had previously discussed the boycott with the
President and Vice President of the WSRSL chapter of BLSA, and they had
expressed total agreement.

94.    Several other students responded positively to Lawson's email,
expressing solidarity and support.

95.    Many students responded to Professor Lawson privately and a couple
students "replied all." Lawson only responded publicly to the two students who
"replied all." Lawson did not forward any emails sent to him privately.

96.    On February 22, 2023, a faculty member reached out to Professor Lawson to acknowledge his hurt and frustration. After hearing Professor Lawson express support for a solution that would allow the event to continue without his personal involvement, this faculty member reached out to the DEI Committee chair to see if about the DEI Committee would be open to a win-win compromise. This faculty member explained that he had spoken to Professor Lawson and was hopeful a positive path forward for the event was eminently possible. Unfortunately, the DEI Committee chair was unreceptive to this proposal.

97.    Later that day, DEI Committee members, Dina Shek and Susan Serrano, responded to Professor Lawson's email by using the WSRSL listserv to distribute a "gaslighting" memo portraying themselves as misunderstood victims. For the very first time, Susan Serrano claimed that she is a Black woman[1].

98.    To Professor Lawson's knowledge, Serrano never claimed to be Black

---

[1] In her book "Nice Racism" Robin DiAngelo discusses the use of "gaslighting" as a tactic liberals use to deflect when confronted with their own racism. After Professor Lawson sent the boycott email, Susan Serrano, for the very first time to Lawson's knowledge, claimed to be Black. When asked by Professor Lawson and another colleague years ago about her race and ancestry, Serrano said she is Japanese and Puerto Rican. Serrano had never before claimed that she is Black. For example, she co-authored a piece entitled *Dismantling Civil Rights: Multiracial Resistance and Reconstruction,* where the co-author's jointly state in a footnote that: **[t]o make this more concrete, racially, we co-authors are Americans of Japanese, Filipino, Asian Indian, Korean, Puerto Rican, Caucasian, Hawaiian and Chinese ancestry."** There is no mention of any of the authors, including Serrano, claiming to be Black or of African ancestry.

to her colleagues or the readers of her scholarship that centers on bias against people of color until Lawson pointed her own implicit bias.

99.    It is telling that during the February 17, 2023, faculty meeting, no one said anything like, "hey, Ken, what are you talking about when you say there are no Black facilitators? Susan Serrano is Black" or "Ken, you do realize there is one Black facilitator on the program and that's Susan Serrano."

100.    The DEI Committee's memo claimed, for the first time, that their Black History Month event had been intended as a "book club" event, as if that explained the absence of Black panelists or facilitators.

101.    After insisting there was absolutely nothing wrong with the design of the upcoming Black History Month event, the DEI Committee's memo announced that the event had been canceled.

102.    One faculty member believed the meeting was canceled to avoid acknowledging that Professor Lawson raised legitimate concern, and because "the organizers seemed to be defensively attacking the messenger." When this faculty member learned that another faculty member had described Professor Lawson's speech as "abusive and belligerent,"   he said it made him think they had attended different meetings.

103.    A student responded publicly, directly to the DEI Committee's email saying that the DEI Committee's "defensiveness and explaining away this issue by

saying that our intentions were righteous likely makes it worse." This student also stated, "I believe we are witnessing the unsettling nature of a true race discussion …." This student thanked Professor Lawson and shared part of her message to Professor Lawson:

> I was personally planning on attending because I (sometimes blindly)  seek to engage in constructive dialogue surrounding race and my responsibility in recognizing privilege and lack thereof. I cannot thank you enough for canceling the book club event that would have faltered me in my intention and I see your message as the necessary dialogue that I crave. I am humbled and grateful.

104.   Another student responded to Professor Lawson privately with similar concern that the DEI Committee's defensiveness and refusal to acknowledge any wrongdoing was unhelpful and "totally missed the point":

> I feel that the response sent out regarding your email totally missed the point. By not including you or other black members of our law school, the implication is that their understanding of your experience is greater than your own. It's essentially mansplaining but with race instead of gender. By predictably canceling the event rather than making changes to address your valid concerns, they've essentially punished you, the black students at our school, and anyone who actively supports you folks. It eerily resembles the imbalance of power that is so necessary to maintain white supremacy and the system of racism. I send this email because I know that many people will not understand your position because they have never experienced racism and/or discrimination...

105.   UH's workplace non-violence procedures indicate that incidents of workplace violence should be immediately reported to campus security. At no point from the time of the February 17, 2024 faculty meeting to the time of his banishment from the WSRSL campus did any of the Defendants alert campus security or request

a police presence to protect anyone from Professor Lawson.

106.   No students expressed fear of Professor Lawson, or even suggested that his boycott email contained any threats or veiled threats of violence.

### *Defendants and Complainants Falsely Allege Safety Concerns & Title IX Violations to Initiate Investigation and Get Professor Lawson Banned From Campus*

107.   UH's workplace non-violence procedures indicate that incidents of workplace violence should be immediately reported to campus security. At no point from the time of the February 17, 2024 faculty meeting to the time of his banishment from the WSRSL campus did any of Defendants or complainants alert campus security.

108.   On Thursday, February 23, 2023, two days after Professor Lawson's boycott email and seeing several students respond in solidarity with Professor Lawson and criticize the DEI Committee's handling of the event, complainants sent emails alleging safety concerns and violations of Title IX to give Defendant Bruno a basis to issue no-contact orders, ban Professor Lawson from the WSRSL campus, and prevent criticism of them via the listserv.

109.   The entire basis for their Title IX complaints was that Professor Lawson said they had exhibited "nice racism," and they were female. They cited no evidence that Professor Lawson's speech was directed at them because of their gender.

110.    In her Title IX complaint, Miyoko claimed she was concerned that Professor Lawson will violently and physically attack her.

111.    Defendant Nelson later told interviewers that she was concerned Lawson had a gun after he spoke in the February faculty meeting.

112.    Yet, all complainants appeared on campus and taught classes in person *after* Professor Lawson's speech during the February 17, 2023 faculty meeting without incident.

113.    Professor Lawson had responded to an email sent by three female colleagues, not because they were female, but because they had falsely accused him of "name-calling" at the February 17, 2023 faculty meeting.

114.    It wasn't until students had publicly expressed support for Professor Lawson that complainants filed a Title IX claim nearly a week after the faculty meeting and two days after the boycott email.

115.    Professor Lawson has been employed full-time at the WSRSL since 2010 and no one had ever accused him of discrimination, or threatening words or behavior prior to his speech at the February 17, 2023, faculty meeting.

### *Defendants Take Adverse Employment Action Against Professor Lawson & Defendant Bruno Appoints Himself Coordinator*

116.    UH's WSRSL does not have a "civility code" or faculty handbook.

117.    UH's workplace non-violence policy and its non-discrimination policies are not civility codes. These policies prohibit workplace violence and

unlawful discrimination but do not impose an affirmative civility requirement.

118.   UH's Administrative Procedure 1.202 ("AP 1.202") outlines the process for filing, investigating, and adjudicating complaints alleging violations of UH's policies; AP 1.202 states the procedure is meant to "ensure due process in the investigation and resolution of complaints."

119.   AP 1.202 provides for a Coordinator who, upon acceptance of the Complaint, selects Investigators to engage in Fact Finding and a Decision Maker and sends the accused individual a Notice of Investigation identifying the parties, accusations, and applicable policies and procedures.

120.   The Coordinator for a UH investigation is normally a trained professional from UH's EEO or Title IX Office. Federal law requires UH to publicize the names and contact information of their Coordinators.

121.   In February of 2023, Dee Uwono was UH's publicly designated EEO and Title IX Coordinator for employees. She was later superseded by Jennifer Rose.

122.   Defendant Bruno was not and is not a University-designated EEO or Title IX Coordinator, but for unexplained reasons he appointed himself as the Coordinator in Professor Lawson's case instead of referring the complaints to UH's EEO or Title IX offices.

123.   Defendant Bruno named himself Coordinator fully aware that

Professor Lawson had a pending grievance and complaint against both him and Defendant Nelson for discrimination and breach of his settlement agreement.

124. Acting as a self-appointed Coordinator, on February 27, 2023, Defendant Bruno sent Lawson a "Notice of Investigation" announcing an effort to determine if his speech and behavior at the February 17, 2023 faculty meeting and his subsequent use of the WSRSL listserv to call for a boycott of the event had created a hostile work environment.

125. Defendant Bruno unilaterally banned Professor Lawson from the WSRSL campus indefinitely, restricted his use of the WSRSL listserv, and issued no-contact orders against Professor Lawson, pending the outcome of Defendant Bruno's investigation of Professor Lawson.

126. Defendant Bruno made it clear in his Notices of Investigations to Professor Lawson that Defendants were investigating all of the complaints against him by using the "Administrative Complaint Procedure for Students, Employees.." to investigate the allegations made in the complaints.

