MEHEULA LAW, LLLC
Limited Liability Law Corporation

WILLIAM MEHEULA   2277-0
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawaiʻi 96813
Telephone No.: (808) 599-9554
Facsimile No.: (808) 599-9610
Email: bill@meheulalaw.com

Attorney for Defendant
CAMILLE NELSON, on the Counterclaim

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAIʻI

| | |
|---|---|
| KENNETH L. LAWSON,<br><br>            Plaintiff,<br><br>    vs.<br><br>DAVID LASSNER, MICHAEL BRUNO, CAMILLE NELSON, NICHOLAS A. MIRKAY,<br><br>            Defendants. | CASE NO. 1:24-CV-00172-LEK-RT<br><br>DEFENDANT CAMILLE NELSON'S COUNTERCLAIM AGAINST PLAINTIFF KENNETH L. LAWSON; EXHIBITS A AND B; CERTIFICATE OF SERVICE<br><br>Trial<br>Date: December 7, 2026<br>Judge: Honorable Leslie E. Kobayashi |

**DEFENDANT CAMILLE NELSON'S COUNTERCLAIM AGAINST
PLAINTIFF KENNETH L. LAWSON**

Defendant CAMILLE NELSON, in her individual capacity ("**Nelson**"), by

and through her Counterclaim counsel, Meheula Law LLLC, asserts this

1

Counterclaim against Plaintiff KENNETH L. LAWSON in his individual capacity
("**Lawson**").

1. Nelson is a resident of the City and County of Honolulu, State of
Hawaii, and since August of 2020, has been the Dean of the William S. Richardson
School of Law ("**WSRSL**").

2. Lawson is a resident of the City and County of Honolulu, State of
Hawaii, and has been teaching at WSRSL since 2012.

3. On February 17, 2023, Lawson attended a WSRSL faculty meeting
("**2/17/23 MTG**") where Lawson planned to and followed through on hijacking the
meeting to attack and scare Nelson and WSRSL for the purpose of obtaining
compensation he is not entitled to. On February 18 and 21, 2023, Lawson
published false statements about Nelson's conduct at the 2/17/23 MTG to the
WSRSL community to further his plan to extort compensation from the University.

4. Since August 2023, Lawson has filed five lawsuits against the
University of Hawaii ("**University**"), Nelson and University Provost Michael
Bruno ("**Bruno**"). Two cases were filed in United States District Court for the
District of Hawaii ("**D. Haw.**") and three were filed in Circuit Court of the First
Circuit, State of Hawaii ("**1st Cir.**").

5. The five lawsuits are:

23-cv-00348 filed 8/21/23 in D. Haw.

1CCV-23-0001391 filed 10/25/23 in 1st Cir.

1CCV-24-0000340 filed 3/14/24 in1st Cir.

24-cv-00172 filed 4/15/24 in D. Haw.

1CCV-25-0000036 filed 1/10/25 in 1st Cir.

("**5 Lawsuits**")

6.     Lawson's outrageous conduct at the 2/17/23 MTG, his defaming emails a few days later and the 5 Lawsuits were intended to extort the University to pay him compensation that the University rejected and or penalties he is not entitled to.

7.     Nelson was a pawn and a victim of Lawson's said plan and acts.

8.     This Counterclaim seeks damages against Lawson for defamation and intentional infliction of emotional distress inflicted on Nelson.

9.     Under Hawaii law, a party is liable for defamation where (a) a person [here Lawson] negligently or with actual malice makes false and defamatory, unprivileged statements concerning another [here Nelson]; (b) that are publicized to third persons; and (c) that causes harm to the person [Nelson].  *Farmer v. Hickam Fed. Credit Union*, 2010 Haw. App. LEXIS 39, *25-26 (Feb. 2, 2010) (quoting *Gold v. Harrison*, 88 Hawai'i 94, 100, 962 P.2d 353, 359 (1998)).

10.    *Beamer v. Nishiki*, 66 Hawai'i 572, 582, 670 P.2d 1264, 1273 (1983) held:

This court has defined "actual malice" as "'deliberate falsification' of facts or 'reckless disregard' of the truth, i.e., reckless publication despite a high degree of awareness, harbored by the publisher, of the probable falsity of the published statements." *Tagawa v. Maui Publishing Co., (Tagawa II),* 50 Haw. 648, 652, 448 P.2d 337, 340, *cert. denied,* 396 U.S. 822, 90 S.Ct. 63, 24 L.Ed.2d 73 (1968). Moreover, this court has agreed with the U.S. Supreme Court that reckless disregard is a subjective question of the defendant's state of mind:

> "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

11. The elements of an intentional infliction of emotional distress claim are: (1) that the conduct allegedly causing the harm was intentional or reckless; (2) that the conduct was outrageous; and (3) that the conduct caused extreme emotional distress to another. *See Hac v. Univ. of Haw.*, 102 Hawai'i 92, 106-07, 73 P.3d 46, 60-61 (2003). *Young v. Allstate Ins. Co.*, 119 Hawai'i 403, 429, 198 P.3d 666, 692 (2008) (the standard is simply whether "an average member of the community" would exclaim, "Outrageous!").

12. Lawson's false statements and intentional, reckless and outrageous conduct started with 2/17/23 MTG where Lawson planned to and followed through on hijacking the meeting and to attack and scare Nelson and WSRSL for the purpose of obtaining compensation he is not entitled to.

13. Before the 2/17/23 MTG, on February 10, 2023, Lawson filed a grievance under the applicable University CBA on the grounds that the University

4

wrongfully denied his request to increase his salary due to race and sex

discrimination.  Nelson participated in that decision on behalf of the University

along with President David Lassner and Provost Michael Bruno.

