UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| KENNETH L. LAWSON,<br><br>              Plaintiff,<br><br>     vs.<br><br>UNIVERSITY OF HAWAII, DAVID LASSNER, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES; MICHAEL BRUNO, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES; CAMILLE NELSON, IN HER OFFICIAL AND INDIVIDUAL CAPACITIES; NICHOLAS A. MIRKAY, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES; AND JANE/JOHN DOES 1-10, IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES;<br><br>              Defendants. | CIV. NO. 24-00172 LEK-RT |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is pro se Plaintiff Kenneth L. Lawson's ("Lawson") Motion for Summary Judgment ("Motion"), filed on January 6, 2026. [Dkt. no. 162.] Defendants Michael Bruno ("Bruno"), Camille Nelson ("Nelson"), and Nicholas A. Mirkay ("Mirkay" and collectively "Defendants") filed their memorandum in opposition on February 12, 2026,[1] and Lawson filed

---

[1] The memorandum in opposition was also filed on behalf of Defendant David Lassner ("Lassner"). See Mem. in Opp. at 1. After the filing of the memorandum in opposition, Lawson voluntarily dismissed his claims against Lassner. See Notice of Voluntary Dismissal of All Claims Against Defendant David Lassner, filed 2/23/26 (dkt. no. 180).

his reply on February 16, 2026. [Dkt. nos. 171, 174.] This matter came on for hearing on March 19, 2026. Lawson's Motion is denied for the reasons set forth below.

## BACKGROUND

Lawson filed this action on April 15, 2024. See Verified Complaint, filed 4/15/24 (dkt. no. 1) ("Complaint"). The operative pleading is Lawson's First Amended Verified Complaint, filed on May 30, 2024 ("Amended Complaint"). [Dkt. no. 43.]

Lawson is a tenured faculty member at the University of Hawai`i ("the University") William S. Richardson School of Law ("WSRSL"). [Amended Complaint at ¶ 8; Defendants' Answer to First Amended Verified Complaint, Filed May 30, 2024 [Dkt. 43] ("Answer"), filed 3/10/26 (dkt. no. 185), at ¶ 8 (admitting that portion of Lawson's ¶ 8).] Lawson was also chosen by students to be the faculty advisor of the Black Law Students Association ("BLSA"). [Amended Complaint at ¶ 16.] Bruno is the University Provost, Nelson is the Dean of the WSRSL, and Mirkay is the Associate Dean of the WSRSL. [Id. at ¶¶ 11-13; Answer at ¶ 12 (admitting Nelson is the WSRSL Dean).[2]] Lawson's claims in this case arise from: a February 17, 2023 faculty meeting ("2/17/23

---

[2] As to Bruno and Mirkay, Defendants admit each "was and is employed by the University," but deny Lawson's allegations as to their specific positions. See Answer at ¶¶ 11, 13.

Meeting"); a February 21, 2023 email that Lawson sent through a WSRSL email listserv calling for a boycott of an event that he criticized during the 2/17/23 Meeting ("2/21/23 Boycott Email");[3] the administrative investigation regarding the 2/17/23 Meeting and the 2/21/23 Boycott Email; and the disciplinary action taken against Lawson as a result. See, e.g., Amended Complaint at ¶¶ 2, 64, 66, 91, 124-25.

The remaining claims in this case are: a Title 42 United States Code Section 1983 claim alleging viewpoint discrimination, in violation of the First Amendment, against Defendants, in their individual capacities ("Count I"); a Section 1983 claim alleging First Amendment retaliation against Defendants, in their individual capacities ("Count II"); a Section 1983 claim alleging First Amendment retaliation against Defendants, in their official capacities ("Count III"); a Section 1983 claim alleging prior restraint of Lawson's First Amendment rights against Bruno, in his official capacity ("Count IV"); a Section 1983 claim against Bruno, in his official capacity, asserting a facial and as-applied challenge to the University's Executive Policy ("EP") 1.202 ("Count V"); a

_____

[3] The 2/21/23 Boycott Email has previously been referred to in other orders as the "2/21/23 Listserv Email." See, e.g., Order Granting in Part and Denying in Part Defendants' Motion for Partial Dismissal of Plaintiff's First Amended Verified Complaint [Dkt. 43], filed 1/31/25 (dkt. no. 138) ("1/31/25 Order"), at 3, available at 2025 WL 358432.

Section 1983 claim against Bruno, in his official capacity, asserting a facial and as-applied challenge to EP 9.210 ("Count VI"); and a Section 1983 claim alleging violations of Lawson's Fourteenth Amendment procedural due process rights, against Defendants in their individual capacities ("Count VII").[4] See Amended Complaint at pgs. 60-78; see also 1/31/25 Order at 27-28 (dismissing some of the claims in the Amended Complaint).

## I.  Undisputed Facts

On February 11, 2023, Lawson filed discrimination grievances against Bruno and Nelson.[5] [Separate and Concise Statement of Facts in Support of Kenneth L. Lawson's Motion for Summary Judgment ("Lawson's CSOF"), filed 1/6/26 (dkt. no. 163), at ¶ 2; Defendants' Response to Plaintiff's Concise Statement of Facts and Defendants' Statement of Facts ("Defs.' CSOF"), filed

---

[4] The Amended Complaint also included a claim pursuant to Title 42 United States Code Section 1986 ("Count VIII"). [Amended Complaint at pgs. 77-78.] That claim appears to have been inadvertently misnumbered as a second "Count VII." See id. at pg. 77. In the 1/31/25 Order, Count VIII was dismissed with leave to amend. See 1/31/25 Order at 26-27. However, Lawson ultimately chose not to file a second amended complaint. See Plaintiff's Status Memorandum on Appeal and Amended Complaint, filed 8/14/25 (dkt. no. 144). Thus, Count VIII is no longer before this Court.

[5] Lawson's February 11, 2023 grievance alleged that, after the WSRSL faculty voted to approve Lawson's request for a special salary adjustment, Bruno and Nelson vetoed the faculty's vote, and their veto was discriminatory and retaliatory. See Amended Complaint at ¶¶ 54-55, 58-59.

2/12/26 (dkt. no. 170), at Response ¶ 2 (stating Lawson's ¶ 2 is undisputed).[6]]

During the 2/17/23 Meeting, Lawson raised concerns about a planned Black History Month event ("the Event").[7] [Lawson's CSOF at ¶ 3; Defs.' CSOF at Response ¶ 3 (partially disputing Lawson's ¶ 3 as to other portions of Lawson's ¶ 3).] Lawson only spoke about his concerns after raising his hand and after Nelson called upon him to speak. [Lawson's CSOF at ¶ 4; Defs.' CSOF at Response ¶ 4.] No one called security because of what transpired when Lawson raised his concerns about the Event. [Lawson's CSOF at ¶ 7; Defs.' CSOF at Response ¶ 7 (disputing other portions of Lawson's ¶ 7).] The 2/17/23 Meeting lasted approximately four more hours after Lawson spoke about the Event. [Lawson's CSOF at ¶ 6; Defs.' CSOF at Response ¶ 6 (partially disputing Lawson's ¶ 6 to point out that there was a break during that period).]

On February 18, 2023, Nelson sent Bruno an email that, *inter alia*, requesting that Lawson be required to undergo anger

---

[6] Defendants' CSOF includes both Defendants' Response to Plaintiff's Concise Statement of Facts, [Defs.' CSOF at pgs. 2-6,] and Defendants' Concise Statement of Facts in Opposition, [id. at pgs. 7-9].