127. Defendants were not investigating the complaint through the disciplinary process under the CBA, Article XVIII B, et al. *See D'Andrea v Univ. Of Haw*. 686 F. Supp. 2d 1079; 2010 U.S. Dist. LEXIS 15031 (2010). In *D'Andrea*, then Chief Judge Seabright, relying on Ninth Circuit case law, recognized that Plaintiff could bring a First Amendment claim and seek to enjoin UH by filing a pre-enforcement

action under the UH workplace non-violence policy when UH threatens to suspend and sanction a professor.

128.    The no-contact orders Defendants issued against Lawson did not and do not have any geographic or temporal boundaries and prohibited Lawson from having any form of contact with the named faculty members. Lawson was never given the option or opportunity to contest the no-contact orders.

129.    Defendant Bruno selected the Investigators and Decision Maker, and issued Notices of Investigation that banned Professor Lawson from the WSRSL campus for an indefinite period of time. Bruno also unilaterally issued no-contact orders.

130.    On March 28, 2023, Defendant extended Professor Lawson's banishment from the WSRSL campus and restrictions on his use of the WSRSL listserv for another month, and informed Professor Lawson that he was now also being investigated for misogyny, because he supposedly had directed his comments only to women, not men.

131.    Both Notices of Investigation were on Office of the Provost letterhead—no one from UH's EEO or Title IX office was cc'd on this correspondence.

132.    Professor Lawson was notified by Defendant Bruno that Dean

Jonathan Osorio ("Dean Osorio") would be the "Decision Maker" for the investigation into Professor Lawson's speech.

133.   At the time, Defendant Bruno, Defendant Nelson, and Dean Osorio had for at least the preceding two years been working together to acquire legislative approval and funding for Hoʻokaulike, a clinic that would be located on the WSRSL campus where it would overlap in mission and compete for resources with clinics managed by Professor Lawson.

134.   Accordingly, Defendant Bruno knew of the potential bias that Dean Osorio would reasonably be expected to have in favor of Defendant Nelson and against Professor Lawson.

135.   Defendant Bruno appointed Dean Osorio as the Decision Maker despite Dean Osorio's conflicts of interest. This behavior indicates that the investigation was never intended to be fair or impartial; that instead, it has always been a pretext for retaliation against Professor Lawson for having filed grievances against Defendants Bruno and Nelson prior to Professor Lawson's speech and actions at and following the February 17, 2023 faculty meeting.

136.   Professor Lawson periodically asked for reasonable accommodations during the investigation, including 1) working in his WSRSL office during evenings and weekends when none of the complainants were likely to be there, 2)  accessing confidential files in his WSRSL office between the hours of 10 p.m. and 6 a.m. when

the WSRSL would probably be deserted, and 3) being escorted on and off campus by the WSRSL Associate Dean or someone from campus security before and after his scheduled classes, so Professor Lawson could teach his students in person rather than remotely from his home. None of these requests for accommodations were granted.

137.    Professor Lawson requested that Defendant UH replace the conflicted Defendant Bruno as the self-appointed Coordinator of the investigations into Professor Lawson, and to remove the conflicted Dean Osorio as the Decision Maker.

138.    Defendant Bruno refused to remove himself as the Coordinator and initially denied Professor Lawson's request to replace Dean Osorio as the Decision Maker. On September 29, 2023, however, shortly before a status conference, Defendant Bruno notified Professor Lawson that Defendant Bruno had just replaced Dean Osorio as Decision Maker with Clementina Ceria-Ulep ("Dean Ceria-Ulep"), Dean of the University of Hawai'i's School of Nursing

### *Dean Ceria-Ulep's Decision and Preliminary Discovery Reveals Viewpoint Discrimination & Defendants Control Over Investigation*

139.    A few months prior to selecting her as Decision Maker, Defendant Bruno had selected Ceria-Ulep to be permanent Dean of the University of Hawai'i School of Nursing. A Decision Maker under UH AP.

1.202 has sanctioning and decision making authority. So does the AP 1.202 Appeal

Hearing Officer.

140.   On December 1, 2023, Professor Lawson received the Decision.

141.   The Fact-Finder's report Dean Ceria-Ulep used in preparing the

Decision reveals that the investigation of Professor Lawson had been entirely under

the supervision of Defendant Bruno and people in his office. The Fact-Finder's report

was prepared by Investigators and Factfinders appointed by Defendant Bruno.

142.   Each time Professor Lawson raised the issue of discrimination in his

grievances that Professor Lawson had submitted prior to speech and actions that

supposedly prompted an investigation of Professor Lawson, Defendant Bruno's

office had told Professor Lawson that the appropriate place for discrimination

complaints is with UH's EEO. Yet, Defendant Bruno and members of his office kept

control of the discrimination and Title IX complaints against Professor Lawson,

rather than referring them to UH's EEO.

143.   UH employees Teresa Kono, Laura Lyons, and Linda Voong work in

Defendant Bruno's office or are subject to his direction and have been personally

involved for years in Professor Lawson's ongoing efforts to be properly classified

and to prove discrimination against him by Defendants Bruno, Nelson, and UH.

144.   Despite also being intimately involved in the denial of Lawson's SSA

request, which was the subject of his February 11, 2023 grievance, Teresa Kono,

Linda Voong, and Laura Lyons were intimately involved in the investigation into Professor Lawson.

145.   When Professor Lawson submitted his SSA request, Linda Voong provided analysis to Laura Lyons and Defendant Bruno that Lyons relied on in recommending that Lawson's SSA request be denied.

146.   Linda Voong offered Dean Ceria-Ulep the option of a "ghostwriter" to write the Decision and assisted Dean Ceria-Ulep in drafting the Decision. When Professor Lawson later requested discovery to appeal the Decision, Teresa Kono provided only part of the correspondence between herself, Lyons, Voong and Dean Ceria-Ulep. They have refused to give the complete email conversation about who actually ghostwrote the Decision.

147.   The Decision confirms that allegations in the March 28, 2023 Notices of Investigation were baseless and Defendant Nelson and Complainants were aware of this when they filed Title IX claims.

148.   The Decision confirmed that the allegation that Professor Lawson had made any threatening or intimidating gestures was unsubstantiated:

> In light of the evidence gathered, there is **no evidence** that supports the allegation that Lawson used intimidating gestures, pointed or waved his hands at Nelson or slammed his hands on the desk and it is unlikely that he did so.

149.   The Decision confirmed that the allegation that Professor Lawson called one or more of his colleagues derogatory names was also unsubstantiated.

150.   Defendant Nelson admitted in her statement to investigators that Professor Lawson raised his hand during the announcement portions and spoke only after being called on. Nelson acknowledged she "interjected" and "jumped in" when Professor Lawson was speaking to the DEI Committee. Defendant Nelson also acknowledged that Professor Lawson was not screaming at her.

151.   Defendant Nelson did not state in her April 4, 2023, statement to the fact-finders or in her February 18, 2023, email to Defendant Bruno and others at U.H. that Lawson interrupted her when she tried to calmly respond to him.

152.   Despite Defendant Nelson herself and other witnesses confirming that Lawson did not interrupt Nelson, the Decision Maker concluded that Lawson interrupted Nelson when she tried to speak and yelled at her.

153.   The Decision includes several more findings that reveal a bias against Professor Lawson and a lack of impartiality in Dean Ceria-Ulep's characterization of the facts to sustain a finding that Lawson's speech violated UH's policies.

154.   Because the allegations that Lawson engaged in any physically threatening or violent conduct were wholly unsubstantiated, Dean Ceria-Ulep was left with the content of Lawson's speech. In order to find violations of UH's policies, Dean Ceria-Ulep blatantly mischaracterized and misquoted Lawson's speech.

155.   For example, despite having the full text of Professor Lawson's emails for review, Dean Ceria-Ulep selectively quotes Professor Lawson, saying that he

"repeatedly" told another faculty member to "come at me" in order to sustain a finding that Lawson's speech contained "veiled threats" of violence. The full text of Professor Lawson's email reads as follows:

> Let's be clear. I did not call anyone names. I did say that some of your statements and actions have been defined as Nice Racism. Since you all like scholarship so much I even quoted the name of the scholar that coined the phrase. I did not call anyone names. **Come at me all you want, but don't lie**. 156. Another faculty member responded saying, "Kapu Aloha please.

You've been to the Mauna and know all of what that entails and why." Professor Lawson replied to this faculty member saying:

> I know what it means when I lend support to the struggle of my Native Hawaiian brothers and sisters. But when it comes to the struggle for Black Civil Rights I learned to speak truth to power. **As I said, come at me all you want but don't lie on me and expect me to be silent**."