14.     On April 4, 2023, Nelson was interviewed by University investigating

officers Maura Okamoto and Daniel Sato who were investigating violations of

workplace policies related to Lawson's conduct at the 2/17/23 MTG ("**2/17/23**

**MTG UH Investigation**").  The interview statement provides:

> April 4, 2023
> **10:00AM**
> Zoom
> The following is a summary of the interview with Camille Nelson, Dean of
> the William S. Richardson School of Law pertaining to the alleged violations
> of the University of Hawaii's Executive Policy EP 9.210, Workplace Non-
> Violence; Executive Policy 1.204, Sex and Gender Based Misconduct
> Executive Policy 1.202, Nondiscrimination, Equal Opportunity and
> Affirmative Action by Kenneth Lawson. Dean Jonathan Osorio is the
> decision-maker in this case.
>
> I started as Dean of the William S. Richardson Law School at UH in August,
> 2020, during the [COVID-19] pandemic. Professor Lawson was a member
> of the faculty at that time. He must have been a faculty member for at least
> 10 to 12 years as he is a tenured specialist faculty within the law school. I'm
> not sure exactly when he was tenured under the previous administration.
>
> I've known of Professor Lawson from before I started here as the dean of the
> law school; I taught at UHM on and off since the early 2000s and took my
> first sabbatical here (UHM), though I don't think Professor Lawson was on
> the faculty at that time. I would describe my relationship with Professor
> Lawson as a more "in the room" relationship, since I've had a very limited
> amount of interactions with him due to the pandemic. We've been in
> meetings together for certain topics, which I can't get into, but aside from
> that, we haven't really seen much of each other. Even now, when most

faculty are back on campus, I hadn't really seen him a lot until that [February 17] meeting. I think that meeting was the first meeting of the faculty he's attended in person.
He's usually on Zoom, and even then, he usually has his screen (webcam) off, so he's not seen.

The meeting of the faculty on the afternoon of Friday February 17, 2023 was a special meeting for Appointments Committee faculty hiring conversations. We normally have regular faculty meetings on the third Wednesday of every month. The Associate Dean for Academic Affairs calls the meetings. The regular meeting was scheduled and a call for agenda items was put out. However, due to few or no items, that meeting was canceled, and any items were to be discussed at the special faculty meeting on Friday.
At the beginning of meetings, I usually give a Dean's report, which I did in this case. Then I thought I would be able to turn the meeting over to Richard Chen, who is the professor who chairs the Appointments Committee, for the special meeting agenda, which was about discussing faculty candidates for hiring. l arrived at the meeting early. The meeting room was one of the rooms that have an oblong table that people can sit around. The meeting was hybrid and some attendees were on screen via Zoom. Professor Lawson came into the room a little later than me-I noted this because he doesn't normally come to meetings in person. I said "hi" to him but he didn't respond maybe he didn't hear me. I gave my Dean's report and asked if anyone had *any* questions or had anything to share. This would normally be a time when faculty might share accolades about colleagues, discuss upcoming events, or other community matters, especially invitations and other items that might recognize people or encourage participation. Professor Lawson raised his hand, so I called on him. He was in the opposite corner from me and he looked visibly upset and his voice was raised. He said he was angry and upset with the diversity committee because of the program about the Dr. Martin Luther King Jr.'s Letter from Birmingham Jail book-club event they created. I viewed it as a diatribe because he launched into an elevated explication about why he was angry about what the committee had done, and it was very personal and pointed. He was angry as he thought there were no black people that were part of the event. He used cuss words. I can't recall exactly the words he used but do remember he said "shit". Honestly, it was just so shocking. Not so much because he used that language, I've seen such outbursts and heard such language before. I was shocked because he did it with so many other people around. It was unprofessional and scary.

6

Professor Susan Serrano was a couple of seats away from Professor Lawson as he went off. He said he was deeply offended, I think, because he was excluded from the event. In his views, there were "no real black people" or "not the right kind of black people" at the event. He was dismissive of what the committee was trying to do. He said things like "unless you've been spit on like I have, beaten by the police", "seen your mama beaten' etc. inferring that only someone who had his experience was "the right kind" of black person and assuming that none of us had experienced similar abuses. I call the way he was speaking a "diatribe" because of his use of these phrases and also the fact that he said he was "not non-violent'. At some point, Susan asked Professor Lawson why he was looking at her. He responded by saying "you're the chair of the diversity committee, aren't you?".

At that point, I felt like I had to step in. I felt like Susan was being verbally abused by Professor Lawson. It was wrong. I interjected and asked Professor Lawson: "can we talk about where we go from here? I feel that you're upset, can we think about how to move on positively and go on?" If there was a positive suggestion, we could have dealt with it; no one tried to diminish anything he was saying. I told him that we are all colleagues, and we can ask them, the diversity committee, what they were trying to achieve. Professor Lawson then responded by saying "you're an apologist and you're what allows this racist shit to continue". He continued in a raised voice and now directing his anger at me by asking if I had "ever seen my mama get beat down", or if I had "ever been beaten by the police" and that if I haven't, I wasn't "a real black person". I have also experienced racist abuse and sexist abuse, I am a black woman in North America, but it was not the time or place to talk about those things and it was not for him to invoke my trauma to prove my authenticity as a black person to him. So, while I had experienced some of those things and others, I didn't want to bear it all at that time in that way, in that space. It wasn't the right place. At that point, it was just Professor Lawson and I that were in the conversation as everyone else was silent. Our colleagues looked devastated, many were looking down at the ground, not making eye contact. Professor Lawson went on to say that he was "not non-violent" and that black civil rights activists would march on this event if they knew what was happening. I've been at other law schools and I knew that if they knew what this committee was trying to do, they wouldn't march on this event. Professor Lawson said he didn't care what the committee was trying to do. The committee had asked me to attend the event, but I couldn't because I had a conflict. I didn't want to mention it at

7

that time because I felt like it wouldn't have mattered as he was basically saying I was not black enough and it might have made him angrier. Professor Lawson would probably then be upset that they asked me instead of him. He said things like "you're not from here, you wouldn't understand". I am Jamaican-Canadian and I've been in this country since 1998. I also recall saying that as we are all educators and work in a school, we should be able to learn from each other, so it matters what the committee was trying to do and also that education around race and rights is not exclusively for black people to carry -- that it is often also an additional burden to be asked to always be the person speaking and educating about race. So, I was referencing and shared that, post-George Floyd, many black people asked other people who cared about race-relations, allies, to take it upon themselves to learn about race and racism, as it was an extra burden to continually be asked to educate others about things so painful. I suggested that perhaps this was part of what was being encouraged by the committee through the Black History Month reflection - could we consider that? He asserted that I could not weigh in or comment as I basically didn't have the right type of blackness, wasn't from here, and/or wasn't black enough to weigh in.