[7] Lawson states that the event was planned and promoted by the WSRSL Diversity, Equity, and Inclusion ("DEI") committee. See Amended Complaint at ¶¶ 61-66. Other filings in this case refer to the DEI committee as the Diversity and Inclusion ("D&I") committee. See *infra* Background Section III.

management and/or another type of psychological support ("Nelson's 2/18/23 Email"). See Lawson's CSOF at ¶ 10; Defs.' CSOF at Response ¶ 10 (partially disputing Lawson's ¶ 10 as to Lawson's other statements about the content of the email); Motion, Kenneth L. Lawson Declaration ("Lawson Decl."),[8] Exh. Z (email chain that included Nelson's 2/18/23 Email).[9] Nelson's 2/18/23 Email stated "we are in mediation, and proceeding through another process with him." [Lawson Decl., Exh. Z at PageID.3723.] Lawson argues the "we" in Nelson's 2/18/23 Email refers to Nelson and Bruno, [Lawson's CSOF at ¶ 11,] but Defendants argue the statement does not expressly refer to Bruno, [Defs.' CSOF at Response ¶ 11]. Nelson's 2/18/23 Email also stated that Nelson thought Lawson's behavior at the 2/17/23 Meeting was "indicative of the manifestation of a disordered mind that is frequently bursting with rage towards his peers and the school." [Lawson Decl., Exh. Z at PageID.3722.]

Also on February 18, 2023, after sending the email, Nelson and Lawson spoke briefly at a public event. [Lawson's

---

[8] A copy of the Lawson Declaration is also attached to Lawson's CSOF. [Dkt. no. 163-1.] Because all of Lawson's exhibits are attached to the version of the Lawson Declaration filed with the Motion, all citations to the Lawson Declaration refer to the version filed with the Motion.

[9] Nelson's 2/18/23 Email was also addressed to Teresa Kono, Laura Lyons, Carrie Okinaga, and Elisabeth Contrades. [Lawson Decl., Exh. Z at PageID.3722.]

CSOF at ¶ 12; Defs.' CSOF at Response ¶ 12 (partially disputing Lawson's ¶ 12 as to specific information regarding the interaction).] Nelson did not discuss this interaction with the fact finders during the administrative investigation. [Lawson's CSOF at ¶ 13; Defs.' CSOF at Response ¶ 13 (partially disputing Lawson's ¶ 13 as to its wording).]

In the 2/21/23 Boycott Email, Lawson and the BLSA called for a boycott of the Event. [Lawson's CSOF at ¶ 14; Defs.' CSOF at Response ¶ 14.]

No WSRSL student filed a complaint regarding either Lawson's remarks at the 2/17/23 Meeting or the 2/21/23 Boycott Email. See Lawson's CSOF at ¶ 8; Defs.' CSOF at Response ¶ 8.

On February 27, 2023, Bruno banned Lawson from the WSRSL campus, imposed restrictions on Lawson's use of the listserv, and ordered Lawson not to contact Nelson and certain other WSRSL faculty and staff ("no-contact orders"). [Lawson's CSOF at ¶ 16; Defs.' CSOF at Response ¶ 16; Lawson Decl., Exh. F (letter dated 2/27/23 to Lawson from Bruno ("Bruno's 2/27/23 Letter")).] Bruno's 2/27/23 Letter also informed Lawson that "the University has initiated a fact-finding investigation to look into the allegations" regarding the 2/17/23 Meeting and the 2/21/23 Boycott Email. [Lawson Decl., Exh. F (Bruno's 2/27/23 Letter) at PageID.3507.] There was no alleged misconduct that occurred during the period between the 2/21/23 Boycott Email and

7

Bruno's 2/27/23 Letter. [Lawson's CSOF at ¶ 17; Defs.' CSOF at ¶ 17.]

Bruno appointed the fact finders and the decision maker in the investigation and issued sanctions after the decision maker issued a decision. [Lawson's CSOF at ¶ 18; Defs.' CSOF at Response ¶ 18 (partially disputing Lawson's ¶ 18 on other grounds).]

The decision maker, Dr. Clementina Ceria-Ulep, Dean of the University's Nancy Atmospera-Walch School of Nursing ("Dean Ceria-Ulep") issued a letter, dated December 1, 2023, stating her findings ("Decision"). [Lawson Decl., Exh. M (Decision).] Dean Ceria-Ulep stated that the fact finders submitted a report to her on October 2, 2023, and the fact finders subsequently submitted an addendum to their report with additional information provided by Lawson. Id. at PageID.3634; see also Lawson Decl., Exh. J (Memorandum dated 10/2/23 to Dean Ceria-Ulep from Anne Marie Puglisi, Investigator, Office of Equity Assurance ("Puglisi"), and Daniel Sato, Administrative Officer, College of Arts, Languages & Letters ("Sato" and "Fact-Finding Report")).

Dean Ceria-Ulep found that the following allegations, which related to EP 9.210, the University's Workplace Non-Violence Policy, were substantiated:

1. Lawson raised his voice and yelled at the event organizers and those who spoke up because he was upset about the Black History month event and the organizers because they did not invite Lawson or outside Black community members to speak.

. . . .

2. Lawson accused the organizers and other faculty members of engaging in white fragility and racism and referred to them as a "woke liberal."

. . . .

3. Lawson repeatedly interrupted Nelson when she tried to speak and swore.

. . . .

5. Lawson's words and actions created an unsafe space for discussion and silenced the room.

. . . .

6. Both in the meeting and in subsequent emails after the meeting, Lawson utilized words perceived as veiled threats, such as informing meetings attendees, students and staff via a listserv that he was "not non-violent," and repeatedly inviting another faculty member who submitted a proposal for ground rules for future faculty meetings to "come at me."

. . . .

7. Lawson's behavior interfered with Work, Academic Performance, and/or workplace safety[.]

[Lawson Decl., Exh. M (Decision) at PageID.3640-44 (emphases omitted).]

Dean Ceria-Ulep also found that the following allegation, which related to EP 1.202, the University's Nondiscrimination, Equal Opportunity, and Affirmative Action Policy, was substantiated: "Lawson questioned Nelson's 'black experience' as someone not raised in the U.S." [Id. at PageID.3646 (emphasis omitted).]

Further, Dean Ceria-Ulep found that the following allegations, which related to EP 1.204, the University's Sex and Gender Based Misconduct Policy, were substantiated in part:

> 2. Lawson attacked a female colleague when she tried to provide a different perspective[; and]
>
> . . . .
>
> 4. Lawson quickly reacted to female colleagues when they requested the establishment of ground rules in faculty conversations, but when male colleagues spoke out against his actions in the meeting, Lawson did not respond[.]

[Id. at PageID.3648-49 (emphases omitted).]

In the Decision, Dean Ceria-Ulep recommended that Bruno take various corrective actions, including, *inter alia*, requiring: "[m]andatory training with the Office of Equity Assurance" regarding EP 1.202 and EP 1.204; and "[m]andatory anger management training to provide Lawson with tools and resources to engage in conversations in a collegial manner." [Id. at PageID.3650.]

10

During her deposition, Dean Ceria-Ulep testified that she primarily relied on the Fact-Finding Report, and that she did not read the 2/21/23 Boycott Email. [Lawson's CSOF at ¶ 30; Defs.' CSOF at Response ¶ 30.]

On March 8, 2024, Bruno issued a letter informing Lawson that Bruno was adopting Dean Ceria-Ulep's Decision ("Bruno's 3/8/24 Letter"). [Lawson Decl., Exh. FF (Bruno's 3/8/24 Letter).] Bruno's 3/8/24 Letter stated:

> I am also adopting the recommendation for corrective action as outlined in Dean Ceria-Ulep's December 1, 2023 decision:
>
> - You will be suspended for one-month without pay;
>
> - You are directed to attend mandatory one-on-one training with the Office of the Vice Provost for Academic Excellence (OVPAE) and System Office of Human Resources (OHR) on EP 9.210, the University's Workplace Non-Violence Policy
>
> - You are directed to attend mandatory training with the Equity Assurance Office (EAO) on both EP 1.202, Nondiscrimination, Equal Opportunity and Affirmative Action and EP 1.204, Sex and Gender Based Misconduct; and
>
> - You are directed to attend five (5) mandatory anger management training sessions to provide you with the tools and resources to engage in conversations in a collegial manner.

[Id. at PageID.3751.]