157.   Pulling out three words—"come at me"—while ignoring the full context of Professor Lawson's statements shows partiality and a lack of good faith in the analysis of the facts. When these statements are taken in their entirety, rather than selectively quoted, there is no "veiled threat" of violence.

158.   The Decision does the same thing with regard to Professor Lawson's comments about his experience in the Black Civil Rights Movement, thereby stripping his comments of all meaningful context.

159.   Professor Lawson's speech at the February 17, 2023. faculty meeting took place in a large meeting room with 28 people physically present and another 5 listening via a speaker phone.

160.   As described in the Decision: "on a scale of 1 (whispering) to 10 (yelling), nineteen (19) of the witnesses rated the volume of Lawson's voice as 7 while nine (9) rated it as 8." No numerical rating was provided for the five witnesses who attended the meeting via Zoom.

161.   Despite no witnesses indicating that Professor Lawson's voice was at 9 or 10 (yelling), the Decision says that Professor Lawson had yelled.

162.   The Decision claims that Professor Lawson was cursing and she uses this as a factor in her decision that Lawson created a hostile work environment. Yet, in over 30 interviews, only two people said Lawson cursed. Nelson said Lawson used the word "shit." Another witness was not sure but said that Lawson may have used the word "shit" but then acknowledged that she had heard Lawson had use curse words in presentations before .

163.   Lawson admitted that he may have used the word "shit" but never cursed at anyone. None of the witnesses said Lawson cursed "at" anyone. None of the other 30 witnesses even mentioned that Lawson cursed while speaking.

164.   Lawson uses the words "shit" or "bullshit" during class, during presentations, during faculty meetings, and during regular conversation—neither Defendants nor anyone in UH's administration had ever raised any concern that Lawson's use of curse words in any of these contexts was a violation of UH's policies or could create a hostile work environment.

165.  The Decision indicates that Professor Lawson's use of terms like "nice racism" and "white fragility" constitutes workplace violence because "these are emotionally charged terms and were perceived as disparaging by some."

166.  The Decision Maker's finding that Professor Lawson's use of the terms "white fragility" and "nice racism" violated the University's EP 9.210 workplace violence policy, makes little sense for several reasons, including that the DEI Committee has hosted training events where such terms were actually embraced.

167.  In 2022 during one DEI sponsored training, the presenter said if someone finds the term "settler" offensive, that is a manifestation of "white fragility." The Decision Maker was aware of the prior accepted use of such "emotionally charged" terms because this training event was described in detail in the fact-finding report.

168.  Other faculty members have freely used the WSRSL listserv to send emails containing controversial speech. One such email included a statement characterizing Trump supporters as racists, KKK members, purveyors of hate, and misogynists. This email called for faculty members to speak out against the Trump administration, including through protests. The faculty member who used the WSRSL listserv in this way was not admonished nor was her access to the listserv limited as a result of that email.

169.  Although some faculty members were Trump supporters, the

controversial request for a faculty-supported anti-Trump protest was raised and discussed at a faculty meeting, with most of the faculty voting for the WSRSL to support the protest against Trump and his supporters. No one was disciplined or even just investigated for this, nor were there any claims that this created a hostile work environment.

170. The selective application of an unwritten listserv policy against Professor Lawson shows that Defendants object to his viewpoint, not his use of words like "white fragility and "racism."

171. In several instances, Dean Ceria-Ulep's Decision conflates other faculty's interpretation of Professor Lawson's words with his actual words.

172. For example, Dean Ceria-Ulep's Decision states that Professor Lawson said Defendant Nelson is "not Black enough" and that Professor Lawson continued this narrative in his boycott email. But none of Professor Lawson's emails say Defendant Nelson is "not Black enough," nor did he ever say those words. The fact finders never told Professor Lawson he had been accused of saying that, nor did they ask if he had said those words.

173. Most important is that the allegation that Professor Lawson said Defendant Nelson is not "Black enough" is not contained in either Notice of Investigation, and again, the fact-finders NEVER asked Professor Lawson if he said those words during the February 17, 2023 faculty meeting.

174.   Plaintiff did not become aware of the allegation that Lawson told Defendant Nelson that she is "not Black enough" until he received the Decision on December 1, 2023.

175.   In her scholarship, Defendant Nelson unambiguously and proudly identifies her heritage, culture, and community as Jamaican. None of this makes her less of a person nor does it mean that she has not experienced racism, but Professor Lawson believes it might help explain why she reacted differently than Professor Lawson to the WSRSL's DEI committee organizing a program on the Black U.S. Civil Rights Movement without any input from Black individuals who personally participated in the Black U.S. Civil Rights Movement.

176.   Ironically, even if he had said that Nelson was not "Black enough" words, or words to that effect, it simply would have parroted comments sometimes made about conservative Black Americans, such as Justice Clarence Thomas, and would qualify as protected speech under the First Amendment. Moreover, in her statement to investigators, Nelson acknowledges that any comments Lawson made to her were made in response to her comments to him.

177.   UH and the WSRSL regularly acknowledge the unique identities and experiences of Native Hawaiians and Americans of Japanese Ancestry.

178.   Because the Decision Maker disagreed with the content of

Professor Lawson's speech and his viewpoint, she wrongly concluded that Professor

Lawson said Defendant Nelson was "not Black enough" and engaged in

"discriminatory harassment" by "questioning Nelson's Black experience."

179.   In Nelson's scholarship, she has written extensively about the unique

experience of Caribbean immigrants and differing perceptions of Blackness. In her

recent law review article, Defendant Nelson explains the ongoing controversy:

> In addition to racial hostility from majority White populations in their adopted homes, Caribbean immigrants and migrant workers who view themselves as Black may additionally be regarded as "other" by people of African descent in their adopted homes. *See Lewis*, supra note 1, at 574 (**noting that although most Jamaican women identify themselves as Black, they are still regarded as "other" by some Americans, including some African Americans. Conversely, the particularity of their experience may be subsumed under an externally imposed essentialized definition of "blackness**."); see also Leonard M. Baynes, **Who is Black Enough for You?** An Analysis of Northwestern University Law School's Struggle Over Minority Faculty Hiring, 2 MICH. J. RACE & L. 205, 207-13, 218-21 (1997) (**discussing the controversy surrounding the hiring of a Black female law professor who is of White Australian and Black Cuban descent**).

Carriers of Globalization: Loss of Home and Self within the African Diaspora, 55 FLA. L. REV. 539 (2003).

180.   UH and the WSRSL regularly acknowledge the unique identities and

experiences of Native Hawaiians and Americans of Japanese Ancestry.

181.   Several faculty at UH and the WSRSL have also written extensively

about the importance of calling out implicit bias and racism. Because they consider

themselves leading experts on this subject, they were completely unwilling to

acknowledge that they themselves might have engaged in implicit bias/racism. As

one student said in an email to Lawson:

> …I do not know if the organizers/staff/faculty of the event are ready willing and able to admit their own racist biases but it is obvious of what type of change (or lack there of) that occurs without it. I pray for more than a mere message of recognition from our colleagues.

182.  The Decision relies on unreliable hearsay to support the allegation that Professor Lawson's speech upset students, and directly contradicts what the two students who were at the faculty meeting actually said about Professor Lawson's speech and their support of Professor Lawson's email expressing solidarity.

183.  One student who attended the February 17, 2023 faculty meeting had been moved to tears by Professor Lawson's speech. The student later indicated that Defendant Nelson had tried to "cap" the conversation. The student was "glad that the [February 18, 2023] email went out so there could be a discussion as opposed to keeping it secret from the students."

184.  The other student who was at the faculty meeting indicated that she was not uncomfortable during Professor Lawson's speech. She stated that she was not personally upset by the situation.

185.  Neither student said that Professor Lawson was in any way threatening violence nor were they concerned that his subsequent email contained threats of violence.

186.  Further, in September 2023, Richardson's BLSA chapter released a letter in which they expressly stated that it was the DEI Committee's actions that

hurt them, not Professor Lawson's speech:

> Simply put, the handful of Black law students were unequivocally excluded from the one and only Black History Month Event, coordinated by the Diversity, Equity, and Inclusion Committee, which further highlights the diminished value of Black people we perceive at Richardson…A sincere apology and an administration-initiated plan to address the pain would have been the salve necessary to begin healing. Instead, we were met with resistance, as though our feelings were invalid… We are deeply hurt and saddened still by the lack of communication, acknowledgment, and continued invalidation of our experience.

187.   The Decision Maker's Decision makes no mention of the First Amendment nor does it consider whether Professor Lawson's speech was protected by the First Amendment.

188.   The Decision Maker recommended to Defendant Bruno that the following corrective actions be taken against Professor Lawson: "One-month suspension without pay; Mandatory one-on-one training with the Office of the Vice Provost for Academic Excellence on EP 9.210, the University's Workplace Non-Violence Policy; Mandatory training with the Office of Equity Assurance on both EP 1.202, Nondiscrimination, Equal Opportunity and Affirmative Action and EP 1.204, Sex and Gender Based Misconduct; and Mandatory anger management training to provide Lawson with tools and resources to engage in conversations in a collegial manner."