At that point, I shut up. Professor Lawson continued the same type of articulation about what it's like to be a black person in the U.S. He said that I was a "nice racist" and "too woke" to understand what is real. Carole Petersen, who was on the other side of Professor Lawson, the other direction from Prof. Serrano (Susan), asked a question of Professor Lawson. He interrupted Carole and called her a nice racist. He said "it's people like you" and made a comment about her being like the white people in the book about white people who are fragile. I felt I had to jump in again as he was directing his anger at Carole now. I suggested to him that the book he was referencing was *White* Fragility by Robin Diangelo and tried to interject to stop his anger from being directed at Carole, but that didn't work as he continued.

It was apparent that Professor Lawson was directing his rage at three different women and no one else was saying anything. They were probably too scared to say anything. They probably thought that if, to Professor Lawson, I wasn't black enough, then obviously no one else would be black enough for him. Eventually, he came to the end of his diatribe. I asked if anyone from the committee, in the room, or on Zoom wanted to add anything. There was a student on Zoom, who had witnessed this and she

turned on her video and apologized to Professor Lawson for all of the things he had had to go through. She was crying. Assistant Prof. Emile Loza deSiles, who was also in the zoom room, also said she was sorry about how he felt as she was on the committee. I asked Professor Lawson if he had anything else to say, he said "no, I'm done".

At this point I was wondering "what do I do now?". The dean's report slides were still up. Do we continue the hiring meeting? I asked Rich Chen if he was comfortable leading the faculty hiring meeting, he said "sure". Rich put his slides up. Professor Lawson stayed for a while, maybe 10-15 minutes, then left. I"m not sure if he rejoined the meeting *via* Zoom. ***After he left the meeting, I remember thinking "I hope he doesn't have a gun, should I alert Public Safety? Is it crazy that I'm thinking like this? I don't know where he's gone, I don't know what he's thinking of."***

***After the first part of the meeting we took a break. I went back to my office and cried. A few colleagues walked me back to my office. Everyone seemed shaken. I've never had a meeting like that. Even when faculty colleagues are upset, no one has ever been attacked personally. Seeing other people treated that way ... it was really painful -you shouldn't have to defend yourself about who you are, or where you come from or where you were born. You shouldn't have to defend yourself in front of a room full of people like that and asked to bear your soul and share your pain to prove your blackness etc .. Frankly, it was just mean and retraumatizing. It was mortifying, even more so because students were there in the zoom room, which I had not known - they were there for the faculty hiring conversation, which is what we thought we would be discussing after the dean's report. They saw faculty behaving like that. I felt so badly for the students, and embarrassed. I didn't know they were there until that student spoke. It was horrible. I didn't go back to the meeting right after the break. I needed to take a few minutes then went back later. I left later again to sit by myself in my office and wasn't there for the end of the meeting.***

The events of the meeting took everyone, including myself, by surprise. There's an expectation that talking about a committee concern, such as the one that Professor Lawson brought up, would be done at a regular faculty meeting. It should have been on an agenda so people could be prepared. ***I think that's why Professor Lawson came in person-to hijack the meeting. If it was put on the agenda, it would have allowed people to plan and think***

*ahead of time. They would have been willing to share, and the committee could have convened and explained.*

The fact-finders then asked who the members of the diversity committee are. I told them Susan Serrano is the chair, and a few others members ... Miyoko Pettit-Toledo, Andrea Freeman to name a few. They asked if the diversity committee was the one putting on the lunchtime event. I told them, yes, the committee was meant to have a conversation and it extended through lunch to have conversations about the letter.

I felt that the behavior demonstrated by Professor Lawson at the meeting was another "manifestation of a disordered mind frequently bursting with rage towards his peers and the school" and how these "frequent bursts with rage" have occurred before. He has a lot of pain that comes out in ways that seem hostile. It's one thing to be passionate and emphatic, to not be ambivalent, but I interpreted his tone as pretty much yelling. He's a passionate guy and has commitment but does not appear willing to listen, to have a civil conversation, or to learn about others' views and perspectives as possibly valid. He was in attack mode, his voice elevated, he pointed, made gestures. I don't know if he knows how he behaves, or how he comes across. *I worry about his judgement and impulse control.* That's how I perceived him. On a scale of 1 to 10, with 1 being a whisper and 10 being shouting at the top of his lungs, I think Professor Lawson's tone was about a 7, elevated, forceful, emphatic, but not screaming.

*I do feel that his vitriol that day felt gendered. That was mostly because the only people who spoke up were women.* I don't know what part of "me" he was responding to, the fact that I'm black, a woman, or an immigrant, all three. I think Professor Lawson is challenged by his peers and colleagues who are women but honestly, if those who spoke up were men, I don't know if it would be any different as he was so angry - as no men spoke up it is hard to tell.

*After the meeting, when Professor Lawson sent that email, the way he framed things in the letter, such as "holding people captive" and the day before, saying he's not a nonviolent person. I was scared and even more concerned. In the email he said he was accused of "overreacting" and "being too sensitive." I don't recall those things ever being said. I know I said to him "let's have a conversation" but I am sure I didn't say that he was overreacting or being too sensitive.* I don't know if Professor Lawson

can disentangle conversations from other places or situations, as he may be bringing forward past trauma to the present moment. He did not want to engage with my question of how we move forward, together, positively.

I have read the summary of my interview and it is accurate and complete.

Emphasis added.