11

Neither Nelson, Bruno, nor Dean Ceria-Ulep is a licensed mental-health professional, and no licensed mental-health professional evaluated Lawson before Bruno imposed the anger management training requirement. [Lawson's CSOF at ¶¶ 35-36; Defs.' CSOF at Response ¶¶ 35-36.]

## II.  Additional Facts Presented by Lawson

Lawson argues that he did not make any verbal threat, nor did he engage in any threatening physical conduct during the 2/17/23 Meeting. See Lawson's CSOF at ¶ 5; see also Lawson Decl., Exh. M (Decision) at PageID.3642 ("there is no evidence that supports the allegation that Lawson used intimidating gestures, pointed or waved his hands at Nelson or slammed his hands on the desk and it is unlikely that he did so"). During her deposition, Nelson agreed Lawson never said that he was "going to hurt [her] or physically do anything to [her.]" [Lawson Decl., Exh. AA (excerpts of trans. of Nelson's depo. ("Nelson Depo.")) at 343.[10]] However, Nelson also testified that "the way [she] experienced [Lawson] behaving at the faculty

---

[10] Lawson represents that Exhibit AA is "a true and correct copy of excerpts" of Nelson's deposition transcript. See Lawson Decl. at ¶ 30. However, Lawson's Exhibit AA does not include either the transcript cover sheet or the court reporter's certification page. Lawson is reminded that these components should be included whenever a party submits an exhibit that is a transcript.

meeting, [she] encountered it as intimidating and menacing."
[Id.]

Citing only the allegations of the Amended Complaint as support, Lawson asserts that no faculty member left the 2/17/23 Meeting because of his remarks, and all of the faculty members who were present after his remarks participated in the votes that were taken during the remainder of the meeting. [Lawson's CSOF at ¶ 7 (citing Amended Complaint at ¶¶ 76-77).] He also argues that Bruno admitted during his deposition that the 2/21/23 Boycott Email was protected free speech. [Id. at ¶ 15 (citing Lawson Decl., Exh. B (excerpts of trans. of Bruno's 8/30/24 and 9/26/24 depo. ("Bruno Depo.")) at 71-72).] Defendants respond that Lawson is taking Bruno's statement out of context because Bruno made the statement in response to a hypothetical about Lawson distributing fliers to promote a boycott of a future event. See Defs.' CSOF at Response ¶ 15 (citing Lawson Decl., Exh. B at 71-72).

Lawson argues that Puglisi removed significant portions of his 2/21/23 Boycott Email from the Fact-Finding Report. [Lawson's CSOF at ¶ 19 (citing Lawson Decl., Exh. D (excerpts of trans. of Puglisi's depo. ("Puglisi Depo.")) at 281:14-290:25).[11]] During the cited portion of Puglisi's

---

[11] Although Lawson cites page 281 of the Puglisi Deposition, that page is not included in Exhibit D.

13

deposition, Lawson read portions of his 2/21/23 Boycott Email that were not included in the Fact-Finding Report. See Lawson Decl., Exh. D (Puglisi Depo.) at 282-90. Puglisi responded that the 2/21/23 Boycott Email was attached to the Fact-Finding Report. See id. at 290. However, Puglisi acknowledged that, if the decision maker was instructed to focus on the report itself, the decision maker would not have seen the parts of the 2/21/23 Boycott Email that Lawson pointed out during Puglisi's deposition. See id. Lawson argues the Fact-Finding Report stated that he did not provide context for his statements. See Lawson's CSOF at ¶ 21 (citing Lawson Decl., Exh. J (Fact-Finding Report) at 75). He argues the fact finders created the lack of context by omitting the relevant portions of the 2/21/23 Boycott Email from the text of the Fact-Finding Report. [Motion, Mem. in Supp. at 23.] However, the lack-of-context statement on page 75 of the Fact-Finding Report referred to one example that Lawson cited in the 2/21/23 Boycott Email; the statement did not refer to Lawson's speech during the 2/17/23 Meeting, nor did the statement refer to the 2/21/23 Boycott Email as a whole. See Lawson Decl., Exh. J at 75 ("In his interview, Lawson provided **some context for the reason he and others carried bricks at the 'Brick Protest,'** which was a symbolic gesture because the young man killed had lifted a brick. However, this explanation was not provided in the February meeting or in Lawson's emails."

14

(emphasis added)). Moreover, the portion of the 2/21/23 Boycott Email discussing the "Brick City Hall Protests" is one of the portions of the email that is included in the text of the Fact-Finding Report. See id. at 19.

Lawson states that, while he was banned from the WSRSL campus, he requested access to retrieve confidential client files, but the request was denied. [Lawson's CSOF at ¶ 41 (citing Amended Complaint at ¶¶ 178-80).] Defendants point out that Lawson was provided with an alternate office space outside of the WSRSL campus, and Lawson met with Mirkay to get books and files from Lawson's WSRSL office. [Defs.' CSOF at Response ¶ 41 (citing Opposition to Plaintiff's Ex Parte Motion for a Temporary Restraining Order, filed 4/26/24 (dkt. no. 22) ("4/26/24 TRO Opp."), Declaration of Nicholas A. Mirkay III ("Mirkay Decl.") at ¶¶ 49-51).]

Lawson argues that, during the period of the investigation, another University faculty member engaged in more egregious conduct and only received a ten-day suspension. [Lawson's CSOF at ¶ 43 (citing Lawson's Decl., Exh. S (email dated 12/1/23 from Kono to Dean Ceria-Ulep ("Kono's 12/1/23 Email"))).[12]] Defendants emphasize that Kono's 12/1/23 Email does

---

[12] At the time, Kono was the Interim Program Office with Office of the Vice Provost for Academic Excellence at the University of Hawa`i at Mānoa. See Lawson Decl., Exh. S (Kono's 12/1/23 Email).

15

not specify the time period when the suspension occurred. [Defs.' CSOF at Response ¶ 43 (citing Exh. S).] Kono's 12/1/23 Email stated that Kono asked other University campuses for examples of discipline against a faculty member for violating EP 9.210 or EP 1.202. [Lawson Decl., Exh. S.] Kono was informed of one instance, which involved "yelling at complainant, physically advancing on complainant, using profanity when demanding that complainant leave the office, using senior faculty position to intimidate and bully junior faculty, and chronically engaging in abusive behavior towards complainant and students." [Id.]

## III. Additional Facts Presented by Defendants

Defendants ask this Court to consider testimony that was previously provided in this case under penalty of perjury. See, e.g., Defs.' CSOF at Opp. ¶¶ 1-9 (citing 4/26/24 TRO Opp., Declaration of Camille Nelson ("Nelson Decl.")).

The 2/17/23 Meeting was a Special Faculty meeting to discuss hiring decisions, and it was not open to the public. [Nelson Decl. at ¶¶ 8, 10.] Three WSRSL students attended the meeting by Zoom to provide comments about the candidates, but the students were expected to leave the meeting after sharing their comments. See id. at ¶ 11.

According to Nelson, when Lawson spoke about the planned Event, "he railed against the D&I Committee's failure to

16

include 'Black people' or 'the right kind of black people' in the program." [Id. at ¶ 19.] Nelson was "concerned that he was having difficulty controlling himself and [she] began to fear for [her] safety as well as the safety of [her] colleagues." [Id. at ¶ 22.] Nelson "felt threatened by [Lawson's] forceful and offensive cursing and elevated pitch, especially as he continued to use profanities, and continued to express and direct his anger about the Black History Month event at [her] and other women around the conference room table." [Id. at ¶ 23.] Nelson stated that Lawson said, "'I am not non-violent,'" and "'I am like Malcolm X and not MLK.'" [Id. at ¶¶ 26-27.] During the 2/17/23 Meeting, Lawson initially directed his anger at Professor Susan Serrano ("Serrano"), see id. at ¶ 34, but Lawson subsequently directed his comments toward Nelson. Lawson referred to Nelson as not "'a real Black person,'" [id. at ¶ 42,] "an 'educated negro' and a 'nice racist,'" [id. at ¶ 48,] and he accused her of being "'too woke to understand what is real,'" [id.]. Lawson also told Nelson: "'You're an apologist, and you're what allows this racist shit to continue!'" [Id. at ¶ 41.]