189.   The Decision Maker's Decision called for corrective actions that were significantly harsher than other UH faculty members who were previously found to

have violated EP 9.210 or EP 1.202.

190.   Another UH faculty member was given a 10-day suspension pursuant to EP 9.210 because he yelled at the complainant, physically advanced on her, used profanity when demanding that she leave his office, used his senior faculty position to intimate and bully a junior faculty member, and chronically engaged in abusive behavior towards not just her but various students as well.

191.   Despite finding that Professor Lawson did not violate EP 1.204, (Title IX) Dean Ceria-Ulep recommended Professor Lawson be sanctioned with mandatory Title IX training on EP 1.204.

192.   On or about December 6 and 7, 2023, Professor Lawson filed grievances in response to the Decision Maker's December 1, 2023 Decision.

193.   On December 7, 2023, Professor Lawson appealed the Decision Maker's Decision.

194.   On January 30, 2024, UH notified Professor Lawson that it determined there was no merit to Professor Lawson's December 6 and 7, 2023, grievances.

195.   On February 2, 2024, the Decision was upheld by the Appeal Officer. According to AP.1.202 and the Appeal Officer's ruling, the Decision then became final and binding on all parties, including UH. The Adverse actions were "ripe" to be challenged under the First Amendment in Court.

### *Exhaustion of Remedies Not Required*

196.   Because this is an action alleging violations of the First and
Fourteenth Amendments of the U.S. Constitution, exhaustion of remedies is not
required.

197.   Before Plaintiff could dismiss and refile his lawsuit to include the
presently alleged adverse employment actions, the Decision Maker's Decision had
to be final and binding…it had to be "ripe" for review.  *See, Williamson Cnty.
Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172,
86,(1982).

198.   After the Decision became final and binding within UH, Plaintiff need
not exhaust the CBA grievance procedures as it is clearly established that Plaintiffs
are not required to exhaust alternative remedies before bringing suit under §1983.
*Patsy v. Florida Board of Regents,* 457 U.S. 496, 512-16 (1982). This is a "flat rule
without exception," *Heath v Cleary*, 708 F.2d 1376, 1379 (9th Cir. 1983). And it
applies to contractual and administrative remedies. *Columbus De. Ass'n v.
Columbus City School District*, 623 F. 2d 1155, 1156-57 n.1 (6th Cir. 1980); *see
also Alexander v Gardner-Denver Co.,* 415 U.S. 36, 49-50 (1974). Such exhaustion
would be meaningless because the results of a grievance or arbitration cannot
preclude or determine Plaintiff's First Amendment right to speak as a private
citizen on a matter of public concern under § 1983. *McDonald v. City of West*

*Branch*, 466 U.S. 284, 104 (1984).

199.   Plaintiff is suing under 42 U.S.C. §1983, not under the CBA or under any state-law or labor management act where exhaustion is usually required. Such contractual remedies are often adequate to redress wrongs related to the contractual obligations of unions and members but do not redress violations of the Federal Constitution. *Patsy,* 457 U.S. at 512-16.

### Defendants Take Additional Adverse Action Against Professor Lawson

200.   Although the Appeal Officer had correctly indicated that the sanctions provided in the Decision were final,  on March 8, 2024, Defendant Bruno notified Professor Lawson that Bruno was in fact the final decisionmaker, and so additional sanctions were possible.

201.   Defendant Bruno indicated that he was adopting the corrective actions against Professor Lawson described in the Decision Maker's Decision, but unilaterally determined that additional sanctions were warranted, including a no-contact order preventing any form of contact with Susan Serrano and continued banishment from the WSRSL campus. Neither of these had even been mentioned, much less decided upon, by the Decision Maker or Appeal Officer.

202.   Defendant Bruno gave Professor Lawson the option of (1) being suspended for the last month of the semester, during which another professor would cover his classes, or (2) serving his suspension during the summer, but submitting

himself immediately to re-education and continued banishment until re-education was complete, which could take several additional months.

203.   Defendant Bruno's March 8, 2024 letter is further retaliation against Professor Lawson as he threatens Lawson more harsh consequences including termination of employment if he exercises his First Amendment rights and protests against anti-Black racism again.

204.   Based on information and belief, UH has not conducted any investigation into any of Professor Lawson's complaints of discrimination and retaliation or any complaints he made on behalf his female colleague who works with him in the Hawaii Innocence Project clinic.

***Preliminary Discovery Reveals False Allegations in Interview Statements***

205.   The limited and redacted discovery Professor Lawson has obtained includes the Fact-Finding report and its addendum, upon which the Decision Maker relied, and emails. The Fact-Finding addendum includes the interview statements of 31 faculty and two students who attended the February 17, 2023 faculty meeting.

206.   Four faculty declined to be interviewed.

207.   Defendant Nelson, Defendant Mirkay, Susan Serrano, Kapua Sproat, Dina Shek, and Miyoko Pettit were interviewed in April or early May 2023.

208.   Defendant and complainant's interview statements were the *only ones* that were amended/submitted several months after the interview date and after

Professor Lawson filed his well-publicized lawsuit.

209.   The submission dates on many of the remaining interview statements are redacted. But for those where the submission date is provided, the interview statements are submitted either on the same day as the interview or within a few weeks.

210.   In their interview statements, and in further effort to retaliate against Professor Lawson,  Defendants go on for several pages about their personal gripes with Professor Lawson, particularly their disagreement with Professor Lawson's speech in the September 10, 2021 DPC meeting and his objections to the discriminatory conversion process they created.

211.   Defendants and complainants' interview statements are noteworthy for the extent to which they attempt to associate Professor Lawson with violence despite never pointing to a single instance in which Lawson became violent with anyone.

212.   For example, Miyoko Pettit starts off her interview statement by complaining that Professor Lawson used to bring his German Shepard with him to work at the clinic building, describing the dog as a "police dog" that might be "trained or predisposed to attack people." Pettit does not mention that the dog was a puppy at the time.

213.   Defendants and complainants give more words to their personal grievances and fear-fantasies about Professor Lawson than to their accounting of the

February 2023 faculty meeting and emails, which was what the interviews were supposed to be about.

214.   These individuals were aware of Professor Lawson's lawsuit and his argument that one incident cannot create a hostile work environment.

215.   Susan Serrano was interviewed on April 27, 2023 but amended her statement on September 17, 2023, nearly a month after Lawson's initial federal lawsuit was filed, to include "some of the missing facts and context." Serrano was directly quoted in Richardson BLSA's September 2023 letter excerpted above. This letter was circulated several weeks before she submitted her amended interview statement. Despite being aware that BLSA directly and unambiguously stated that the DEI Committee's actions were harmful to Black students, Serrano claims that Lawson's boycott email was what upset BLSA students. Serrano also goes on for several pages about Professor Lawson's speech during the September 10, 2021 DPC meeting.

216.   The factfinders never asked Professor Lawson about or gave him an opportunity to respond to the allegations Defendants raised about his speech during the September 10, 2021 DPC meeting or the basis for his objections to the conversion process Defendant Nelson and others created. His speech during this meeting and his objections to the conversion process were not the subject of either Notice of Investigation.

217.   Defendants' and complainants' characterization of Lawson's speech in the September 10, 2021 meeting and his objections to the discriminatory conversion process are false.

### *Defendants Show Alleged Safety Concerns Were A Pretext for Retaliation*

218.   Defendants claim that the adverse actions and sanctions against Lawson were necessary to ensure a safe working environment and because Lawson is a safety threat. Yet, in several instances over the past 8 months, Defendants have permitted Lawson to appear on the WSRSL campus and at other events at the same time as other faculty and students.

219.   In November 2023, December 2023, January 2024, and February 2024, Defendant Bruno allowed Professor Lawson to teach his two trial practices courses, which can only be taught in person, while on campus in the mock-trial room when some of the complaining witnesses, were also present at WSRSL.

220.   On April 26, 2024, Professor Lawson requested permission to appear on the WSRSL campus to attend a vigil for Lawson's late student. Lawson was very close to this student. Defendant Bruno's office responded the following day, explaining that Bruno was "of course supportive of [Lawson] attending this event" on the WSRSL campus.

221.   Miyoko Pettit and Defendant Nelson were present at the vigil. Lawson saw Pettit at the vigil and walked right past her. Pettit did not leave the vigil or

request for security to protect her out of fear of Lawson.

222.   Lawson introduced Defendant Nelson to the student's family. After Lawson spoke at the vigil, he handed Nelson the microphone for her to speak. Nelson also did not request security to stand between her and Lawson or indicate any fear of him.