15.    WSRSL Associate Dean, Nicholas A. Mirkay III ("**Mirkay**"), was at the 2/17/23 MTG, and provided a declaration in 23-cv-00348 filed 8/21/23 in D. Haw. that confirmed Nelson's recollection of the 2/17/23 MTG and also expressed his observation that immediately after the meeting that Nelson was "visibly shaken and emotionally distraught", "crying" and "visibly jarred and defeated."

16.    The email Nelson referred to in her interview statement is an email from Lawson dated February 18, 2023, where he stated:

**Kenneth Lawson** <kenlawdog@gmail.com>Sat, **Feb 18, 2023 at 3:26 PM**
To: Camille Nelson <nelsonca@hawaii.edu>
Cc: dshek@hawaii.edu, susanks@hawaii.edu, mtpettit@hawaii.edu,
Nicholas Mirkay<namirkay@hawaii.edu>, tynakamu@hawaii.edu

Camille,
     I have copied others on this email. I do not have the email address of Troy Ballard or all of the committee members of the Diversity and Inclusion Committee. Someone be kind enough to forward this email to all members of that group. Thank you, in advance.

     Camille, yesterday you asked me "where do we go from here?" Before I answer that, I would like to bring some context to what I was saying yesterday. ***My anger comes from my pain and hurt. Camille, you were highly dismissive of the pain that was caused by this racially insensitive act. You kept saying it was a mistake. Like shit happens, and this type of racism is no big deal when directed at Black Americans who were born and raised in this racist country. I'm certain you can also find***

11

*some educated "Negros" who may agree with you. The "Negro" intellectual who will speak about Black civil rights but only from a distance as these Negros are too afraid to take direct action on the street.*

In any event, Emile and our law student (who I did not know was listening) felt my pain and were moved to tears by the hurt this Law School has caused. To be clear, I am not asking you Dina, Susan, or anyone else involved in this racially insensitive act to recognize or acknowledge my pain, but *being dismissive of this racially insensitive act by viewing my protest as overblown is troublesome and is part of the problem at our Law School and here in Hawaii*.

A few years ago the Big Island mayor referred to a Black man as a colored boy. I wrote about that and was blasted for being overly sensitive. A few years ago, an Asian Defendant about to be sentenced to a lengthy prison sentence, showed up in court in blackface. The judge did not stop the proceedings. The defense lawyer did not stop the proceeding. The prosecutor did not stop the proceeding. The sentencing went on as if nothing was wrong. I found out because a reporter called me and said no one at the Law School or in the community will talk about this case. The reporter had just moved here from Vegas and he could not believe this would happen and that no one was willing to go on the record and speak out against it. How could a judge, and attorneys allow it to happen? Neither could I. Even other Black leaders in the community, including the NAACP, did not speak up because they did not want to cause racial rifts in Hawaii. I did the interview condemning what happened and I did an op-ed on it. I was blasted for being too sensitive. Not one person from the Law School said anything. Not one person in the Law School lent support. I am not deterred. Yesterday, I was told I was overreacting. Being too sensitive. "You know they meant no harm". Same thing people kept saying when Big Island Mayor Harry Kim called a grown Black man colored, "old Harry meant no harm...he's a good man." As if good people can't be racist or do racially insensitive things to Black folks.

Here's something we all know and can agree on- had this been about a presentation on Native Hawaiian civil rights, this Law School would have never thought it okay to have all white facilitators or facilitators that were not Native Hawaiian lead the discussion. If the topic were about Japanese Internment Camps, the Law School would not think of hosting an event where none of the facilitators were Japanese. If we were celebrating Pride

Month, would the Law School have non-LGBTQ facilitate the panel and not invite people from that community? Would the Law School put together a panel of facilitators to discuss the Jewish Holocaust and have all non-Jewish facilitators lead the discussion? Of course not, so why did I have to raise the issue for the "woke" to be awakened when it comes to Black Americans and our struggle for civil rights?

My point yesterday was not to say others have not experienced racism, sexism, or other life challenges. The issue was this specific Black History month event focused on the Black Civil Rights Movement and King's letter from the Birmingham Jail. So I shared my experience and my family's experience and our total dedication to the Black Civil Rights and Black Power Movements in racist America. I shared, so you and others understand that I have *earned* the right to speak on this specific issue. My roots with the Civil Rights movement and direct action protests go back to 1968 and the Cincinnati Riots after Dr. King was shot and killed. The riots happened three houses away from my grandmother's house in the neighborhood of Avondale. I was five years old, but my family has always been involved in civil rights and the Black Power/Nationalism movements. Although we disagreed with turn-the-other-cheek protests, we stood shoulder-to-shoulder with our Black brothers and sisters to advance our civil rights. Like I said yesterday, Rev Fred Shuttlesworth worked hand-in-hand with Dr. King in civil rights, and it was Rev. Shuttlesworth, who was from Birmingham, and he led the marches with King in Birmingham. See attached picture of the two of them together. Shuttlesworth came to Cincinnati in 1961, and his church was four blocks from my grandmother's house, the same neighborhood where riots took place in 67 and 68.

In another attached image, you will see the slightly older Rev Fred Shuttlesworth and other Black leaders, including myself. The image with Shuttlesworth, myself, and others was where we were announcing the "Brick City Hall Protests" and our list of demands to the city for a change in the way mental health patients are arrested. The next day, we marched with bricks to city hall and demanded change in CPD's policies for arresting the mentally ill. ***Shuttleworth refused to carry a brick as he thought it would make him look like he supported violence. Most of us carried bricks into City Hall.*** I have always been a Black activist, making it only natural that areas of practice were civil rights and criminal defense. The mentally ill Black man that was killed was named Lorenzo Collins. I did his civil rights case, which is cited in my CV. The City of Cincinnati implemented a Mental

13

Health and Awareness team for the police force. It still exists today.  For at least two decades, other Black civil rights leaders and I worked with Rev Shuttlesworth and others on protest strategies, civil rights demonstrations, homeless campaigns, and economic boycotts in Cincinnati.