Lawson later directed another similar tirade toward Professor Carole Petersen ("Petersen"). See id. at ¶¶ 53-56.

After Lawson left the 2/17/23 Meeting, Nelson wondered whether he had a gun. [Id. at ¶ 64.] However, Nelson was

17

"concerned that if [she] did call public safety, [Lawson] would use this outreach to further his assertion that [she] was being racist." [Id. at ¶ 65.] At some point after Lawson left, there was a break in the meeting, and Nelson went to her office "to gather [her]self and [cry] privately." [Id. at ¶ 68.]

Serrano stated that, during a break in the 2/17/23 Meeting at some point after Lawson's remarks, Serrano "was still physically shaking, and [her] heart was racing and pounding." [4/26/24 TRO Opp., Declaration of Susan Serrano ("Serrano Decl.") at ¶ 23.] Serrano stated that, after the incident during the 2/17/23 Meeting, she "lost sleep for a couple of weeks" and "had difficulty getting [her] work done for several days . . . because [she] experienced terrible anxiety and headaches." [Id. at ¶ 34.] Because of the incident and Lawson's emails that followed, Serrano was afraid to come to campus and did not do so for a week, teaching her classes online. [Id. at ¶ 35.]

Dina Shek, a Faculty Specialist at WSRSL ("Shek"), stated that she "felt intimidated and threatened by" Lawson's behavior at the 2/17/23 Meeting. [4/26/24 TRO Opp., Declaration of Dina Shek ("Shek Decl.") at ¶ 19.] After the meeting, she "was shaking and [her] blood pressure really spiked." [Id. at ¶ 35.] Even in the days after the meeting, Shek could not complete her work, her hands trembled, and she could not control her blood pressure. [Id.]

18

Mirkay states that the 2/17/23 Meeting occurred on a Friday and, over the weekend, he communicated with several faculty members who told him that they were extremely upset about what occurred at the meeting. [Mirkay Decl. at ¶ 29.] Because he was the Associate Dean for Academic Affairs at that time, Mirkay had responsibility over the faculty, and he "felt responsible and compelled to report the incident." [Id. at ¶ 30.] He therefore wrote an email on February 20, 2023 about the 2/17/23 Meeting to persons from the University's Office of Vice Provost for Academic Affairs and the University's Office of General Counsel ("Mirkay's 2/20/23 Email"). See id.; Lawson Decl., Exh. T (Mirkay's 2/20/23 Email).[13]

**DISCUSSION**

## I.    Scope of the Record

On February 21, 2026, Lawson filed objections to the portions of Defendants' CSOF that are based upon the declarations submitted with the 4/26/24 TRO Opposition. See generally Plaintiff's Notice of Evidentiary Objections Under Fed. R. Civ. P. 56(c)(2) ("Objections"), filed 2/21/26 (dkt. no. 179). Lawson argues this Court should only consider the

---

[13] The version of Mirkay's 2/20/23 Email filed as Exhibit T to the Lawson Declaration is redacted. See dkt. no. 162-22. No party has asserted that the redacted information is relevant to the Motion.

findings in the Decision and the record that was before Dean Ceria-Ulep. [Id. at 7.]

First, although Dean Ceria-Ulep did not consider the Nelson Declaration, the Mirkay Declaration, the Serrano Declaration, and the Shek Declaration, all of which were submitted with the 4/26/24 TRO Opposition, the fact finders interviewed each of those persons and considered their statements in preparing the Fact-Finding Report, which was before Dean Ceria-Ulep. See Lawson Decl., Exh. J at 11-12 (listing Mirkay, Nelson, Serrano, and Shek among the attendees of the 2/17/23 Meeting who were interviewed during the investigation); id., Exh. M (Decision) at 1 (stating the Fact-Finding Report was submitted to Dean Ceria-Ulep on 10/2/23). The statements that Nelson, Mirkay, Serrano, and Shek made to the fact finders addressed the same events that are addressed in their 2024 declarations. To the extent that Lawson contends there are inconsistencies between a person's statements to the fact finders and that person's 2024 declaration, the alleged inconsistency goes to credibility and weight of the evidence, not admissibility. Further, in ruling on Lawson's Motion, this Court cannot determine whether the person's statement to the fact finders is more credible or entitled to more weight than the person's 2024 declaration. See Estate of Lopez ex rel. Lopez v. Gelhaus, 871 F.3d 998, 1009 n.10 (9th Cir. 2017) ("At the

20

summary judgment stage, '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" (alteration in Lopez) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))).

Even if Lawson is correct that this Court should only consider the statements available at the time of the Decision or when Bruno adopted the Decision, Lawson's argument would only apply to the portion of his claims based on the disciplinary actions taken against him following Bruno's adoption of the Decision. See, e.g., Amended Complaint at ¶ 277 (alleging "Dean Ceria Ulep's Decision[ and] Defendant Bruno's letters . . . show that the actions taken against him were based on his speech in February 2023" and alleging "[t]he sanctions that later followed were also based on Lawson's speech"). Other portions of Lawson's claims are based upon, *inter alia*, complaints by Nelson, Mirkay, and Bruno that led to the initiation of the investigation. See id. at ¶ 261. Thus, testimony about what they knew or should have known when they took those initial actions is relevant to the instant Motion.

For all of the above reasons, Lawson's Objections are denied. This Court now turns to the merits of the Motion.

## II.   Lawson's Claims

Lawson argues he is entitled to summary judgment as to all of the remaining claims in this case. See Motion, Mem. in Supp. at 42.

All of the remaining claims in this case are brought pursuant to Title 42 United States Code Section 1983. The elements of a Section 1983 claim are: "(1) a person acting under color of State law; (2) subjects or causes to be subjected to deprivation; (3) a U.S. citizen or person in the jurisdiction of the United States; (4) of a right, privilege, or immunity secured by the Constitution and laws." Chaudhry v. Aragón, 68 F.4th 1161, 1169 & n.9 (9th Cir. 2023). Because there does not appear to be any dispute regarding the first and third elements, this Court will focus on the second and fourth elements as to each claim.

### A.   Viewpoint Discrimination

Count I alleges viewpoint discrimination, [Amended Complaint at pgs. 60-63,] and the as-applied challenges in Counts V and VI are based in part on alleged viewpoint discrimination, see id. at pgs. 68-74.

> The First Amendment generally prohibits the government from retaliating or discriminating against individuals for engaging in protected speech. See Hartman v. Moore, 547 U.S. 250, 256, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006). . . . But in the context of public employment, the Supreme Court has long recognized that the

22

> government has "interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). Accordingly, the Court has developed a framework that requires a "fact-sensitive and deferential weighing of the government's legitimate interests" against the First Amendment rights of public employees. Bd. of Cnty. Comm'rs v. Umbehr, 518 U.S. 668, 677, 116 S. Ct. 2342, 135 L. Ed. 2d 843 (1996). This framework — often called the "Pickering balancing test" — is part of a two-step, burden-shifting approach. Riley's [Am. Heritage Farms v. Elasser], 32 F.4th [707,] 720– 21 [(9th Cir. 2022)].

Damiano v. Grants Pass Sch. Dist. No. 7, 140 F.4th 1117, 1137 (9th Cir. 2025). The Pickering analysis applies to both First Amendment retaliation claims and viewpoint discrimination claims. See Reges v. Cauce, 162 F.4th 979, 1004 (9th Cir. 2025) (citing Damiano v. Grants Pass Sch. Dist. No. 7, 140 F.4th 1117, 1149 (9th Cir. 2025)). In the context of a retaliation claim, the Ninth Circuit has described the Pickering analysis as follows:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

Jensen v. Brown, 131 F.4th 677, 686 (9th Cir. 2025) (citation

omitted).