223.   On May 8, 2024, Defendant Bruno, via his assistant, Teresa Kono, emailed Professor Lawson and informed him that a number of students petitioned Defendants and requested that Professor Lawson be allowed to attend commencement.

224.   Bruno informed Lawson that he was allowed to attend commencement at the Andrews Amphitheater across the street from WSRSL. Bruno also warned Professor Lawson that his attendance at commencement was contingent on compliance with the no-contact order Susan Serrano requested. Professor Lawson asked for guidance on what "any contact whatsoever" meant. Lawson asked if standing/sitting too close to Serrano or passing by her and saying "excuse me" would violate the no-contact order, explaining that restraining/no-contact orders generally impose a requirement to maintain a certain distance.

225.   Defendants responded that he could not have "any communication" with Susan but refused to provide any guidance on proximity.

226.   Bruno also informed Lawson that Lawson could attend commencement

but not the pre-commencement toast on the WSRSL campus.

227.   Lawson did not attend the commencement ceremony because he was concerned about standing too close to Serrano or being accused of saying something that would subject him to further sanctions.

228.   Defendants denied Lawson's request to use the listserv to let the graduating students know why he could not attend.

229.   In denying Lawson's request to use the listserv, in an email dated May 9, 2024, Defendant Bruno stated: "[w]ith respect to your request to utilize the WSRSL listservs so that you can communicate your explanation to students for why you will or will not attend commencement, your intended use is not in alignment with University policies.  UH Listservs, like other University resources, are made available to administrators, faculty and staff and are intended to be used for institutional purposes."

230.   The very next day, on May 10, 2024, using the same listserv that Lawson was denied the right to use, Professor David Foreman was allowed to send an email asking faculty if anyone had a car that a friend of his from off island could rent while here in Hawaii.

231.   Before February of 2023, WSRSL had no policy requiring faculty to seek approval for the content of email messages being sent over listserv to faculty, students, and staff.

232.   If WSRSL now has such a policy where approval is required before emails are sent, they have not distributed it to Plaintiff.

233.   Professor Lawson asked for guidance on the listserv and inquired whether his use would violate the no-contact order. Defendants have refused to respond to Plaintiff's email and to offer any guidance on whether Lawson's use of the listserv would violate the no-contact order since Serrano would automatically receive any email Lawson sends using the listserv.

234.   Because of Defendant Bruno's March 8, 2024 letter and the indefinite no-contact order prohibiting "any communication" with Susan Serrano, Professor Lawson credibly fears that Defendants will sanction Professor Lawson or issue other no-contact orders if Professor Lawson expresses his beliefs on anti-Black racism, calls for a peaceful boycott of anti-Black racism at UH, even if he is asked to do so in response to questions in classes that he teaches on this subject.

Professor Lawson has, therefore, self-censored at meetings and in classroom discussions when expressing his viewpoint on civil rights, anti-Black racism, immigration, and issues of diversity.

235.   No-contact order has no geographical boundaries and applies anywhere in the world.

236.   The no-contact is ongoing and has no expiration date.

237.   There is no guidance on what has to occur for the no-contact order to no longer

be in effect.

238.   No hearing or any other due process was given or offered to Plaintiff before Bruno issued the no-contact order. The Decision maker did not mandate that a no-contact order be issued for anyone.

### *The Undisputed Facts Show That Lawson Speech Is Protected by the First Amendment*

239.   The First Amendment applies to public schools including with respect to its investigations and pursuit of disciplinary sanctions. *Healy v. James*, 408 U.S. 169 (1972). Public school employees are entitled to speak about matters of public concern without fearing retaliation or adverse treatment by the university, even when their speech is critical of the university or its administration. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1967).

240.   Lawson's speech during the faculty meeting and in his subsequent emails is protected by the First Amendment Lawson's because his speech was addressing a matter of public concern and he spoke as a private citizen. *Dodge v. Evergreen School Dist.*# 114, 56 F.4th 767, 787 (9th Cir. 2022). Lawson's speech concerned "nice racism," which is inherently a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 149 n.8. (1983). Lawson was not speaking pursuant to his official academic duties. *Posey v. Lake Pend Oreille Sch. Dist. No*. 84, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008).  Even if Lawson spoke pursuant to his academic duties, his speech would be protected, as racism is a topic related his scholarship and

54

teaching. *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2012).

241.   It is well established that universities cannot exploit workplace policies to unilaterally suppress speech that falls short of a true threat. *Bauer v. Sampson*, 261 F.3d 775, 786 (9th Cir. 2001) ("Both the Supreme Court and this Circuit have published widely on the free speech rights of academics, the requirements for a statement to be a "true threat," and the invalidity of proscriptions on potentially violent expression that falls short of being a "true threat.'").

242.   Lawson's speech was not a true threat because it clearly did not manifest an intent to engage in unlawful violence. *Fogel v. Collins*, 531 F.3d 824, 832–33 (9th Cir. 2008). It is undisputed that Lawson never engaged in any violent behavior towards any faculty colleague or student during at any time on or off campus. And the context of his statements shows that Lawson was not threatening violence but was instead explaining the violence he and others experienced as a Black American in the fight for civil rights. No reasonable person would take his speech during the meeting or in his subsequent emails as a true threat.

243.   It is clearly established that a public university cannot lawfully suppress or discipline a professor for engaging in pure speech on a matter of public concern under the guide of preventing a hostile environment under its anti-harassment policies. *Rodriguez v. Maricopa County Cmty. College Dist.*, 605 F.3d 703, 710 (9th Cir. 2009). The First Amendment constrains the extent to which a university may

lawfully apply its anti-harassment policies to police unpopular speech, as harassment law generally covers conduct and restricts speech "only when consistent with the First Amendment." *Id*. at 708 ("There is no categorical 'harassment exception' to the First Amendment's free speech clause").

244.   Harassment law prohibits speech based on its non-expressive content when such speech is unwelcome, severe, and pervasive enough "to create an objectively hostile or abusive working environment." *Harris v. Forklift Sys*., 510 U.S. 17, 21–22 (1993); *Rodriguez*, 605 F.3d at 710.

245.   Here, Lawson was not expressing a discriminatory idea when he noted that Nelson is not from the US and does not have any roots or legacy in the Black US Civil Rights Movement. Lawson never told Nelson that she is "not Black enough." Lawson's speech was not objectively offensive, as Richardson's BLSA students agreed with him and joined his email, nor were his comments pervasive enough because they were isolated instances.

246.   Further, Lawson's comments to Nelson and others during the faculty meeting were *in response* to their racially insensitive comments. *See*, *Dodge*, 56 F.4th at 779. In *Dodge*, the Ninth Circuit held that a principal calling an employee a racist, a bigot, a homophobe, and a liar, and swearing at him for having a MAGA hat, was protected speech in response to the employee's protected speech. *Id*. ("It would be the height of irony, indeed, if mere speech, in response to speech, could

constitute a First Amendment violation.") (quoting *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998).

247.    Lawson was not talking directly to Defendant Nelson until she, and another faculty member, interjected. *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 415 (1979) ("Having opened his office door to petitioner, the principal was hardly in a position to argue that he was the 'unwilling recipient' of her views.").

248.    Finally, Defendant-Appellee Nelson acknowledged Lawson was not yelling and the Decision indicates that 19 out of 28 people had Lawson's voice level at a 7, with one being whispering and 10 yelling. Only two people, plus Lawson, said Lawson may have said the word "shit", showing that any use of profanity was not particularly noteworthy, shocking, or memorable. Nelson also acknowledged that after Lawson spoke, she invited the DEI Committee members and other faculty to speak on the issue, which shows that the conversation did not disrupt the meeting, as Nelson had invited more input on the subject Lawson had raised.

**Defendants Adverse Actions and Sanctions Do Not Serve a Legitimate Interest**

249.    The Supreme Court has cautioned that "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin v. McPherson*, 483 U.S. 378, 384 (1987). The adverse reactions of those subject to criticism cannot use their

own disruptive behavior as proof of an actual injury. *Roth v. Veteran's Admin. of United States*, 856 F.2d 1401, 1408 (9th Cir. 1988); *Settlegoode v. Portland Pub. Schs*, 371 F.3d 503, 520 n.8 (9th Cir. 2004) ("It is highly doubtful, in any event, that an adverse reaction of those who are the subject of criticism could sustain a finding of actual injury…if unhappiness with criticism causes job disruption, this may be the fault of those being criticized rather than those doing the criticizing.").

250.  It is clearly established that sanctioning a public teacher or professor based on the perceived unpopularity of his speech violates the First Amendment. *Dodge*, 56 F.4th at 787. *Dodge* shows that other faculty members reporting that they felt "'intimidated,' 'shock[ed],' 'upset,' 'angry,' 'scared,' 'frustrated,' and 'didn't feel safe'" is not a sufficient basis to discipline a professor without evidence of actual injury to the university's operations. *Id*.