The other photos are from the protests that led to the riots of 2001. In Cincinnati, I represented almost all the 15 Black families who had loved ones killed by the Cincinnati police in a two-year period. In 2001, I represented a mother whose unarmed teenage son was shot and killed by the police. We went to City Hall for a council meeting to get an answer to her question: what did the officer say was his reason for shooting her unarmed son? The Chief of Police and the council refused to answer the question. They were citing an ongoing investigation as their excuse. *A civil rights pastor whispered into my ear and asked me whether I wanted him to have the protestors block the chamber doors and lock the city council, chief of police, and mayor into the chambers until they answered my client's question. I told him yes. The civil rights protestors blocked the doors, locking the city council in chambers and keeping the police force from entering.* In some of the photos, you will see me at the table sitting next to the mother of the teenager that was killed by the police. In one, you will see me standing up at the same table yelling at the white racist Police Chief. Much of this council meeting is also on youtube. *We held them captive in city hall for 3 hours until they answered my client's question.* Shortly after we released them, the riots started and lasted for three days. We were shot at by police with rubber bullets, tear-gassed, and maced for three days. Days after the riots ended, with Rev Shuttlesworth and hundreds of other protestors, we left the funeral for the murdered black teenager and we attempted a peaceful march to city hall. We were again shot at with rubber bullets, maced, and tear-gassed. This time by police officers wearing masks and in unmarked cars doing drive-bys. Several children were struck and seriously hurt by the rubber bullets. We filed a class action racial profiling lawsuit, and the systemic change it brought about was historical and is still being used as a model for other cities to follow.

Those are just two of the civil rights demonstrations I was involved in as a lawyer and activist. There were countless others, many of which happened before I became a lawyer. I have spent much of my entire life, from grade school to the present being involved in protests, riots, and economic boycotts. I grew up fighting against racial injustice.

Dr. King did not write his letter from the Birmingham jail from the comfort of his church office. He wrote the letter, in jail, after getting his ass beat by

racist police and racist white civilians. He sat in jail with other black folks who were likewise beaten. It was the pain of the struggle and the lack of understanding from moderate liberals that motivated him to write the letter. The white moderates' position on the direct action protest caused him pain and anger, and he responded by writing the letter. This brings me to the decision made by the Law School's Diversity and Inclusion committee and Medical Legal Partnership to exclude Black civil rights activists and attorneys from facilitating this topic for Black History month. To claim to be so woke but not inviting or seeking to find Black civil rights lawyers to facilitate this discussion is appalling and racist. King responded to the white liberals, who thought they were woke, by writing his letter from the Birmingham jail. I responded to our Law School's liberals in the only way I know how, telling my truth. It's the experience offering for your life while engaged in direct action protest, being beaten and locked up that was the catalyst of the letter, not something he read in a book, researched, and wrote scholarly article about. The risk those of us Black Americans took with our lives and careers to uplift our people were great.

Where do we go from here? Not sure. From my perspective, as I alluded to earlier, being the Law School's only Black American-born faculty member and raised in racist America, Robin DiAngelo best describes how I feel whenever I bring up race and my Blackness at the Law School and in Hawaii:

> *In not thinking critically about our racial positions and how they shape our experiences, we don't develop skills for navigating a sensitive conversation. This is especially true if my worldview, assumptions, or behaviors are being questioned. The result: white fragility. And Black people know that most of us can't answer the question of our own whiteness, and that we bring that inability to the table. Thus, they [Blacks] are likely to experience more punishment, not less, if they raise race issues. This is one of the great contradictions of white [another non-black progressives]. On the one hand, I would never want to say or do anything racially hurtful. But on the other, don't you dare tell me I have said or done something racially hurtful!*

**Robin DiAngelo**, *Nice Racism How Progressive White People Perpetuate Racial Harm* (Beacon Press Boston, 2021).

Maybe this is why the NAACP, and other Blacks stay so silent on issues affecting Blacks in Hawaii. Anyway, I suspect that those involved in this incident still do not believe their actions were racially insensitive, wrong, and hurtful.

Camille, you're the Law School Dean. Where do we go from here? As for me and my family, We will always be vocal and willing to fight on the frontlines for justice for Black people.

Kenneth Lawson

Emphasis added.  ("**2/18/23 KL Email**").

17.    On February 21, 2023, Lawson forwarded an edited version of his

2/18/23 KL Email to the *WSRSL's faculty, staff and students* and *members of*

*African American Lawyer Association in Hawaii* with the following cover email:

Dear all,
Professor Lawson and members of the WSRSL Chapter Of the National Black Law Students Association call for a BOYCOTT of The Black History Month event sponsored by the Law School's Committee on Diversity and Equity and the Medical-Legal Partnership, "Reflections On A Letter From the Birmingham Jail" [see attached flyer] scheduled for this Thursday, February 23, at noon in CR 2.

As a Law School, we can and should be proud that we are the most diverse law school in the United States.  However, with that honor comes the responsibility of understanding and respecting our diversity and unique racial and cultural differences. All of our races and cultures deserve recognition and respect. We ask that you stand in solidarity with us for the following reasons.

We are deeply respectful and dedicated to the Black Civil Rights Movement because our parents and grandparents were born during the Jim Crow era of segregation. During the 1950s and 1960s, many of our family members were actively involved in the civil rights movement. We are also involved in the fight for civil rights. Professor Lawson has been involved in the Black Civil Rights Movement since the late 1960s, as many of you are aware.

16

We are a small group of Black students at WSRSL. We, too, struggle for a sense of belonging at times. But it hurts when we are not seen or simply ignored. We were disappointed and surprised to learn that the Law School's Black History Month event was not facilitated by any local Black Civil Rights attorneys, BLSA members, or Black Civil Rights Activists. In fact, there are no Black facilitators for the event. Dr. King was a monumental figure in our community, and we would have hoped that for just one moment during the school year, our small black community could be heard and truly welcomed among you all.