### 1.    Matter of Public Concern

> To be covered under the Pickering doctrine,
> [the plaintiff]'s speech must have been on a
> matter of public concern. See Eng [v. Cooley],
> 552 F.3d [1062,] 1070 [(9th Cir. 2009)]. "Speech
> involves a matter of public concern when it can
> fairly be considered to relate to 'any matter of
> political, social, or other concern to the
> community.'" Johnson v. Multnomah Cnty., 48 F.3d
> 420, 422 (9th Cir. 1995) (quoting Connick v.
> Myers, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L.
> Ed. 2d 708 (1983)). "Even if only 'a relatively
> small segment of the general public' might have
> been interested in the subject of [the speech],
> that is sufficient." Hernandez v. City of
> Phoenix, 43 F.4th 966, 978 (9th Cir. 2022)
> (citation omitted). In contrast, "individual
> personnel disputes and grievances . . . of no
> relevance to the public's evaluation of the
> performance of governmental agencies" are not
> matters of public concern. McKinley v. City of
> Eloy, 705 F.2d 1110, 1114 (9th Cir. 1983).
>
> "Whether an employee's speech addresses a
> matter of public concern must be determined by
> the content, form, and context of a given
> statement, as revealed by the whole record."
> Connick, 461 U.S. at 147-48, 103 S. Ct. 1684. "Of
> these, content is the most important factor."
> Demers v. Austin, 746 F.3d 402, 415 (9th Cir.
> 2014). "We adhere to a liberal construction of
> what an issue 'of public concern' is under the
> First Amendment." Roe v. City of San Francisco,
> 109 F.3d 578, 586 (9th Cir. 1997).

Id. at 687 (some alterations in Jensen).

In Pickering, the United States Supreme Court stated

that "the preferable manner of operating [a] school system . . .

clearly concerns an issue of general public interest." 391 U.S.

24

at 571. Cases like Pickering, Jensen, and Demers presented clearer examples of speech regarding the manner of operating a school system than the speech at issue in this case. See Pickering, 391 U.S. 565-66 (submission of a letter to the editor that criticized the school board's use of bond funds that were purportedly for the construction of new schools, the board's allocation of resources between educational and athletics programs, and the board's attempt to prevent teachers from opposing or criticizing the bond issue); Jensen, 131 F.4th at 684 (creation and distribution of a handout criticizing a department policy change that the plaintiff argued lowered the math and technical skills of graduates from the community college); Demers, 746 F.3d at 406-07 (distribution of a pamphlet setting forth a proposed plan regarding the restructuring of the university's college of communication).

In contrast, Lawson criticized a single event, primarily asserting that the organizers should have invited him or another member of the Black community to speak at the Event. See, e.g., Nelson Decl. at ¶ 17; Lawson Decl., Exh. I (2/21/23 Boycott Email) at PageID.3526 ("We were disappointed and surprised to learn that the Law School's Black History Month event was not facilitated by any local Black Civil Rights attorneys, BLSA members, or Black Civil Rights Activists. In fact, there are no Black facilitators for the event."). However,

Lawson's criticism of the Event "can fairly be considered to relate to any matter of political, social, or other concern to the community." See Johnson, 48 F.3d at 422 (citation and internal quotation marks omitted).

The fact that some of Lawson's statements during the 2/17/23 Meeting and in the 2/21/23 Boycott Email addressed a matter of public concern does not end this Court's inquiry because many of Lawson's statements did not address a matter of public concern. For example, Dean Ceria-Ulep found that the investigation substantiated the allegation that "Lawson utilized words perceived as veiled threats, such as informing meetings attendees, students and staff via a listserv that he was 'not non-violent[.]'" [Lawson Decl., Exh. M (Decision) at PageID.3643.] Dean Ceria-Ulep also found that Lawson "utilized the terms 'nice racism', 'white fragility' and 'woke'" during the 2/17/23 Meeting. [Id. at PageID.3646.] Dean Ceria-Ulep further found that "Lawson stated that Nelson was not Black enough, questioned her black experiences, [and] devalued and denied her capacity to represent a Black person in a conversation simply because she was not raised in the United States[.]"[14] [Id. at PageID.3647.] Such statements, if Lawson did

---

[14] Lawson denies that he used some of these phrases. See, e.g., Reply at 18 ("even if he had said 'educated negro,' 'not Black enough,' or 'not non-violent,' those too would be
                                                        (. . . continued)

26

in fact use them, would indicate that his speech concerned personal disputes that were not relevant to the issue of whether the Event was an appropriate WSRSL event. See McKinley, 705 F.2d at 1114 ("Speech by public employees may be characterized as not of 'public concern' when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies." (citing Connick, 461 U.S. 138)).[15] Viewing the record in the light most favorable to Defendants, there are genuine issues of material fact as to whether some of Lawson's statements during the 2/17/23 Meeting and in the 2/21/23 Boycott Email constituted speech that did not address a matter of public concern. See Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

The remainder of the Pickering analysis will only address Lawson's statements specifically addressing the Event.

---

protected speech."). However, in considering Lawson's Motion, the record must be construed in the light most favorable to Defendants as the nonmoving parties. See Harris v. Cnty. of Orange, 17 F.4th 849, 855 (9th Cir. 2021).

[15] The plaintiff in McKinley was a probationary police department employee who spoke out against the city council's decision not to approve an annual pay raise for police officers. McKinley, 705 F.2d at 1112.

## 2.    Private Citizen or Public Employee

It is undisputed that Lawson is part of the WSRSL faculty, and that the University is a state entity. See Amended Complaint at ¶¶ 8-9; Answer at ¶¶ 8-9 (admitting those portions of Lawson's ¶ 8 and ¶ 9). The WSRSL is part of the University. See Haw. Rev. Stat. § 304A-1351 ("There shall be a school of law at the University of Hawaii[.]"). Thus, Lawson is a public employee.

The 2/17/23 Meeting was a special faculty meeting to discuss hiring and other personnel decisions. Thus, the 2/17/23 Meeting was not open to the public. The only attendees were WSRSL faculty and three WSRSL students. See Nelson Decl. at ¶¶ 9-11. The students' attendance was for a limited purpose and for a limited period during the meeting. See id. at ¶ 11. Viewing the record in the light most favorable to Defendants, this Court concludes that Lawson attended the 2/17/23 Meeting in his capacity as a public employee.

> The premise of th[e] requirement [that the plaintiff spoke as a public employee], derived from Garcetti v. Ceballos, is that generally, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. 410, 421, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). But Garcetti noted that it was not "decid[ing] whether the analysis [the Court] conduct[ed] . . . would apply in the same manner

28

> to a case involving speech related to scholarship
> or teaching." Id. at 425, 126 S. Ct. 1951.
>
> Addressing that open question in Demers, we
> held that "Garcetti does not — indeed, consistent
> with the First Amendment, cannot — apply to
> teaching and academic writing that are performed
> 'pursuant to the official duties' of a teacher
> and professor." 746 F.3d at 412. Rather, speech
> "related to scholarship or teaching" is covered
> by the Pickering doctrine even if it was made
> pursuant to a public employee's official duties.
> Id.

Jensen, 131 F.4th at 688 (some alterations in Jensen).

As previously noted, Lawson is the BLSA faculty advisor. See Amended Complaint at ¶ 16. Lawson's criticism of the Event was "related to scholarship or teaching," and therefore "does not come within Garcetti's bar on First Amendment protection for speech made pursuant to a public employee's official duties." See Jensen, 131 F.4th at 689. The second part of the Pickering analysis is satisfied as to Lawson's statements specifically addressing the Event.