251.  Like in *Dodge*, there was no actual injury to the university's operations caused by Lawson's speech. The February 17, 2023, faculty meeting was completed as planned and lasted at least 4-5 more hours, with **every** faculty member participating and voting.

252.  Many students were interested in discussing the event after Lawson's boycott email, and students had thanked him for bringing attention to the issue through is boycott email. Defendants seek to turn the US Civil Rights Movement on its head by arguing that a call for a boycott, which means not to attend a racist event,

created a disruption at the Law School.

253.   Given the obvious animus the complaining faculty had against Lawson, the exaggerated nature of their claims, and the fact that all the claims that were unsubstantiated by other witnesses came from the complaining witnesses who amended their interview statements *after* Lawson filed a federal lawsuit, it is patently unreasonable for any employer to impose discipline based on these facts. *See Waters v. Churchill*, 511 U.S. 661, 677 (1994). A reasonable employer under these circumstances would make a credibility determination and find that their accounting of events is untrustworthy. *Id*. But Defendant Bruno (the Coordinator and ultimate decisionmaker) had a preexisting animus against Lawson and intended to impose discipline no matter what the facts showed.

254.   If all a university must do is point to other faculty who claim to be "threatened" or "unsafe" by a professor's speech, the university's burden under Pickering would collapse and there would be no protection for a public professor's unpopular speech.

255.   The Supreme Court and Ninth Circuit have thoroughly distinguished the permissible scope on faculty speech in the K-12 context from the university context—it is clearly established that speech restrictions permissible in the K-12 context are wholly inapplicable on the university campus. *See e.g., Mahanoy Area Sch. Dist. v. B. L.*, 141 U.S. 2038, 2049 n.2 (2021).

256.   Richardson is ranked as the #4 Most Chosen By Older Students law school by the Princeton Law Review with average incoming law student at Richardson being 27 years old. All Richardson students have graduated from college and most have spent several years in the workplace as an adult. Many have families, are married, and some are in the military. Defendants have no interest in suppressing speech about racism to "protect" students from engaging in difficult discussions about race, especially when the average student is approaching 30 years old and several students have openly expressed enthusiasm about engaging with these topics.

## COUNT I
## Violation of Professor Lawson's First Amendment Rights: Content and Viewpoint Discrimination
### (Defendants Nelson, Bruno, & Mirkay in Their Individual Capacities)
### (42 U.S.C. § 1983)

257.   Professor Lawson realleges and incorporates each allegation set forth in the preceding paragraphs by reference.

258.   It is clearly established that viewpoint discrimination is "an egregious form of content discrimination" that violates the First Amendment. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

259.   It is clearly established that while a government may categorically prohibit all political speech as a valid administrative interest, it cannot do so in a manner that favors or disfavors a particular view. *Dodge*, 56 F.4th at 787 (2022). "[E]ven in a nonpublic forum, state actors may not suppress speech because of its

point of view." *Rodriguez*, 605 F.3d at 710-11.

260.   UH has encouraged and permitted political speech about race and racism, including DEI sponsored trainings where terms like "white fragility" were used. Several faculty members at WSRSL have used the listserv to speak against racism and express controversial political beliefs.

261.   Defendants Nelson, Mirkay, Bruno, and complainants initiated an investigation into Professor Lawson on the basis of his dissenting viewpoint on issues of public concern.

262.   Several students, including WSRSL's BLSA chapter, have clearly indicated that the DEI Committee's actions, reaction to their criticism of those actions, lack of communication, and failure to  acknowledge any wrongdoing has adversely affected them and contributed to the marginalization of Richardson's small population of Black students.

263.   It is only because Defendants and complainants object to the allegation that *they* engaged in nice racism that they seek to silence Lawson. These same professors have written extensively about the implicit biases of others, but ironically roll out the "violent, angry Black trope" in response to criticism about their racial biases.

264.   Richardson has no interest in shutting down a community discussion and shielding the DEI Committee from criticism simply because the feelings of its

individual members might be hurt as a result.

265.    Neither of the students interviewed expressed any concern about violence or disruption to their learning environment caused by Lawson's speech. One student who attended the faculty meeting explained that she was "glad" that the boycott email went out and that she had hoped there would be a discussion about it, but the DEI Committee refused to address it. The Decision cites *zero* student complaints that Lawson's speech disrupted their learning.

266.    As a direct and proximate result of Defendants' viewpoint-discriminatory actions, Professor Lawson has suffered irreparable injury, including deprivation of his First Amendment right to free expression, which is an injury *per se*.

267.    In the First Amendment context, the Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976). Consequently, "[i]rreparable harm is relatively easy to establish in a First Amendment case." *CTIA- The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019) ([A] party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury . . . by demonstrating the existence of a colorable First Amendment claim.").

268.    As a direct and proximate result of Defendants' actions, Professor

Lawson has suffered emotional distress and injury to his reputation. UH has banned him from the campus for more than a year under the threat of termination while they pursued an "investigation" based on speech that Defendants know is protected by the First Amendment. The additional sanctions UH seeks to impose require further suppression of Professor Lawson's protected speech under the threat of termination.

269.    Lawson, at the very least, raises a colorable First Amendment claim, and accordingly, irreparable harm is presumed. *Baird v. Bonta*, 81 F.4th 1036, 1047 (9th Cir. 2023) (Courts should not "shrink" from the obligation to enforce constitutional rights "because even a brief deprivation of a constitutional right causes irreparable injury"); *Am. Bev. Ass'n v. City & Cty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019).

270.    Since preventing a constitutional violation is in the public interest and it is essential that universities retain their role as the nation's marketplace of ideas, the public interest tilts sharply in Lawson's favor. *Healy*, 408 U.S. at 180.

271.    Professor Lawson has consequently suffered damages, as set forth above.

**COUNT II**
**First Amendment Retaliation**
**(Defendants Nelson, Bruno, and Mirkay in Their Individual Capacities)**
**(42 U.S.C. § 1983)**

272.    Professor Lawson realleges and incorporates each allegation set forth in the preceding paragraphs by reference.

273.    As described above, Lawson's engaged in protected speech.

274.    An adverse employment action does not have to be severe and it may take many forms, including the removal of a benefit or imposition of sanctions. *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2002). The ultimate question is whether the retaliatory actions would "chill or silence a person of ordinary firmness from continuing to speak out." *Blair v. Bethel School Dist.*, 608 F.3d 540, 543 n.1 (9th. Cir 2010).

275.    Defendants actions as described above "would chill a person or ordinary firmness from continuing to speak out." *Blair*, 608 F.3d at 543 n.1.

276.    Further, the undisputed facts show that Lawson's speech was a substantial and motivating factor behind Defendants' adverse employment actions based on: 1) the proximity in time of the adverse actions following Lawson's speech, 2) the fact that Defendants expressed opposition to Lawson's speech, and 3) Defendants' explanation for their actions are false and pretextual. *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751-752 (9th Cir. 2001).

277.    The Notices of Investigation, Dean Ceria Ulep's Decision, Defendant Bruno's letters, and Defendants' interview statements show that the actions taken against him were based on his speech in February 2023. Defendants acknowledged that any "investigation" was being pursued based on his speech. The sanctions that later followed were also based on Lawson's speech.

278.   The delay in the investigation process further shows the retaliatory nature of Defendants' actions. For every month that Defendants prolonged the investigation, Lawson's banishment was extended. Defendants were interviewed in April and early May of 2023. Another two months passed before anyone else was interviewed in July 2023. Lawson was not interviewed until August 2023, nearly six months after the February 2023 faculty meeting.

279.   The differential treatment of Lawson compared to other faculty members, particularly in the context of contentious comments on racism, highlights the selective and discriminatory application of workplace policies by Defendants.

280.   Failing to comply with pre-established policies weighs in favor of a finding of retaliatory intent. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).  Defendant Nelson's decision to direct her complaints about Lawson's speech to Defendant Bruno shows that she did not intend to invoke UH's ordinary procedure for EEO or Title IX complaints. After unilaterally appointing himself Coordinator, Bruno appointed the Fact-Finders, Investigators, Decision Maker, and alternate Decision Maker. Bruno refused to recuse himself as Coordinator and refused to make reasonable accommodations.

281.   Accordingly, Defendants took adverse employment action against Professor Lawson in retaliation for his protected speech.

282.   As a direct and proximate result of Defendants' actions as described

above, Professor Lawson was and continues to be deprived of his constitutional rights, which is an irreparably harm *per se* as explained above.

283.  Professor Lawson has consequently suffered damages, as set forth above.

## COUNT III
## First Amendment Retaliation
**(Defendants Lassner, Nelson, Bruno, & Mirkay in Their Official Capacities)**
**(42 U.S.C. § 1983)**

284.  Professor Lawson realleges and incorporates each allegation set forth in the preceding paragraphs by reference.

285.  As a direct and proximate result of Defendants' actions as described above, Professor Lawson was and continues to be deprived of his constitutional rights, which is an irreparably harm *per se* as explained above.