***Last week, Professor Lawson explained to the Dean, the committee, and other faculty members why he was offended and angry. On Saturday, he emailed the Dean and members of the Diversity and Inclusion Committee, but his concerns were ignored and labeled "angry" and "sensitive", while failing to recognize our deeply rooted connection to our culture. Professor Lawson has cut and pasted below, in red font, an edited version of the email he sent out on Saturday. He also has attached the images that accompanied that email. Hopefully, it explains why we join him in calling for the boycott of this event.***
Sincerely,
Kenneth Lawson and Members of the Black Law Students Association

Emphasis added.  A copy of this email is attached hereto as **Exhibit A** ("**2/21/23**

**KL FW email**").

18.     In Lawson's Verified Complaint against the University, Lassner,

Bruno, Nelson and Mirkay in 24-cv-00172 filed 4/15/24 in D. Haw. further

publicized his false statements about Nelson's conduct at the 2/17/23 MTG in

paragraphs 65-82.  In paragraph 72, Lawson stated: "Professor Lawson explained

that some of his family members had belonged to the Black Panther Party and how

he also followed the teachings of Malcolm X who believed in protesting peacefully

but using self-defense if attacked."  Lawson did state at the meeting that he is

adherent of Malcolm X, drawing a distinction from Dr. Martin Luther King Jr., to

17

make his threat that "***he's not a nonviolent person***" as he restated in his 2/18/23

KL Email.  However, unlike Lawson, Malcolm X had empathy for Black women in

America.  Malcolm X once said: "

> "The most disrespected person in America is the Black woman. The most unprotected person in America is the Black woman. The most neglected person in America is the Black woman."—Malcolm X

https://zora.medium.com/malcolm-x-stood-up-for-black-women-when-few-others-would-68e8b2ea2747.  Malcolm X was also of Caribbean descent as his mother

was Grenadian.

20.	Faculty members who were at the February 18 meeting found

Lawson's conduct at the faculty meeting unacceptable.

20.	On February 21, 2023, Professors Linda Krieger, Kapua Sproat and

Carole J. Petersen wrote to Nelson and Associate Dean Mirkay, and copied All

Voting Members of the Law School Faculty:

> ***We write to express our profound regret regarding, and strong objections to, the disrespectful way in which Professor Ken Lawson addressed our Dean and other colleagues during the faculty meeting of February 17, 2023. We fully recognize Ken's right to express his views at faculty meetings. However, Ken also has an obligation to treat our Dean and all colleagues with respect and to refrain from name-calling and other abusive language and behavior that could create a hostile and intimidating work environment.***

> We believe that the time has come to formally adopt Ground Rules for all meetings in our Law School. We have no desire to stifle academic freedom or vigorous debate, which are hallmarks of a university. However, we believe that Ground Rules are necessary to ensure respectful dialogue and a safe and non-hostile workplace.

18

We are drafting a set of proposed Ground Rules and welcome faculty input.
The goal is to preserve space for respectful debate while also complying
with the University's Policy on Workplace Non-Violence, which prohibits
abusive and belligerent language (see
https://www.hawaii.edu/policy/?action=viewPolicy&policySection=Ep&poli
cyChapter=9&policyNumber=210 ). The proposed Ground Rules will also
take into account the University's obligations under state and federal law,
including Title VI, Title VII, and Title IX.

We respectfully request that this item be placed on the agenda for the next
regular faculty meeting. We will endeavor to circulate a set of proposed
Ground Rules in advance of the meeting so that colleagues can consider the
content and offer amendments if desired.
Ideally, we would be able to vote on the Ground Rules at the meeting.

We also invite other members of the faculty to endorse and join us in this
effort.

Emphasis added.

21.     On February 22, 2023, Professor Susan Serrano and Faculty Specialist

Dina Shek who were members of the Diversity and Inclusion Committee wrote to

Lawson in response to his 2/21/23 KL FW email attached as Exhibit A:

Aloha mai kākou,

Thank you to those who have reached out to inquire about the Black History
Month book club "lunch and discussion." We thought it would be helpful to
share what we have already shared with other faculty regarding the
background and format of this event (see attached). We offer this additional
information in the spirit of openness, and we hope it fosters better
understanding and dialogue within our law school and greater community.

Dina Shek & Susan Serrano

19

Their attached memo dated February 21, 2023, which sets forth how the Black

History Month book club "lunch and discussion" came about and addresses

Lawson's concerns, is attached hereto as **Exhibit B**.

22.    On March 6, 2023, the African American Lawyers Association

("**AALA**") in Hawaii responded to Lawson's 2/21/23 KL FW email, with the

following letter:

Dear Prof. Lawson:

*We reviewed your email to various unidentified people about Dean Camille Nelson of UH Law School.*

*We disagree. You referred to "intellectual Negroes" and you were upset because a Book Club about Dr. King's letter from Birmingham jail did not include you as a speaker. First of all, you were invited to the book club as it was open to the public. Instead of attending you got upset and stated there were no African Americans speakers. We understand Prof. Serrano is of African descent. Prof Serrano has attended many events advocating for Black people and has participated in protests in Hawaii to support making life better for Black People and Black Lives Matter. She was a facilitator of the book club.*

*You referred to Dean Nelson several times in a derogatory manner. You appear to assert that because she was not born in America, she is really not Black.* National origin is a form of discrimination. She was born in Jamaica, a Black Country. As Peter Tosh sang, "No matter where you come from, as long as you are Black, you are an African."