### 3.   Substantial or Motivating Factor

Count I alleges Defendants made complaints that initiated the investigation against him because of "his dissenting viewpoint on issues of public concern." [Amended Complaint at ¶ 261.] Nelson's 2/18/23 Email informed Bruno about what transpired at the 2/17/23 Meeting. See Lawson Decl., Exh. Z at PageID.3722. Mirkay's 2/20/23 Email informed University administrators of his concerns about what happened at the

2/17/23 Meeting and of his belief that "it r[ose] to the level of a possible Title IX violation but [was] certainly a violation of the University's policy on Workplace Non-Violence (Exec. Policy 9.210)." [Id., Exh. T (Mirkay's 2/20/23 Email) at PageID.3669.] Bruno's 2/27/23 Letter informed Lawson that the University had initiated an investigation into the allegations about Lawson's conduct at the 2/17/23 Meeting. [Id., Exh. F at PageID.3506-07.] Nelson made her report the day after the 2/17/23 Meeting, Mirkay made his report two days after the meeting, and Bruno informed Lawson about the investigation ten days after the meeting. Nelson's report and Mirkay's report could not have been motivated by Lawson's protected speech in the 2/21/23 Boycott Email because their reports preceded the email. Bruno's 2/27/23 Letter was sent less than a week after the 2/21/23 Boycott Email.

"A plaintiff may establish motive using direct or circumstantial evidence." Jensen, 131 F.4th at 689 (quotation marks and citation omitted). The temporal proximity between Lawson's protected speech and the reports and investigation can support an inference that his speech was a substantial or motivating factor in the reports and investigation. However, that inference is not enough to carry Lawson's burden on his request for summary judgment as to Count I. Cf. C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc., 213 F.3d 474, 480

(9th Cir. 2000) ("When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." (citation and internal quotation marks omitted)).

Nelson's 2/18/23 Email stated she was "deeply concerned for [her] own ability to continue to work and be healthy in a space where [Lawson's] hostility towards the institution, his colleagues, and [her] manifests in abusive ways." [Lawson Decl., Exh. Z at PageID.3723.] In her declaration, Nelson stated that "Lawson's unannounced behavior at the [2/17/23 M]eeting, and subsequently, [was] emotionally distressing and disturbing, divisive, publicly disparaging to [her]self and the law school, and have left [her] concerned and frightened that if he cannot control his impulses, hostility, and rage, he might physically harm [her] colleagues and [her]," and she "was scared to be at home alone for weeks" after the 2/17/23 Meeting. See Nelson Decl. at ¶¶ 83-84.

Mirkay attended the 2/17/23 Meeting, and stated that he "felt responsible for not having done something in the meeting to end the conflict," but he did not attempt to intervene "[b]ecause race was at issue, [and he] did not feel

31

[he] was a legitimate speaker and would only inflame the situation if [he] interjected." [Mirkay Decl. at ¶ 28.] The faculty members who communicated with Mirkay over the weekend following the 2/17/23 Meeting expressed feeling "extremely upset and jarred by what had occurred at the February 17, 2023 meeting." [Id. at ¶ 29.] Mirkay sent his February 20 email because he felt that he had a responsibility to report the incident because of his management position. [Id. at ¶ 30.]

Bruno's 2/27/23 Letter stated that "several concerns [were] raised to the University" about Lawson's conduct at the 2/17/23 Meeting, [Lawson Decl., Exh. F at PageID.3506,] and the investigation was initiated "[b]ased on the information received," [id. at PageID.3507].

Viewing the record in the light most favorable to Defendants as the nonmoving party, there is evidence that Nelson and Mirkay made their reports based on legitimate concerns about Lawson's behavior and that Bruno initiated the University's investigation in response to those reports. This Court therefore finds that there are genuine issues of material fact as to whether Lawson's protected speech was a substantial or motivating factor in Defendants' actions.

### 4.    Adequate Justification

> "Once a plaintiff shows that his statements were of public concern and that the statements were a substantial motivating factor for the

32

> disciplinary action taken against him, the burden shifts to the defendant to show that its legitimate administrative interests outweigh the plaintiff's First Amendment rights." Bauer v. Sampson, 261 F.3d 775, 784 (9th Cir. 2001). In assessing the strength of the state's interest, pertinent considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin [v. McPherson], 483 U.S. [378,] 388, 107 S. Ct. 2891 [(1987)].

Jensen, 131 F.4th at 690-91. Because Lawson has not established that his protected speech was a substantial or motivating factor in Defendants' actions, it is not necessary for this Court to address the remaining parts of the Pickering analysis. However, this Court provides the following to provide guidance to the parties.

In the context of a viewpoint discrimination claim, the adequate justification requirement of the Pickering analysis is addressed as follows.

> Even protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities. Cf. Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 136 (1977). Recognizing that the Government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated,"

33

> Greer v. Spock, 424 U.S. 828, 836 (1976), the
> Court has adopted a forum analysis as a means of
> determining when the Government's interest in
> limiting the use of its property to its intended
> purpose outweighs the interest of those wishing
> to use the property for other purposes.
> Accordingly, the extent to which the Government
> can control access depends on the nature of the
> relevant forum.

Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788,

799-800 (1985) (some alterations in Cornelius).

The three primary categories are "the traditional

public forum, the public forum created by government

designation, and the nonpublic forum." See id. at 802.

> The traditional public forum is a place "which by
> long tradition . . . ha[s] been devoted to
> assembly and debate." [Flint v. Dennison, 488
> F.3d 816, 830 (9th Cir. 2007)] (internal
> quotation marks omitted). The designated public
> forum "exists when the government intentionally
> dedicates its property to expressive conduct."
> Id. (internal quotation marks omitted). The non-
> public forum is "any public property that is not
> by tradition or designation a forum for public
> communication." Id. (internal quotation marks
> omitted).
>
> There is also a fourth category, the limited
> public forum, which is a partially designated
> public forum:
>
>> The government is not left with only the two
>> options of maintaining a non-public forum or
>> creating a designated public forum; if the
>> government chooses to open a non-public
>> forum, the First Amendment allows the
>> government to open the non-public forum for
>> limited purposes. The limited public forum
>> is a sub-category of a designated public
>> forum that refers to a type of nonpublic
>> forum that the government has intentionally

34

> opened to certain groups or to certain topics.

Id. at 830-31 (internal quotation marks omitted).

> In traditional and designated public fora, content-based restrictions on speech draw strict scrutiny. Id. at 830. But in a limited public forum, speech restrictions are constitutional so long as they: (1) comport with the definition of the forum (for example, the government cannot exclude election speech from a forum that it has opened specifically for election speech); (2) are reasonable in light of the purpose of the forum; and (3) do not discriminate by viewpoint. Id. at 831.

OSU Student All. v. Ray, 699 F.3d 1053, 1062 (9th Cir. 2012) (some alterations in OSU Student All.). The same level of scrutiny applies to a nonpublic forum as to a limited public forum. See Seattle Mideast Awareness Campaign v. King Cnty., 781 F.3d 489, 496 n.2 (9th Cir. 2015) ("the same level of First Amendment scrutiny applies to all forums that aren't traditional or designated public forums").

### a.    The 2/17/23 Meeting

Based on the evidence discussed, *supra* Discussion Section II.A.2, regarding the purpose of the 2/17/23 Meeting and who attended the meeting, this Court is inclined to find that the 2/17/23 Meeting was a nonpublic forum.

### b.    The 2/21/23 Boycott Email

Although the parties have not presented any evidence regarding the nature of the WSRSL listservs, based on the

evidence that was presented in connection with prior motions, this Court is inclined to find that there is a genuine issue of fact as to whether the 2/21/23 Boycott Email was speech in a public forum. Cf. Order Denying the Portion of Plaintiff's May 30, 2024 Motion Seeking a Preliminary Injunction, [Filed 5/30/24 (Dkt. No. 44)], filed 11/21/24 (dkt. no. 132) ("11/21/24 Order"), at 10-17 (discussing the WSRSL listservs and the restrictions on Lawson's use of them).[16]

### 5.    Whether Defendants Would Have Acted Even Absent Lawson's Protected Speech

Lawson's criticism of the Event during the 2/17/23 Meeting and in the 2/21/23 Boycott Email addressed a matter of public concern and related to his scholarship or teaching, see *supra* Discussion Sections II.A.1-2, and therefore may be protected speech. However, those statements were made contemporaneously with other statements that likely were not protected speech, such as Lawson's statements questioning Nelson's Black experience. Further, there are genuine disputes of material fact regarding what specific words Lawson used when he made those statements during the 2/17/23 Meeting. The potentially protected speech was so closely intertwined with the potentially unprotected speech that this Court cannot, on

---

[16] The 11/21/24 Order is also available at 2024 WL 4851602.

summary judgment, determine whether Defendants would have acted

in the absence of Lawson's protected speech.