286.  Absent preliminary and permanent injunctive relief enjoining Defendants from retaliating against Professor Lawson based on his protected speech, Defendants will continue violating Professor Lawson's First Amendment rights.

287.  Lawson sues Defendants in their official capacity only for injunctive relief.

## COUNT IV
## Violation of Professor Lawson's First Amendment Rights: Prior Restraint
**(Defendants Lassner and Bruno in Their Official Capacities)**
**(42 U.S.C. § 1983)**

288.  Professor Lawson realleges and incorporates each allegation set forth

in the preceding paragraphs by reference.

289.   Prior restraints are presumptively unconstitutional and may only be upheld when there are no less restrictive alternatives available. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *Cuviello v. City of Vallejo*, 944 F.3d 816, 826 (9th Cir. 2019); *In re Dan Farr Productions*, 874 F.3d 590, 596 (9th Cir. 2017) ("[A]ny imposition of a prior restraint must be based on case-specific justifications for why less extreme measures are not viable alternatives.").

290.   Provisions that allow state actors unbridled discretion to permit or prohibit expressive conduct based are facially invalid. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969). Such provisions give a government official the unilateral authority to restrict speech based on the content of the speech and run afoul of the First Amendment.  *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64 (1988).

291.   Defendant Bruno unilaterally issued no-contact orders and restricted Professor Lawson's use of the listserv, renewing these restrictions every month since February 28, 2023.On March 8, 2024, Defendant Bruno unilaterally issued another no-contact order.

292.   Defendants' no-contact orders and listserv ban are unconstitutional prior restraints because they prohibit Professor Lawson from engaging in protected speech without prior approval and subject Professor Lawson to content and

viewpoint-based restrictions. Defendants' no-contact orders and listserv ban are not limited in duration or scope.

293.   Defendants' Administrative Procedures violate the First Amendment to the extent it grants Defendants unbridled discretion to suppress Professor Lawson's speech by issuing no-contact orders and banning him from the listserv.

294.   Defendants' no-contact orders and listserv ban restrict Professor Lawson from engaging in protected speech in the same manner that all other WSRSL faculty are permitted and have been permitted to do, even and especially on matters of public concern.

295.   As a direct and proximate result of Defendants' actions as described above, Professor Lawson was and continues to be deprived of his constitutional rights, which is an irreparably harm *per se* as explained above.

296.   Absent preliminary and permanent injunctive relief enjoining Defendants from retaliating against Professor Lawson based on his protected speech, Defendants will continue violating Professor Lawson's First Amendment rights.

297.   Lawson sues Defendants in their official capacity only for injunctive relief.

## COUNT V
## <u>Facial & As-Applied Challenge to Executive Policy 1.202</u>
## (Defendants Lassner and Bruno in Their Official Capacities)
## (42 U.S.C. § 1983)

298.   Professor Lawson realleges and incorporates each allegation set forth

in the preceding paragraphs by reference.

299.   A policy violates the First Amendment for overbreadth when "a substantial number of its applications are unconstitutional judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotations and citations omitted).

300.   A policy violates the First Amendment for vagueness when it denies fair notice of the standard of conduct to which the citizen is accountable and if it is an unrestricted delegation of power that invites "arbitrary, discriminatory, and overzealous enforcement." *Leonardson v. East Lansing*, 896 F.2d 190, 196 (6th Cir. 1990).

301.   Further, content and viewpoint-based limitations on speech render a policy facially unconstitutional even when the policy is aimed towards prohibited otherwise unprotected speech. *R.A.V. v. St. Paul*, 505 U.S. 377, 391-93 (1992).

302.   Under Executive Policy 1.202, the Defendants have the authority to prohibit and discipline pure speech including "Offensive remarks about a person's, race, color, age, disability, pregnancy, breastfeeding, national origin, religion or other protected category." This policy is facially unconstitutional on three independent grounds: (1) overbreadth, (2) vagueness, and (3) content and view-point discrimination.

303.   Firstly, this policy is facially unconstitutional because it results in a

substantial number of unconstitutional applications where students and professors may be disciplined for engaging in pure speech protected by the First Amendment when a complainant and UH find the speaker's viewpoint to be offensive—a substantial number of "offensive remarks," even about a protected characteristic, are protected by the First Amendment.

304.   Secondly, this policy is facially unconstitutional because it does not define the parameters of what constitutes an "offensive remark" and invites arbitrary, capricious, and view-point discriminatory application. The policy lists "racial slurs, racial epithets, or name-calling" and "intimidation and threats of harm" as separate categories of prohibited speech—thus, "offensive remarks" cannot be narrowly construed as a restriction on fighting words or true threats.

305.   Finally, this policy is facially unconstitutional because it constitutes a content and viewpoint limitation on protected speech—it necessarily requires UH to assess the content of the "offensive remark" as it relates to the complainant's protected characteristic to determine if the policy has been violated.

306.   The policy does not prohibit "offensive remarks" used against a person based on a non-protected characteristic and it does prohibit "offensive remarks" based on the non-expressive quality of the remark.

307.   The policy is overbroad and vague as applied to Professor Lawson because it has been used to suppress his protected speech based on Defendants'

disagreement with his viewpoint and does not provide fair notice as to what constitutes an "offensive remark."

308.   Professor Lawson's speech does not constitute unlawful harassment for the reasons described above.

309.   As a direct and proximate result of Executive Policy 1.202, Professor Lawson and other speakers in the community continue to be deprived of constitutional rights, which is an irreparably harm *per se*.

310.   Absent preliminary and permanent injunctive relief enjoining Defendants from retaliating against Professor Lawson based on his protected speech, Defendants will continue violating Professor Lawson's First Amendment rights.

311.   Lawson sues Defendants in their official capacity only for injunctive relief.

**COUNT VI**
**Facial and As-Applied Challenge to Executive Policy 9.210**
**(Defendants Lassner and Bruno in Their Official Capacities)**
**(42 U.S.C. § 1983)**

312.   Professor Lawson realleges and incorporates each allegation set forth in the preceding paragraphs by reference.

313.   Executive Policy 9.210 disclaims any specific or unique definitions, and it does not provide any time, manner, or place limitations.

314.   Executive Policy 9.210 prohibits "any work related or workplace violence against its students, faculty, staff, visitors and contract employees which

materially and substantially interferes with an individual's work, academic

performance, and/or workplace safety and/or otherwise subjectively and objectively

creates a hostile environment. Such prohibited violent acts may involve physical

attack, property damage, as well as written or verbal statements or non-verbal

gestures that, to a reasonable person, express or suggest the intent to cause physical

or mental harm to another person including but not limited to: shouting or yelling in

a threatening or hostile manner; threatening gestures or remarks; disruptive or hostile

actions; abusive or belligerent language."

315. This provision of the policy is facially unconstitutional on three

independent grounds: (1) overbreadth, (2) vagueness, and (3) content and view-point

discrimination under the authority cited above.

316. Firstly, it is unconstitutionally overbroad because it prohibits mere

speech that does not rise to the level of a true threat. The use of and "and/or" in this

provision expands the range of possible permutations to includes a substantial

amount of protected speech, including speech that does not actually interfere with

workplace safety.

317. The forms of "violence" prohibited under this policy includes written

or verbal statements. And it is not limited to unlawful expressions of intent to cause

harm (i.e., true threats).

318. This provision prohibits a professor or student from speaking about

lawful self-defense. For example, this policy prohibits a professor or student from saying: "If a person broke into my home, I would retrieve my firearm and shoot to kill" or "I will use lethal force against anyone who threatens my life." These statements are clear expressions of an intent to cause physical harm to another person, they are threatening remarks, and they would interfere with the safety of anyone using unlawful violence against the speaker. But they are expression of the speaker's lawful right to use lawful violence in self-defense.

319.   This provision is also overbroad to the extent that it sweeps in otherwise protected speech that is expressed above a certain decibel, in a manner that the University deems "disruptive," or using language that the University finds "abusive or belligerent."

320.   Secondly, this policy is unconstitutionally vague because it does not provide fair notice of prohibited conduct and invites arbitrary and capricious enforcement. There are no definitions or limiting principles applied to terms like "threatening" "hostile" "disruptive" "abusive" and "belligerent." And there are no time, manner, and place restrictions narrowing the construction of these terms.

321.   This policy is unconstitutionally overbroad as applied to Professor Lawson because it has been used to suppress his protected speech based on Defendants' disagreement with his viewpoint and manner of expression.

322.   It is also unconstitutionally vague as applied to Professor Lawson

because it does not provide fair notice that the single use of a curse word could fall within the purview of a policy prohibiting workplace violence, especially when Defendants were well aware that Lawson regularly uses curse words in public settings and had never objected to it previously. As explained in *Cohen*, universities cannot, without notice and on an ad hoc basis, weaponize its policies and construe them in a manner that penalizes the same forms of speech that the professor has used for many years. *Cohen v. San Bernardino Valley College*, 92 F.3d 968, 972 (9th Cir. 1996).