You wrote that Blacks in Hawaii are silent and afraid to speak out This is untrue. Blacks in Hawaii marched to have Dr. King's holiday recognized by Hawaii State, fought to have a Hawaii Civil rights Commission, we objected to racists comments by Judges making remarks about "n ..... rs in woodpile" about Black attorneys. Atty. Andre Wooten wrote a letter to the editor challenging the state to appoint a Black Judge to the Hawaii Court and we rallied behind appointing Sandra Simms as the first African American

20

female Judge, we testified on a number of legislations, we fought to have Juneteenth recognized, we gave financial support to needy Black Students and gave away scholarships, we recognized Charles Johnson who was one of the first advocates for the creation of UH Law school and its first preadmission program officer, and objected to the racist remarks of a defense attorney who argued to a jury that "It is everyone's nightmare to come home and find a Black man on their daughter" in a criminal case. We have sued UH for discrimination before. We are not afraid and silent and have spoken out. You are not the only Black person to write letters to the editor or be on television or speak out Until Ron Williams, editor of Mahogany and Afro Hawaii News who died a few years ago, we had our own community newspapers, some of us published articles on community events. We testified against the former Tourism Chief who referred to Barrack Obama as a "coon" and Hillary Clinton as a "beaver". After our testimony against him for racism, he resigned. We held National Bar Association meetings and forums at UH law school and have sponsored may events by zoom such as having Attorney General Keith Ellison to speak about the prosecution of Darek Chauvin for the murder of George Floyd.

We, as African American Lawyers in Hawaii have long advocated for civil rights and on matters of importance to the Black community in Hawaii and were recognized for our role by the Hawaii Friends of Civil Rights and our Congressional delegation in 2009. Several of us are recipients of the Hawaii NAACP - Lifetime Achievement Awards for their contributions to justice and our community.

We agree the UH should utilize more African American Attorneys in the community, especially for mentorship in civil rights, lectures and other events. We are willing to this. ***However we do not agree that attacking Dean Nelson and the Black community as silent "Intellectual Negroes" is the way forward.***

Sincerely,
/S/
Daphne Barbee-Wooten, Atty.
Andre' Wooten, Atty.
Sandra Simms, Ret. Judge
Rustam Barbee, Atty
cc: AALA

21

Emphasis added.

23.    On March 6, 2023, Lawson responded to the above AALA letter as follows:

From: **Kenneth Lawson** <kenlawdog@gmail.com>
Date: Mon, Mar 6, 2023 at 5:07 PM
Subject: My Apology
To: <rustam@honoluluattorney.com>, <attyandrewooten.com@gmail.com>, <sandrasimms48@gmail.com>, <daphnebarbee@gmail.com>, <morgan@bsds.com>
Dear all,
Rather than reply to the email chain, I am responding on a separate email thread.
First, I want to apologize to you all for I was not speaking about any of you as "negroes" when I wrote it, that's why I copied you on it. I mentioned your names in the meeting when I shared my hurt about this situation as people that could have been called to facilitate the event. Because of my personal history, I was very hurt by what had transpired. *Upon reflection, I should have approached the issue differently.* I know all of you have stood up and fought for justice here. Again, that's why I suggested at the meeting that some of you should have been contacted.

Secondly, with respect to Susan, a few years ago, she had told me and another Black
colleague when we were discussing our racial ancestry that she was Japanese and Puerto
Rican. In an abundance of caution, *prior to me saying that there were no Black facilitators, we did research and found a civil rights article that she co-authored entitled*: Civil Rights, *Disma11tli11g Civil Rights: Multiracial Resistance and Reconstruction,* Susan and her co-author's state in a footnote that: [t]o make this more co11crete, racially, we co-authors are Americans of Japanese, Filipino, Asian Indian, Korean, Puerto Rican, Caucasian, Hawaiian and Chinese ancestry." There is no mention of any of the authors, including Susan, claiming to be Black or African ancestry.  I say this with all due respect and please understand I am not attacking her - if she's Black she's Black, but it's not what she told us a few years ago and it's not what she

22

tells her readers in her scholarship when she and her co-authors are trying to explain how racially diverse they are.

I do not write this email to debate. ***I was wrong in how I handled this matter. If given the opportunity in the future I will apologize to Camille and others for the way that I handled the matter. It has taken away from my main point, which is the systemic anti-Black racism in the UH community.*** A few years ago, (before Camille was the Dean) a white colleague applied for a job at the Law School and used images of monkeys in suits in his PowerPoint presentation. When I and another Black sister voiced our anger and outrage about the Law School hiring this person, many in the room said we overreacting we were too angry and too sensitive. Just recently, Artie Wilson and a number of other former Black UH student-athletes signed a petition to expand the search committee for a new AD because no Blacks were on the committee yet UH benefits by having a high percentage of Black student-athletes.

We can agree to disagree on the issue of the Law School excluding Black Law Students
and Black Civil Rights activists from being involved in the Law School's Black History Month event was unconscious racial bias. I stand by what I said on that point, and it was extremely hurtful to me and others, but as I said earlier, I could have handled it differently.

Finally, I would like to be part of and not separate from our Black legal community. If you all are willing, I could benefit by participating with some of you in the restorative process through ho'oponopono. If you are willing to allow me to go through his restorative process with you, then maybe Judge Simms can assist in making this happen.
Respectfully,

Emphasis added.

24.     On October 2, 2023, a fact-finding report on the 2/17/23 MTG UH

Investigation was issued after interviewing 33 witnesses to the 2/17/23 MTG.  On

December 1, 2023, the University decision-maker, the Dean of the School of

Nursing, issued a written decision that accepted most of the findings in the report

including that "[s]ixteen witnesses corroborated that Lawson interrupted Nelson every time she tried to speak", and concluded that Lawson's conduct at the 2/17/23 MTG, his 2/18/23 KL Email and 2/21/23 Forward Email violated the University's Workplace Non-Violence Policy (EP 9.210), and Nondiscrimination, Equal Opportunity and Affirmative Action Policy (EP1.202).

25.     Lawson never apologized to Nelson.  Instead, he filed the 5 Lawsuits between 8/21/23 to 1/10/25, all suing the University and Nelson, and all based in part on or referring to the 2/17/23 MTG, his 2/18/23 KL Email and/or his 2/21/23 Forward Email; thus perpetuating the false statements in his 2/18/23 KL Email including that at the 2/17/23 MTG that Nelson was "***highly dismissive of the pain that was caused by this racially insensitive act. You kept saying it was a mistake. Like shit happens, and this type of racism is no big deal when directed at Black Americans who were born and raised in this racist country. . . being dismissive of this racially insensitive act by viewing my protest as overblown is troublesome and is part of the problem at our Law School and here in Hawaii***."