### 6.    Ruling

As to Lawson's viewpoint discrimination claims, this

Court rules as follows:

-there are genuine issues of material fact as to whether some of
    Lawson's statements during the 2/17/23 Meeting and in the
    2/21/23 Boycott Email did not address a matter of public
    concern; and

-as to Lawson's statements made during the 2/17/23 Meeting
    and/or in the 2/21/23 Boycott Email that did address a
    matter of public concern - *i.e.*, the statements
    specifically addressing the Event - there are genuine
    issues of material fact as to whether that speech was a
    substantial or motivating factor in Defendants' actions.

In light of these rulings, Lawson is not entitled to summary

judgment as to any portion of his viewpoint discrimination

claims. The Motion is therefore denied as to Count I and as to

the portions of Counts V and VI that allege viewpoint

discrimination.

### B.    Retaliation

Counts II and III allege retaliation, [Amended

Complaint at pgs. 63-66,] and the as-applied challenges in

Counts V and VI are based in part on alleged retaliation, see

id. at pgs. 68-74. As noted *supra* Discussion Section II.A

(citing Reges v. Cauce, 162 F.4th 979, 1004 (9th Cir. 2025)),

the Pickering analysis applies to First Amendment retaliation

claims and viewpoint discrimination claims. The first two parts

of the Pickering analysis – whether Lawson spoke on a matter of public concern and whether he spoke as a private citizen or public employee – are resolved in the same manner for Lawson's retaliation claims as they were for his viewpoint discrimination claims. See *supra* Discussion Sections II.A.1-2.

### 1.    Motivating Factor and Adequate Justification

Bruno's 2/27/23 Letter and Bruno's 3/8/24 Letter each imposed one or more adverse employment actions on Lawson. See Lawson Decl., Exh. F (Bruno's 2/27/23 Letter) at PageID.3507; id., Exh. FF (Bruno's 3/8/24 Letter) at PageID.3751-52. However, even considering the temporal proximity of the initial adverse employment actions to Lawson's speech during the 2/17/23 Meeting and the 2/21/23 Boycott Email, there are genuine issues of material fact as to whether the adverse employment actions were justified because many of the allegations in Bruno's 2/27/23 Letter were found to be substantiated after the University's investigation. See id., Exh. M (Decision) at PageID.3640-50 (finding 7 of 12 allegations substantiated, and 2 other allegations substantiated in part); id., Exh. FF (Bruno's 3/8/24 Letter) at PageID.3751 (confirming the Decision's conclusion that Lawson violated University policies including EP 9.210, Workplace Non-Violence, and EP 1.202, Nondiscrimination, Equal Opportunity, and Affirmative Action).

Lawson challenges the Decision on several grounds, such as arguing that: Bruno acted as the coordinator of the investigation, in spite of the fact that Bruno did not typically handle such matters and in spite of Lawson's pending grievance against Bruno; [Motion, Mem. in Supp. at 15-16;] and Bruno's office, not Dean Ceria-Ulep, wrote the majority of the Decision, [id. at 16-17]. The evidence that Lawson cites in support of these arguments, even when considered together with the temporal proximity of the initial adverse employment actions to Lawson's protected speech, is insufficient to carry Lawson's burden on summary judgment. Viewing the record in the light most favorable to Defendants, this Court finds that there are genuine issues of material fact as to the third and fourth parts of the Pickering analysis.

### 2. Whether Defendants Would Have Acted Even Absent Lawson's Protected Speech

Lawson's potentially protected speech, his criticism of the Event, made contemporaneously with other statements that likely were not protected speech. Further, there are genuine disputes of material fact regarding what specific words Lawson used when he made those statements during the 2/17/23 Meeting. The potentially protected speech was so closely intertwined with the potentially unprotected speech that this Court cannot, on summary judgment, determine whether Defendants would have

imposed the adverse employment actions in the absence of

Lawson's protected speech.

### 3.    Ruling

As to Lawson's retaliation claims, this Court rules as

follows:

-there are genuine issues of material fact as to whether some of
    Lawson's statements did not address a matter of public
    concern; and

-as to Lawson's statements made during the 2/17/23 Meeting
    and/or in the 2/21/23 Boycott Email that did address a
    matter of public concern - *i.e.*, the statements
    specifically addressing the Event - there are genuine
    issues of material fact as to whether that speech was a
    substantial or motivating factor in the adverse employment
    actions and as to whether there was adequate justification
    for the adverse employment actions.

In light of these rulings, Lawson is not entitled to summary

judgment as to any portion of his retaliation claims. The Motion

is therefore denied as to Counts II and III and as to the

portions of Counts V and VI that allege retaliation.

### C.    Prior Restraint

Count IV alleges the no-contact orders and the

listserv ban that were imposed upon Lawson in Bruno's 2/27/23

Letter constituted prior restraint on Lawson's protected speech,

[Amended Complaint at pgs. 66-68,] and the as-applied challenges

in Counts V and VI are based in part on alleged prior restraint,

see id. at pgs. 68-74.

"First Amendment retaliation and prior restraint are distinct claims that require different analyses." Damiano, 140 F.4th at 1152.

> Although the Pickering framework is most often applied in the retaliation context, a similar analysis is used when assessing prospective restrictions on government employee speech. See United States v. Nat'l Treasury Emps. Union (NTEU), 513 U.S. 454, 465–68, 115 S. Ct. 1003, 130 L. Ed. 2d 964 (1995); Gibson v. Office of Attorney Gen., 561 F.3d 920, 926–27 (9th Cir. 2009). Where a "wholesale deterrent to a broad category of expression" rather than "a post hoc analysis of one employee's speech and its impact on that employee's public responsibilities" is at issue, NTEU, 513 U.S. at 467, 115 S. Ct. 1003, the Court weighs the impact of the ban as a whole — both on the employees whose speech may be curtailed and on the public interested in what they might say — against the restricted speech's "'necessary impact on the actual operation' of the Government," id. at 468, 115 S. Ct. 1003 (quoting Pickering, 391 U.S. at 571, 88 S. Ct. 1731). "[U]nlike an adverse action taken in response to actual speech," a prospective restriction "chills potential speech before it happens." Id. The government therefore must shoulder a heavier burden when it seeks to justify an ex ante speech restriction as opposed to "an isolated disciplinary action." Id.

Moonin v. Tice, 868 F.3d 853, 861 (9th Cir. 2017) (alteration in Moonin).

### 1.   **Speech as a Citizen on a Matter of Public Concern**

The first prong of the employee speech analysis involves two inquiries: whether the restriction reaches only speech within the scope of a public employee's official duties, and whether it impacts speech on matters of public concern. See Garcetti, 547 U.S. at 423–24, 126 S. Ct. 1951. In assessing a prior restraint, we

focus on the text of the policy to determine the extent to which it implicates public employees' speech as citizens speaking on matters of public concern. See, e.g., Milwaukee Deputy Sheriff's Ass'n v. Clarke, 574 F.3d 370, 383 (7th Cir. 2009); Gasparinetti v. Kerr, 568 F.2d 311, 316 (3d Cir. 1977).

Id.

In addition to construing the record in the light most favorable to Defendants as the nonmoving party, "all justifiable inferences are to be drawn in [Defendants'] favor." See Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quotation marks and citation omitted). Even viewing the record in the light most favorable to Defendants and drawing all justifiable inferences in their favor, it can be reasonably inferred from the record that Lawson intended to engage in speech that was similar in nature to the speech that he engaged in during the 2/17/23 Meeting and in the 2/21/23 Boycott Email. To the extent that Lawson engaged in at least some protected speech during the 2/17/23 Meeting and in the 2/21/23 Boycott Email, see *supra* Discussion Section II.A.1-2, this Court assumes, for purposes of the instant Motion, that he wished to engage in similar protected speech.