323.   As a direct and proximate result of Executive Policy 9.210, Professor Lawson and other speakers in the community continue to be deprived of constitutional rights, which is an irreparably harm *per se*.

324.   Absent preliminary and permanent injunctive relief enjoining Defendants from retaliating against Professor Lawson based on his protected speech, Defendants will continue violating Professor Lawson's First Amendment rights.

325.   Lawson sues Defendants in their official capacity only for injunctive relief.

## COUNT VII
### Violation of the Fourteenth Amendment: Right to Due Process of Law
**(Defendants Lassner, Bruno, Nelson, & Mirkay in Their Individual Capacities)**
**(42 U.S.C. § 1983)**

326.   Professor Lawson realleges and incorporates each allegation set forth

in the preceding paragraphs by reference.

327.   It is clearly established that before a public university may seriously discipline or sanction a tenured professor it must comply with the terms of the Due Process Clause of the Fourteenth Amendment. *Nat'l Collegiate Ath. Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988).

328.   Due process generally requires a notice of charges, an explanation of the evidence, an opportunity to present his/her evidence before an impartial tribunal, and a pre- or post-deprivation hearing.

329.   Administrative Procedure 1.202 proclaims that the University is committed to "ensuring due process in the investigation and resolution of complaints."

330.   Defendants did not give Professor Lawson prior notice or an opportunity before an impartial tribunal before issuing the no-contact orders or restricting his use of the listserv.

331.   Defendants did not provide a hearing after the no-contact orders or listserv restrictions were in place to determine whether they should remain in effect.

332.   Defendants did not provide notice that Defendants and complainants had raised new allegations that were not included in the Notices of Investigation, and he was never given an opportunity to respond to these allegations before the Decision was rendered—this allegations include claims about his speech during a

September 2021 faculty meeting and the claim that he told Defendant Nelson that she is "not Black enough."

333.    Defendants failed to provide Professor Lawson with the opportunity to a fair investigation process before an impartial tribunal due to Defendant Bruno's personal involvement with the investigation, decision-making, and his unilateral imposition of sanctions.

334.    Defendant Bruno has had a glaring conflict of interest from the beginning of the investigation, yet he refused to recuse himself as Coordinator.

335.    From the beginning of the investigation Defendant Bruno has had a direct pecuniary and personal interest in an outcome that would harshly sanction Professor Lawson and limit his presence on the WSRSL campus.

336.    Defendant Bruno's participation in the investigation and role as the ultimate decisionmaker against Professor Lawson tainted the investigation and violates due process. *Stivers v. Pierce*, 71 F.3d 732, 748 (1995) ("Whether actual or apparent, bias on the part of a single member of a tribunal taints the proceedings and violates due process."); *Chen v. Albany Unified Sch. Dist.*, 56 F.4th 708, 725 (2022).

337.    Defendants have violated Professor Lawson's clearly established constitutional rights of which all reasonable college administrators and staff shown have known, rendering them liable to Professor Lawson under 42 U.S.C. § 1983.

338.    As a direct and proximate result of Defendants' actions as described

above, Professor Lawson was and continues to be deprived of his constitutional rights, which is an irreparably harm *per se*.

339.    Absent preliminary and permanent injunctive relief enjoining Defendants from retaliating against Professor Lawson based on his protected speech, Defendants will continue violating Professor Lawson's First Amendment rights.

340.    Professor Lawson has consequently suffered damages, as set forth above.

## COUNT VII
### Neglect to Prevent Violation of Civil Rights
### (Defendants Lassner, Bruno, Nelson, & Mirkay in Their Individual Capacities)
### (42 U.S.C. § 1983)

341.    Professor Lawson realleges and incorporates each allegation set forth in the preceding paragraphs of this Complaint by reference.

342.    Under 42 U.S.C. §1986 a person who has actual or constructive knowledge of but neglects to prevent acts prohibited by 42 U.S.C. §1983 is liable for damages resulting from the acts.

343.    Each individual Defendant, including Lassner, being sued in his/her personal and individual capacity was aware, actually or constructively, of the discriminatory and retaliatory actions of the other Defendants or their employees and had the ability to prevent the actions and failed to prevent the actions, in violation of 42 U.S.C. §1986.

344.   Defendants Lassener, Bruno, Nelson and Mirkay each received repeated notices, warnings and pleas from Lawson to stop the ongoing violations of his Civil Rights by Defendants and complainants.

345.   Defendants were each warned by The FIRE organization, counsel for Plaintiff and Plaintiff, that Defendants and complainants were violating Plaintiff's civil rights under the 1st and 14th amendments of the US Constitution.

346.   Each defendant had a duty and the ability to stop the civil rights violations but choose to allow them to continue.

347.   Lawson has consequently suffered injury and damages, as set forth above.

## **PRAYER FOR RELIEF**

348.   **WHEREFORE**, Professor Lawson prays for Judgment in his favor and against Defendants, jointly and severally, as follows:

349.   For an emergency temporary restraining order and preliminary injunction enjoining and restraining the Defendants, their superiors, agents, servants, employees, successors in office, and all persons acting in concert with them from failing and refusing to restore Professor Lawson to the same position and location at WSRSL as of February 26, 2023, and from subjecting him to further punishment in the future for speaking on issues of public concern.

350.   For an emergency temporary restraining order preliminary injunction

enjoining and restraining the Defendants, their superiors, agents, servants, employees, successors in office, and all persons acting in concert with them from enforcing the sanctions provided in the Decision Maker's December 1, 2023, Decision and Defendant Bruno's March 8, 2023 letter, on the basis of Professor Lawson's constitutionally protected speech.

351.   For a permanent  injunction enjoining and restraining the Defendants, their superiors, agents, servants, employees, successors in office, and all persons acting in concert with them from enforcing the sanctions provided in the Decision Maker's December 1, 2023, Decision and Defendant Bruno's March 8, 2023 letter, on the basis of Professor Lawson's constitutionally protected speech.

352.   Because the threat of future investigations and discipline has a chilling effect on Professor Lawson's, a declaration that Professor Lawson can continue to use his history in the US Black Civil Rights movement to teach and lecture on Fourth Amendment and civil rights violations and the threat of future investigations and discipline against him for his constitutionally protected speech violates his First Amendment rights to freedom of speech and academic freedom.

353.   Special damages in an amount to be determined at a trial or hearing hereof;

354.   General damages in an amount to be determined at a trial or hearing hereof;

355.   Compensatory damages against all Defendants sued in their individual

capacities in an amount to be determined at a trial or hearing hereof;

356.   Punitive damages against all Defendants in their individual capacities

in an amount to be determined at a trial or hearing hereof;

357.   Reasonable attorneys' fees and costs;

358.   Pre-judgment interest and post-judgment interest; and

Any and all other relief as may be deemed just and equitable by the Court.


Dated: May 30, 2024                    */s/ Kenneth L. Lawson*
                                       Kenneth L. Lawson

                                       *Plaintiff*, pro se

## <u>DECLARATION UNDER PENALTY OF PERJURY</u>

I, Kenneth L. Lawson, a citizen of the United States and a resident of the State Of Hawaii, declare under penalty of perjury under 28 U.S.C. §1746 and hereby verify that the above allegations in my First Amended Complaint are true and correct to the best of my knowledge.

Executed this 30 Day of May, 2024 at Honolulu, Hawaii.

Dated: May 30, 2024

*Kenneth Lawson*

_____

Kenneth L. Lawson

*Plaintiff*, pro se

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAI'I

| | |
|---|---|
| KENNETH L. LAWSON,<br><br>     *Plaintiff*,<br><br>  v.<br><br>UNIVERSITY OF HAWAI'I; DAVID LASSNER; MICHAEL BRUNO; CAMILLE NELSON; NICHOLAS MIRKAY,<br><br>     *Defendants*. | CIV. NO. 24-00172 LEK-RT<br><br>DEMAND FOR JURY TRIAL<br><br>No Trial Date Set. |

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all issues triable of right by jury in this case, pursuant to Rule 38, Federal Rules of Civil Procedure.

Dated: May 30, 2024

/s/ *Kenneth L. Lawson*
Kenneth L. Lawson

*Plaintiff*, pro se

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2024, a copy of the foregoing First

Amended Verified Complaint and Demand for Jury Trial was filed electronically

and emailed to counsel of record. Notice of the filing will be sent to all parties for

whom counsel has entered an appearance by operation of the Court's Electronic

Filing System.


Dated: May 30, 2024                    */s/ Kenneth L. Lawson*_____
                                        Kenneth L. Lawson

                                        *Plaintiff*, pro se