26.     Through these planned events, Lawson intentionally and predictably caused Nelson prolonged chronic stress, which has progressed to allostatic overload resulting in illness the specifics of which will be disclosed in discovery under a Court-approved protective order.  Thus, Lawson caused Nelson serious

illness, pain and emotional distress that likely will have long-term adverse effects on Nelson's health, well-being and future employment.

27.    Special damages are those damages which can be calculated precisely or can be determined by you with reasonable certainty from the evidence.  HI R CIV JURY Instr. 8.2.

28.    General damages are those damages which fairly and adequately compensate plaintiff(s) for any past, present, and reasonably probable future disability, pain, and emotional distress caused by the injuries/damages sustained. HI R CIV JURY Instr. 8.3.

29.    Pain is subjective, and medical science may or may not be able to determine whether pain actually exists. You are to decide, considering all the evidence, whether pain did (, does and will) exist. HI R CIV JURY Instr. 8.4.

30.    Emotional distress includes mental worry, anxiety, anguish, suffering, and grief, where they are shown to exist.  HI R CIV JURY Instr. 8.5.

31.    Punitive damages are awarded against a particular defendant only if plaintiff(s) have proved by clear and convincing evidence that the particular defendant acted intentionally, willfully, wantonly, oppressively or with gross negligence. Punitive damages may not be awarded for mere inadvertence, mistake or errors of judgment. The proper measure of punitive damages is (1) the degree of intentional, willful, wanton, oppressive, malicious or grossly negligent conduct that

formed the basis for your prior award of damages against that defendant and (2)

the amount of money required to punish that defendant considering his/her/its

financial condition. In determining the degree of a particular defendant's conduct,

you must analyze that defendant's state of mind at the time he/she/it committed the

conduct which formed the basis for your prior award of damages against that

defendant. Any punitive damages you award must be reasonable. HI R CIV JURY

Instr. 8.12.

32.    An act is "willful" when it is premeditated, unlawful, without legal

justification, or done with an evil intent, with a bad motive or purpose, or with

indifference to its natural consequences.  HI R CIV JURY Instr. 8.13.

33.    An act is "wanton" when it is reckless, heedless, or characterized by

extreme foolhardiness, or callous disregard of, or callous indifference to, the rights

or safety of others. HI R CIV JURY Instr. 8.14.

34.    An act is "oppressive" when it is done with unnecessary harshness or

severity.  HI R CIV JURY Instr. 8.15.

35.    An act is "malicious" when it is prompted or accompanied by ill will

or spite.  HI R CIV JURY Instr. 8.16.

36.    Gross negligence is conduct that is more extreme than ordinary

negligence. It is an aggravated or magnified failure to use that care which a

reasonable person would use to avoid injury to himself, herself, or other people or

26

damage to property. But gross negligence is something less than willful or wanton conduct.  HI R CIV JURY Instr. 8.17.

37.   Lawson is liable to Nelson for defamation and intentional infliction of emotional distress that caused her reputational harm, special damages including medical expenses and future loss of employment, general damages including pain and emotional distress and entitles her to punitive damages.

**WHEREFORE**, Plaintiffs pray for judgment and relief against Defendants, jointly and severally, as follows:

A.   Damages in amounts to be proven at trial including reputation harm, special damages and general damages.

B.   Punitive damages.

C.   Injunctive relief.

D.   Attorneys' fees and costs.

E.   Pre-judgment and post-judgment interest.

F.   Such other relief as the Court may deem just and proper.

DATED:  Honolulu, Hawai'i, March 10, 2026.

*/s/ William Meheula*
WILLIAM MEHEULA

Attorney for Defendant/Counterclaimant

27

Camille Nelson

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAI'I

| | |
|---|---|
| KENNETH L. LAWSON,<br><br>                    Plaintiff,<br><br>          vs.<br><br>DAVID LASSNER, MICHAEL BRUNO, CAMILLE NELSON, NICHOLAS A. MIRKAY,<br><br>                    Defendants. | CASE NO. 1:24-CV-00172-LEK-RT<br><br>CERTIFICATE OF SERVICE |

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the

foregoing document was duly served upon the following on the date indicated

below and by the method indicated:

KENNETH L. LAWSON, *pro se*
3362 Loulu Street
Honolulu, Hawaii 96822
kenlawdog@gmail.com

Plaintiff

☐ VIA HAND DELIVERY

☒ CM/ECF NOTICE OF ELECTRONIC FILING

☐ VIA U.S. MAIL, POSTAGE PREPAID

1

CARRIE K. S. OKINAGA, ESQ.
University General Counsel
JUSTIN M. LUNEY, ESQ.
GREG H. TAKASE, ESQ.
ELISABETH A.K. CONTRADES, ESQ.
ERIC A. IRWIN, ESQ.
Associates General Counsel
UNIVERSITY OF HAWAI'I
2444 Dole Street, Bachman Hall 101
Honolulu, Hawai'i 96822

Attorneys for Defendants
UNIVERSITY OF HAWAI'I,
DAVID LASSNER, MICHAEL BRUNO,
CAMILLE NELSON, AND NICHOLAS A.
MIRKAY

☐ VIA HAND DELIVERY

X CM/ECF NOTICE OF ELECTRONIC FILING

☐ VIA U.S. MAIL, POSTAGE PREPAID

DATED:  Honolulu, Hawai'i, March 10, 2026.

/s/ *William Meheula*
WILLIAM MEHEULA

Attorney for Defendant
CAMILLE NELSON, on the Counterclaim

*Kenneth L. Lawson v. David Lassner, et al.*; Case No. 1:24-CV-00172-LEK-RT;
CERTIFICATE OF SERVICE

2