### 2.   *Pickering/NTEU* Balancing

Because the no-contact orders and the listserv ban encompassed Lawson's intended protected speech, this Court must determine whether there was adequate justification for the no-

42

contact orders and the listserv ban. See Moonin, 868 F.3d at 864. In the context of a prior restraint claim, the defendant's "burden when seeking to justify a broad deterrent on speech . . . is greater than when it is defending an individual disciplinary decision." See id. at 865 (quotation marks and citations omitted).

> In particular, "when the [defendant] defends a regulation on speech as a means to . . . prevent anticipated harms, it . . . must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." NTEU, 513 U.S. at 475, 115 S. Ct. 1003 (alterations and citation omitted); see also Gibson, 561 F.3d at 928 (upholding a pre-clearance policy where there was "a close and rational relationship between the policy and legitimate governmental interests").

Id. (some alterations in Moonin). First, there is a genuine issue of fact as to whether the restrictions that Bruno's 2/27/23 Letter imposed on Lawson's use of the WSRSL listservs were part of general restrictions on all listserv usage and were not specifically directed at Lawson. Further, viewing the evidence discussed in the preceding sections in the light most favorable to Defendants and drawing all justifiable inferences in their favor, this Court finds that there are genuine issues of fact as to whether the risk of harm to WSRSL operations was real and not merely conjectural.

### 3. __Ruling__

In light of these rulings, Lawson is not entitled to summary judgment as to any portion of his prior restraint claims. The Motion is therefore denied as to Count IV and as to the portions of Counts V and VI that allege prior restraint.

### D. __Due Process__

Count VII alleges violations of Lawson's due process rights. [Amended Complaint at pgs. 74-77.]

The elements of a Section 1983 procedural due process claim are "'(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process.'" See 1/31/25 Order at 22-23 (quoting Bear River Band of Rohnerville Rancheria v. California Dep't of Soc. Servs., Case No. 23-cv-01809-HSG, 2024 WL 1055849, at *8 (N.D. Cal. Mar. 11, 2024) (quoting Portman v. Cnty. of Santa Clara, 995 F.2d 898, 904 (9th Cir. 1993))). At its core, due process requires notice and an opportunity to be heard. See Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 570 n.7 (1972).[17]

> Public employees have a "property interest" in the terms and conditions of their employment if that interest is established "by existing rules or understandings that stem from an independent

---

[17] Roth was overruled in part on other grounds by Paul v. Davis, 424 U.S. 693 (1976). See, e.g., Glover v. Cate, No. 2:10-cv-0430 KJM KJN P, 2011 WL 2746093, at *3 (E.D. Cal. July 13, 2011).

> source such as state law-rules or understandings
> that secure certain benefits and that support
> claims of entitlement to those benefits." Board
> of Regents v. Roth, 408 U.S. 564, 576–77, 92 S.
> Ct. 2701, 33 L. Ed. 2d 548 (1972); Ulrich [v.
> City & Cnty. of San Francisco], 308 F.3d [968,]
> 975 [(9th Cir. 2002)].

1/31/25 Order at 23 (alterations in 1/31/25 Order) (quoting

Cooper v. Cate, No. 1:10-cv-899 AWI DLB, 2011 WL 5554321, at *4

(E.D. Cal. Nov. 15, 2011)).

This Court concludes that the record supports that

Lawson had a property interest in the terms and conditions of

his employment, and this property interest was protected by the

United States Constitution. Thus, Lawson was entitled to notice

and an opportunity to be heard before the final adverse

employment decisions imposed in Bruno's 3/8/24 Letter.[18]

Lawson states that the focus of his due process claim

is on whether Dean Ceria-Ulep actually considered the evidence

and actually rendered the Decision or whether Bruno was behind

the Decision. See Reply at 27-28. Viewing the record in the

light most favorable to Defendants, there are genuine issues of

---

[18] The Amended Complaint alleges "Defendants did not give
Professor Lawson prior notice or an opportunity before an
impartial tribunal before issuing the no-contact orders or
restricting his use of the listserv[,]" [Amended Complaint at
¶ 330,] but the Motion and the Reply do not address this portion
of Count VII. It appears that Lawson is not pursuing this
portion of Count VII. Therefore, it is not necessary for this
Court to address the merits of that portion of Count VII in this
Order.

fact regarding Lawson's argument that Dean Ceria-Ulep failed to consider all of the relevant evidence and Lawson's argument that Dean Ceria-Ulep did not ultimately write the Decision. For example, while Lawson argues that Dean Ceria-Ulep's draft decision was seven pages long, but "[t]he final version was eighteen pages after edits by Bruno's office," see Motion, Mem. in Supp. at 16 (citing Lawson Decl., Exh. L (draft decision), Exh. M (Decision), Exh. C (excerpts of trans. of Dean Ceria-Ulep's 9/23/24 depo. ("Ceria-Ulep Depo.")) at 261), Defendants argue Dean Ceria-Ulep's deposition testimony establishes that Laura Lyons in Bruno's office helped by editing the Decision, but the Decision was Dean Ceria-Ulep's, see Mem. in Opp. at 27-28 (quoting Defs.' CSOF, Declaration of Counsel, Exh. 1 (Ceria-Ulep Depo.) at 30-31)).

Lawson also argues his procedural due process rights were violated because the Decision relied upon terms allegedly used by Lawson during the 2/17/23 Meeting but that were not specifically alleged in the notice letters issued by Bruno. See Reply at 28. Bruno's 2/27/23 Letter stated that the allegations against Lawson included that he "swore and yelled at, belittled and berated Camille Nelson, Dean, William S. Richardson School of Law (WSRSL) when she tried to calmly respond to" Lawson and that Lawson "questioned Dean Nelson's 'black experience' as someone not raised in the United States and referred to her as a

46

nice racist." See Lawson's Decl., Exh. F (Bruno's 2/27/23 Letter) at PageID.3506.

Defendants' memorandum in opposition asserts Lawson called Nelson "an 'educated negro,'" [Mem. in Opp. at 3,] but that phrase is not cited in the Decision. Because Dean Ceria-Ulep did not consider the alleged use of that phrase in the Decision, the failure to allege the use of that phrase in the notices does not constitute a due process violation. The Decision found that "Lawson stated that Nelson was not Black enough." See Lawson's Decl., Exh. M (Decision) at PageID.3647. Although the specific phrase "not Black enough" is not included in the notice of allegations in either Bruno's 2/27/23 Letter or Bruno's 3/8/24 Letter, there is a genuine issue of fact as to whether it was similar enough to the allegations that were included in the letters such that Lawson had sufficient notice of the allegation against him.

In light of the foregoing, there are genuine issues of material fact that preclude summary judgment as to Lawson's procedural due process claim. Lawson's Motion is therefore denied as to Count VII.

III. **Qualified Immunity**

Finally, the Motion seeks a summary judgment ruling that Defendants are not entitled to qualified immunity. [Motion, Mem. in Supp. at 39-41.] Because "[q]ualified immunity is an

47

affirmative defense that must be raised by a defendant," O'Brien

v. Welty, 818 F.3d 920, 936 (9th Cir. 2016) (quotation marks and

citation omitted), this Court declines to address the qualified

immunity issue in the context of Lawson's Motion. Cf. Answer at

¶ 363 (asserting qualified immunity as Defendants' fourth

defense). Defendants are DIRECTED to file the appropriate motion

addressing qualified immunity by **May 1, 2026.**

This Court therefore denies as premature the portion

of the Motion requesting a summary judgment ruling that

Defendants are not entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, Lawson's Motion for Summary

Judgment, filed January 6, 2026, is HEREBY DENIED in its

entirety.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, April 30, 2026.



/s/ Leslie E. Kobayashi

Leslie E. Kobayashi
Senior U.S. District Judge

**KENNETH L. LAWSON VS. UNIVERSITY OF HAWAII, ET AL; CV 24-00172
LEK-RT; ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**