UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| KENNETH L. LAWSON,<br><br>              Plaintiff,<br><br>     vs.<br><br>UNIVERSITY OF HAWAII, DAVID LASSNER, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES; MICHAEL BRUNO, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES; CAMILLE NELSON, IN HER OFFICIAL AND INDIVIDUAL CAPACITIES; NICHOLAS A. MIRKAY, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES; AND JANE/JOHN DOES 1-10, IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES;<br><br>              Defendants. | CIV. NO. 24-00172 LEK-RT |

**ORDER GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT RE QUALIFIED IMMUNITY**

On May 1, 2026, Defendants Michael Bruno ("Bruno"),

Camille Nelson ("Nelson"), and Nicholas A. Mirkay ("Mirkay" and

collectively "Defendants") filed their Motion for Summary

Judgment Re Qualified Immunity ("Motion"). [Dkt. no. 208.] Pro

se Plaintiff Kenneth L. Lawson ("Lawson" or "Plaintiff") filed

his memorandum in opposition on June 2, 2026, and Defendants

filed their reply on June 9, 2026. [Dkt. nos. 218, 220.] This

matter came on for hearing on June 23, 2026. Defendants' Motion

is granted for the reasons set forth below. Summary judgment is

granted in favor of Defendants as to all remaining claims against them in their individual capacities.

## BACKGROUND

The instant case arises from the University of Hawai`i's ("the University") response to, *inter alia*, Lawson's conduct during a February 17, 2023 meeting of the faculty of the University's William S. Richardson School of Law ("2/17/23 Meeting" and "WSRSL") and a February 21, 2023 email that Lawson sent through a WSRSL email listserv calling for a boycott of a Black History Month event that he criticized during the 2/17/23 Meeting ("the Event" and "the 2/21/23 Boycott Email"). See, e.g., First Amended Verified Complaint ("Amended Complaint"), filed 5/30/24 (dkt. no. 43), at ¶¶ 61-65, 91, 108, 124, 188, 200-03.

The remaining claims in this case are: a Title 42 United States Code Section 1983 claim alleging viewpoint discrimination, in violation of the First Amendment, against Defendants, in their individual capacities ("Count I"); a Section 1983 claim alleging First Amendment retaliation against Defendants, in their individual capacities ("Count II"); a Section 1983 claim alleging First Amendment retaliation against Defendants, in their official capacities ("Count III"); a Section 1983 claim alleging prior restraint of Lawson's First Amendment rights against Bruno, in his official capacity

("Count IV"); a Section 1983 claim against Bruno, in his official capacity, asserting a facial and as-applied challenge to the University's Executive Policy ("EP") 1.202 ("Count V"); a Section 1983 claim against Bruno, in his official capacity, asserting a facial and as-applied challenge to EP 9.210 ("Count VI"); and a Section 1983 claim alleging violations of Lawson's Fourteenth Amendment procedural due process rights against Defendants, in their individual capacities ("Count VII"). See id. at pgs. 60-78.

## I.    Undisputed Facts

During the period relevant to this case, Bruno was the Provost of the University of Hawai`i at Mānoa. See Defendants' Concise Statement of Facts in Support of Motion for Summary Judgment Re Qualified Immunity ("Defs.' CSOF"), filed 5/1/26 (dkt. no. 207), Declaration of Michael Bruno ("Bruno Decl.") at ¶¶ 1, 3. In February 2023, Bruno was informed about complaints regarding Lawson's conduct at the 2/17/23 Meeting. [Defs.' CSOF at ¶ 1; Plaintiff's Response to Defendants' Concise Statement of Facts Re Qualified Immunity and Plaintiff's Concise Statement of Facts in Opposition ("Lawson's CSOF"), filed 6/2/26 (dkt. no. 219), at ¶ I.1 (admitting that portion of Defs.' ¶ 1).[1]]

---

[1] Part I of Lawson's CSOF responds to the statements in Defendants' CSOF, [Lawson's CSOF at pgs. 2-9,] and Part II of Lawson's CSOF is Lawson's statement of facts in support of his memorandum in opposition, [id. at pgs. 10-18].

On February 27, 2023, Bruno sent Lawson a letter informing Lawson that the University was initiating an investigation. See Defs.' CSOF at ¶ 2; Lawson's CSOF at ¶ I.2 (admitting Defs.' ¶ 2); see also Bruno Decl., Exh. 1 (letter dated 2/27/23 to Lawson from Bruno ("Bruno's 2/27/23 Letter")). Interim measures were imposed against Lawson while the investigation was pending. [Defs.' CSOF at ¶ 5; Lawson's CSOF at ¶ I.5 (admitting that portion of Defs.' ¶ 5).] Bruno's 2/27/23 Letter banned Lawson from the WSRSL campus, imposed restrictions on Lawson's use of the WSRSL listservs, and ordered Lawson not to contact Nelson and certain other WSRSL faculty and staff ("no-contact orders"). [Bruno Decl. Exh. 1 (2/27/23 Letter) at UH_008469-70.]

On February 23, 2023, Mirkay gave instructions that all WSRSL faculty were to be removed from the WSRSL student listserv. By February 24, 2023, no WSRSL faculty could use the student listserv without Mirkay's approval. See Defs.' CSOF at ¶ 12; Lawson's CSOF at ¶ I.12 (admitting that portion of Defs.' ¶ 12).

On March 28, 2023, Bruno sent Lawson another letter notifying Lawson of other allegations that would also be part of the investigation. See Defs.' CSOF at ¶ 6; Lawson's CSOF at ¶ I.6 (admitting that portion of Defs.' ¶ 6); see also Bruno

Decl., Exh. 2 (letter dated 3/28/23 to Lawson from Bruno

("Bruno's 3/28/23 Letter")).

The decision maker, Dr. Clementina Ceria-Ulep, Dean of

the University's Nancy Atmospera-Walch School of Nursing ("Dean

Ceria-Ulep"), issued a letter, dated December 1, 2023, stating

her findings ("Decision"). [Bruno Decl., Exh. 3 (Decision).]

On March 8, 2024, Bruno issued a letter informing

Lawson that Bruno was adopting the corrective actions

recommended in the Decision. See Defs.' CSOF at ¶ 9; Lawson's

CSOF at ¶ I.9 (admitting that portion of Defs.' ¶ 9); see also

Bruno Decl., Exh. 4 (letter dated 3/8/24 to Lawson from Bruno

("Bruno's 3/8/24 Letter")).

## II.  Additional Facts Presented by Defendants

Lawson's 2/18/23 Email, which continued the criticism

of the Event that Lawson expressed during the 2/17/23 Meeting,

was sent to Nelson, Mirkay, and other WSRSL personnel. Also on

February 18, Nelson forwarded Lawson's 2/18/23 Email to Bruno

and "personnel from the Office of Vice Provost for Academic

Excellence and the Office of General Counsel" ("Nelson's 2/18/23

Email"). See Defs.' CSOF, Declaration of Camille Nelson ("Nelson

Decl."), Exh. 5;[2] Nelson Decl. at ¶ 3 (identifying the people to

---

[2] Exhibit 5 is an email dated 3/23/23 from Teresa Kono ("Kono") to Maura Okamoto and Daniel Sato forwarding Nelson's 2/18/23 Email, which included Lawson's 2/18/23 Email. [Dkt.

(. . . continued)

whom Nelson's 2/18/23 Email was sent). According to Nelson, "[her] email described Lawson's interactions during the February 17, 2023 faculty meeting and expressed concerns regarding Lawson's behavior." [Nelson Decl. at ¶ 3.]

During the relevant period, Mirkay was WSRSL's Associate Dean for Academic Affairs. See Defs.' CSOF, Declaration of Nicholas A. Mirkay III ("Mirkay Decl.") at ¶ 2. During the weekend after the 2/17/23 Meeting, Mirkay "communicated with several faculty members . . . , who were primarily women," who told him that "they felt extremely upset and jarred by what had occurred at the February 17, 2023 meeting." [Id. at ¶ 3.] In light of his position at WSRSL, Mirkay "felt responsible and compelled to report the incident," and, on February 20, 2023, he sent an email describing the incident at the 2/17/23 Meeting "to certain members of the Office of Vice Provost for Academic Excellence as well as the Office of General Counsel" ("Mirkay's 2/20/23 Email"). Id. at ¶ 4; see also id., Exh. 6 (Mirkay's 2/20/23 Email).

---

no. 207-8 at PageID.5822-23 (Nelson's 2/18/23 Email text); id. at PageID.5823-29 (Lawson's 2/18/23 Email).] During the relevant period, Kono was the Interim Program Officer for Academic Personnel in the Office of the Vice Provost for Academic Excellence at the University of Hawai`i at Mānoa. See Opposition to Plaintiff's Ex Parte Motion for a Temporary Restraining Order, filed 4/26/24 (dkt. no. 22) ("Opp. to TRO Motion"), Declaration of Teresa Kono ("Kono 4/26/24 Decl.") at ¶ 1.

6

Nelson's 2/18/23 Email and Mirkay's 2/20/23 Email were among the "related communications" that informed Bruno about the concerns regarding Lawson's conduct at the 2/17/23 Meeting and about the University policies that Lawson allegedly violated. See Bruno Decl. at ¶ 4; Mem. in Opp., Declaration of Kenneth L. Lawson in Support of Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment Re Qualified Immunity ("Lawson Decl."), Exh. AAA at PageID.6378-79 (stating Nelson was one of the complaining witnesses);[3] Lawson Decl., Exh. CCC (Puglisi Depo.) at 16-17 (stating Mirkay was one of the complainants). Bruno states that, "[b]ased on the information reported to [him] at that time, [he] believed the University had an obligation to investigate whether University policies had been violated, including policies concerning workplace non-violence, nondiscrimination, and maintenance of a safe working and learning environment." [Bruno Decl. at ¶ 9.]

Nelson states that, other than cooperating as a witness, she had no part in either the University's decision to investigate the incident at the 2/17/23 Meeting and Lawson's subsequent emails, nor was she a part of conducting the

---

[3] Exhibit AAA consists of the transcript of both Bruno's August 30, 2024 Zoom deposition ("8/30/24 Bruno Deposition"), [dkt. no. 218-14 at PageID.6175-264,] and the transcript of Bruno's September 26, 2024 videotaped deposition ("9/26/24 Bruno Deposition"), [id. at PageID.6265-645].

investigation. See Nelson Decl. at ¶¶ 5, 7. Nelson "responded to the investigators' questions and provided [her] recollection and perception of the February 17, 2023 meeting and related communications as accurately as [she] recalled." [Id. at ¶ 7.]

Mirkay makes the same statements in his declaration. See Mirkay Decl. at ¶¶ 8, 10. He also states that he had no part in the recommendation or imposition of disciplinary action against Lawson. See id. at ¶ 9. Further, on February 23, 2023, Mirkay ordered the removal of **all WSRSL faculty** from the student listserv, and he states that the removal made WSRSL student listserv policy consistent with the policies of the other professional schools within the University. As of February 24, 2023, any WSRSL faculty who wanted to use the student listserv had to obtain Mirkay's prior approval. See id. at ¶¶ 6-7.

Bruno states that his appointment of two fact finders and a decision maker was "consistent with the University's past practices and procedures for [EP 9.210 and EP 1.202] investigations." [Bruno Decl. at ¶ 7.] He also states that, because EP 9.210 does not set forth an investigation procedure, the University's practice is to use the procedures set forth in the University's Administrative Procedure ("AP") 1.202. [Id. at ¶ 8.] Bruno states that he did not make the factual findings in the investigation. See id. at ¶ 14.

Bruno also states that he imposed the interim measures upon Lawson pending the completion of the investigation because he believed the measures "were necessary to reduce workplace disruption, protect the integrity of the investigation, and allow law school operations to continue." See id. at ¶¶ 10-11.

Bruno initially appointed Jonathan Osorio, Dean of the University's Hawai`inuiākea School of Hawaiian Knowledge ("Dean Osorio") as the decision maker. [Id. at ¶ 5.] While the investigation was pending, Lawson asserted that Dean Osorio had a conflict of interest. Although Bruno believed that no conflict existed, he replaced Dean Osorio with Dean Ceria-Ulep as the decision maker. [Id. at ¶ 15.]

Bruno states it was his understanding that Dean Ceria-Ulep relied upon the information provided to her by the fact finders and Dean Ceria-Ulep made the findings in the Decision based on that information. [Id. at ¶ 16.] Bruno states that he "relied on the University's investigative and decision-making process, including the Decision Maker's written decision, in determining the appropriate corrective action," which he stated in Bruno's 3/8/24 Letter. See id. at ¶¶ 18-19.

According to Bruno, his actions in connection with the investigation were "within [his] authority as Provost and consistent with University policy, the applicable collective bargaining agreement provisions, and the University's obligation

9

to maintain workplace safety and nondiscrimination." [Id. at ¶ 20.]

III. **Additional Facts Presented by Lawson**

Lawson points out that, before the 2/17/23 Meeting, Nelson recommended that Lawson's request for a special salary adjustment ("SSA") be denied. [Lawson Decl. at ¶ 4.c; id., Exh. HH (memorandum dated 11/11/22 to Laura Lyons, Interim Vice Provost for Academic Excellence, from Nelson).] On February 10, 2023, Lawson submitted a formal grievance against Bruno and the University regarding the denial of his SSA. [Lawson Decl. at ¶ 4.f.] Lawson argues Nelson's 2/18/23 Email ties the dispute about the 2/17/23 Meeting to his SSA grievance because Nelson stated, "we are in mediation, and proceeding through another process with him." See Lawson's CSOF at ¶ 14; Nelson Decl., Exh. 5 (Nelson's 2/18/23 Email) at UH_002287. Lawson argues this shows that "[t]he disciplinary process did not arise in a neutral institutional context." [Lawson's CSOF at ¶ 14.]

Lawson states that he saw Nelson at a February 18, 2023 Black History Month event at the Honolulu Museum of Art ("2/18/23 HoMA Event"), [Lawson Decl. at ¶ 3.h.] Lawson and Nelson greeted each other, and Nelson shook the hand of Lawson's wife. [Id., Exh. DDD (trans. of Nelson's 10/8/24 videotaped deposition ("Nelson Depo.")) at 344.] However, Nelson claimed to have forgotten about this encounter when the fact finders asked

10

her if she had any other contact with Lawson after the 2/17/23

Meeting. See id. at 345-47.

Lawson emphasizes that neither Bruno's 2/27/23 Letter

nor Bruno's 3/28/23 Letter contains the allegation that he told

Nelson she was "not Black enough." [Lawson's CSOF at ¶ 13.]

According to Lawson, Bruno testified during his

deposition that the 2/21/23 Boycott Email was protected free

speech. [Lawson Decl. at ¶ 3.c.] However, this Court notes that

the testimony that Lawson relies upon was not about the 2/21/23

Boycott Email, but about hypothetical future boycott speech:

> [Continued question by Lawson:] So my
> question is: If I call for another boycott --
> let's say in the future I think that there's
> something going on racist here at [the
> University] and I call for another boycott and I
> start passing out boycott fliers all throughout -
> - to the students coming in, and the event gets
> cancelled, that's disruption? I'm not talking
> about canceling class.
>
> [Defendants' counsel:] Objection. . . .
>
> A. [By Bruno:] I mean, I'll answer. I think
> that's free speech, and it's entirely, in my
> view, protected.

[Lawson Decl., Exh. AAA at PageID.6246 (8/30/24 Bruno Depo. at

72).] Lawson also points to Bruno's deposition testimony that

Lawson's words at issue during the investigation

> would be protected. My – my opinions in this
> matter really are based on the – the over all
> [sic] behavior that was perceived by -- by many,
> if not all of the participants as -- as

11

> threatening, as -- as concerning. And that --
> that included gestures, volume and tone of voice.
>
> So my own -- my own belief is that the – the
> root of the complaints and really the root of the
> matter is -- is the behavior, not the words.

[Id. at PageID.6413-14 (9/26/24 Bruno Depo. at 149-50).]

On April 18, 2023, the Foundation for Individual Rights and Expression ("FIRE") sent a letter addressed to David Lassner, in his capacity as President of the University ("4/18/23 FIRE Letter"), warning that the University's investigation into Lawson's conduct at the 2/17/23 Meeting and in his subsequent emails violated the First Amendment. Bruno, Nelson, and Dean Osorio also received copies of the letter. See Lawson's CSOF at ¶ II.7; Lawson's Motion for Summary Judgment, filed 1/6/26 (dkt. no. 162), Kenneth L. Lawson Declaration ("Lawson 1/6/26 Decl."), Exh. E (4/18/23 FIRE Letter). Bruno testified that he "reflected on" the 4/18/23 FIRE Letter. See Lawson Decl., Exh. AAA at PageID.6413 (9/26/24 Bruno Depo. at 149).

On August 17, 2023, Lawson's counsel at the time sent the University's counsel a letter raising a number of issues, including alleging that Dean Osorio had a conflict of interest because Dean Osorio worked with Bruno and Lawson to lobby for funding for a program that would compete with an existing program that Lawson previously founded. Lawson's counsel

asserted this conflict required Dean Osorio's replacement as the decision maker. [Id., Exh. FFF.] Lawson argues Bruno acknowledged the conflict, as evidenced by his replacement of Dean Osorio with Dean Ceria-Ulep. See Lawson's CSOF at ¶ 18; Lawson Decl., Exh. GGG (letter dated 9/29/23 to Lawson from Bruno). Lawson's counsel responded that the replacement did not cure the conflict in the disciplinary process as a whole because Bruno still controlled the process, and Bruno also had a conflict of interest. See Lawson Decl., Exh. HHH (letter dated 10/3/23 to the University's counsel from Lawson's counsel at that time).

Lawson emphasizes that Dean Ceria-Ulep testified in her deposition that she did not read the 2/21/23 Boycott Email. See Lawson's CSOF at ¶ II.6; Lawson Decl., Exh. BBB (trans. of Dean Ceria-Ulep's 9/23/24 videotaped deposition ("Ceria-Ulep Depo.")) at 253. She also testified that, when she was appointed as the decision maker, she did not receive special training on the applicable policies, laws, or the First Amendment. [Lawson Decl., Exh. BBB at 193-94.] Kono instructed Dean Ceria-Ulep to rely mainly on the report of the fact finders, to compare it to

the applicable policies, and to determine if there was any violation.[4] [Id. at 142-43.]

Lawson asserts that, on December 1, 2023, Linda Voong ("Voong") from Bruno's office sent Dean Ceria-Ulep the final draft of the Decision for distribution on Dean Ceria-Ulep's letterhead. See Lawson Decl. at ¶ 3.f (asserting Voong is part of Bruno's office); Lawson 1/6/26 Decl., Exh. O (email dated 12/1/23 from Voong to Dean Ceria-Ulep, transmitting the final draft of the Decision). Lawson asserts that, while the final Decision is eighteen pages long, Dean Ceria-Ulep's draft was only seven pages long. See Lawson Decl. at ¶ 8.h; Lawson 1/6/26 Decl., Exh. L (draft of Decision). Thus, Lawson argues that Bruno's office wrote the majority of the Decision. See Mem. in Opp. at 19.

Lawson emphasizes that the Fact-Finding Report did not substantiate the allegation that Lawson said Nelson was "not Black enough," only that he questioned her black experience because she was not raised in the United States. See Lawson 1/6/26 Decl., Exh. J (Fact-Finding Report) at 68-70.

Lawson also emphasizes that Dean Ceria-Ulep's Decision did not find a violation of EP 1.204, but Bruno's 3/8/24 Letter

---

[4] Anne Marie Puglisi and Daniel Sato submitted a memorandum dated October 2, 2023 to Dean Ceria-Ulep ("Fact-Finding Report"). [Lawson 1/6/26 Decl., Exh. J (Fact-Finding Report).]

still ordered Lawson to undergo EP 1.204 training. [Lawson's

CSOF at ¶ 11.]

The Decision found that the following allegation,

among others, was substantiated:

> Both in the meeting and in subsequent emails
> after the meeting, Lawson utilized words
> perceived as veiled threats, such as informing
> meetings attendees, students and staff via a
> listserv that he was "not non-violent," and
> repeatedly inviting another faculty member who
> submitted a proposal for ground rules for future
> faculty meetings to "come at me."

[Bruno Decl., Exh. 3 (Decision) at UH_001266 (emphasis

omitted).] Lawson points out that Bruno testified:

> Q. [by Lawson:] You've seen that exhibit
> where I have email and the email says: Come at me
> all you want, but don't lie on me. I don't call
> anybody names?
>
> A. [by Bruno:] Yes.
>
> Q. Do you think it's fair to take out the
> words "come at me" and then say that those are
> veiled threats of violence?
>
> A. I agree that the context of the statement
> is -- that's important, yes. So if it was going
> to be included, it should have been included in
> the entirety.

[Lawson Decl., Exh. AAA at PageID.6530 (9/26/24 Bruno Depo. at

266).]

Further, Lawson points to Bruno's testimony that,

after the incident during the 2/17/23 Meeting, the meeting ended

after all votes were taken. No one at the meeting called 911 or

campus security. See id. at PageID.6489 (9/26/24 Bruno Depo. at 225). Nelson testified that she did not have any duties at the 2/17/23 Meeting after she gave the dean's report, and, although she was not there for the remainder of the meeting, she "assum[ed] the meeting was functional." See Lawson Decl., Exh. DDD (Nelson Depo.) at 226-27. Lawson therefore argues "[n]o operational disruption occurred" because of his speech. See Lawson's CSOF at ¶ II.3.

Similarly, Lawson emphasizes that neither the Fact-Finding Report nor the Decision indicated either of the two students who attended the 2/17/23 Meeting was fearful, felt threatened, or believed Lawson's speech was disruptive. See id. at ¶ II.17.

## IV.  **Defendants' Motion**

Defendants argue they are entitled to summary judgment as to all of the claims remaining against them in their individual capacities because they are entitled to qualified immunity. See Motion, Mem. in Supp. at 2, 6, 25. Defendants argue that, during the period in question, there was no clearly established law that prohibited Defendants from reporting, investigating, and imposing corrective actions for Lawson's conduct at the 2/17/23 Meeting and in his subsequent related emails. See Motion at 2.

## DISCUSSION

I.   **Preliminary Issues**

   A.    **The Relevant Claims**

All of the remaining claims in this case are brought pursuant to Title 42 United States Code Section 1983. The elements of a Section 1983 claim are: "(1) a person acting under color of State law; (2) subjects or causes to be subjected to deprivation; (3) a U.S. citizen or person in the jurisdiction of the United States; (4) of a right, privilege, or immunity secured by the Constitution and laws." Chaudhry v. Aragón, 68 F.4th 1161, 1169 & n.9 (9th Cir. 2023). Further, "[i]n order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation . . . ." Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).

Insofar as "qualified immunity covers only defendants in their individual capacities," Cmty. House, Inc. v. City of Boise, 623 F.3d 945, 966 (9th Cir. 2010), only Counts I, II, and VII are relevant to the instant Motion. Count I, Lawson's viewpoint discrimination claim, alleges Defendants "initiated an investigation into Professor Lawson on the basis of his dissenting viewpoint on issues of public concern," [Amended Complaint at ¶ 261,] and Defendants barred Lawson from the WSRSL campus and imposed other sanctions that "require further

17

suppression of Professor Lawson's protected speech under the threat of termination," [id. at ¶ 268]. Count II, Lawson's retaliation claim, is based upon the same conduct as Count I. See id. at ¶ 275 ("Defendants['] actions as described above would chill a person or ordinary firmness from continuing to speak out." (citation and internal quotation marks omitted)). Count VII, Lawson's due process claim, alleges Defendants: failed to give Lawson notice and an opportunity to be heard either before or after the interim measures were imposed; [id. at ¶¶ 330-31;] failed to provide sufficient notice of allegations that were the subject of the investigation; [id. at ¶ 332;] and failed to provide a fair investigative and decision-making process, [id. at ¶¶ 333-36].

B.    **Relevant Statements Made by Lawson**

This Court must also determine, as a preliminary matter, what statements are before it. Lawson has previously denied making some of the statements that were attributed to him during the investigative and decision-making process. See, e.g., Amended Complaint at ¶ 172 ("Dean Ceria-Ulep's Decision states that Professor Lawson said Defendant Nelson is 'not Black enough' and that Professor Lawson continued this narrative in his boycott email. But none of Professor Lawson's emails say Defendant Nelson is 'not Black enough,' nor did he ever say those words."); Lawson 1/6/26 Decl., Exh. J (Fact-Finding

18

Report) at 74 ("Lawson said that he did not use the term 'non non-violent' or 'not non-violent.'").

In response to the instant Motion, Lawson argues that, "even assuming he used every contested phrase Defendants attribute to him — the speech is protected as a matter of law." [Mem. in Opp. at 1 (citations omitted).] Thus, he asserts that, for purposes of the instant Motion, this Court can "assume Plaintiff said everything Defendants attribute to him — 'nice racism,' 'white fragility,' 'woke,' 'not non-violent,' that Nelson was 'not Black enough,' and that he 'questioned Nelson's black experience.'" [Id. at 4.] Although Lawson acknowledges that this Court could find that there is a genuine issue of material fact for trial as to whether Lawson made those statements,[5] he urges this Court to "decide protection as a matter of law now." See id. at 8.

This Court construes Lawson's arguments as a waiver of any factual dispute regarding what statements he made during the 2/17/23 Meeting. To the extent that it is necessary to the qualified immunity analysis, this Court will address whether

---

[5] Federal Rule of Civil Procedure 56(a) states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Lawson's specific statements were protected under the First Amendment.

C.    **Whether the Assumed Statements Are Protected**

The standards developed from Pickering v. Board of Education of Township High School District 205, 391 U.S. 563 (1968), and its progeny, apply to both viewpoint discrimination claims and retaliation claims and are summarized in this Court's prior order on Lawson's Motion for Summary Judgment. See Order Denying Plaintiff's Motion for Summary Judgment, filed 4/30/26 (dkt. no. 206) ("4/30/26 Order"), at 22-24.[6] In particular, this Court stated,

> the Ninth Circuit has described the Pickering analysis as follows:
>
> > (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.
>
> Jensen v. Brown, 131 F.4th 677, 686 (9th Cir. 2025) (citation omitted).

[Id. at 23-24.]

---

[6] The 4/30/26 Order is also available at 2026 WL 1189265.

This Court has previously stated that Lawson's criticism of the Event during the 2/17/23 Meeting and in the 2/21/23 Boycott Email was likely protected speech because it addressed a matter of public concern and related to his scholarship or teaching. See id. at 36; see also id. at 26 (finding that "Lawson's criticism of the Event 'can fairly be considered to relate to any matter of political, social, or other concern to the community'" (quoting Johnson v. Multnomah Cnty., 48 F.3d 420, 422 (9th Cir. 1995))). The same would also be true of Lawson's criticism of the Event in Lawson's 2/18/23 Email. Although this Court viewed the record in the light most favorable to Defendants in the 4/30/26 Order, see 4/30/26 Order at 26-27 n.14, and this Court must now view the record in the light most favorable to Lawson,[7] that does not affect the protected nature of Lawson's criticism of the Event because it is undisputed that Lawson made statements criticizing the Event during the 2/17/23 Meeting and in his relevant emails that followed.

"In contrast, 'individual personnel disputes and grievances . . . of no relevance to the public's evaluation of the performance of governmental agencies' are not matters of

---

[7] In considering Defendants' Motion, this Court must view the record in the light most favorable to Lawson as the nonmoving party. See Harris v. Cnty. of Orange, 17 F.4th 849, 855 (9th Cir. 2021).

public concern." Jensen, 131 F.4th at 687 (alteration in Jensen) (quoting McKinley v. City of Eloy, 705 F.2d 1110, 1114 (9th Cir. 1983)). In McKinley, the Ninth Circuit stated that "speech that concerns 'issues about which information is needed or appropriate to enable the members of society' to make informed decisions about the operation of their government merits the highest degree of first amendment protection." 705 F.2d at 1114 (quoting Thornhill v. Alabama, 310 U.S. 88, 102, 60 S. Ct. 736, 744, 84 L. Ed. 1093 (1940)).

As to the statement that Nelson was "not Black enough," Lawson argues it was protected speech because the subject of Nelson's "peer-reviewed scholarship" is "intra-Black diasporic identity and representational legitimacy." [Mem. in Opp. at 6 (some citations omitted) (citing Camille A. Nelson, *Carriers of Globalization: Loss of Home & Self Within the African Diaspora*, 55 Fla. L. Rev. 539 (2003)).] He is mistaken. The matter of public concern that Lawson addressed during the 2/17/23 Meeting related to the Event and not Nelson's academic publications or her qualifications as a scholar or law school administrator. Even assuming that Lawson's "not Black enough" comment was a reference to Nelson's area of scholarship, this remark was a personal attack and not relevant to the issue of whether the Event was an appropriate WSRSL function. Nor did the comment convey any information necessary to the evaluation of

22

the planned Event because Nelson was not scheduled to be one of the Event facilitators. <u>See</u> Motion for Preliminary Injunction and Request for Expedited Hearing, filed 4/15/24 (dkt. no. 14), Declaration of Kenneth L. Lawson, Exh. 1 (Event flier identifying Dina Shek, Susan Serrano, Miyoko Pettit-Toledo, and Troy Andrade as the facilitators of the Event). Simply put, his statement was an individual grievance and not a matter of public concern.

Even viewing the record in the light most favorable to Lawson, there is no genuine issue of fact, and this Court finds that Lawson's statement during the 2/17/23 Meeting that Nelson was "not Black enough" did not address a matter of public concern. Thus, this Court concludes that Lawson's statement that Nelson was "not Black enough" was not protected under the First Amendment.

This Court finds that, for purposes of the instant Motion, it is not necessary to address whether the other statements that Lawson is assumed to have made were protected under the First Amendment. This Court's ruling that the assumed "not Black enough" statement was not protected is sufficient for the analysis below.

## II.  <u>Qualified Immunity Framework</u>

The Ninth Circuit has stated:

"Qualified immunity shields government actors from civil liability under 42 U.S.C. § 1983 if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Castro v. County of Los Angeles</u>, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). "To determine whether [a government actor] is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the [government actor's] conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident." <u>Id.</u> . . . .

<u>Hartzell v. Marana Unified Sch. Dist.</u>, 130 F.4th 722, 742 (9th Cir.) (some alterations in <u>Hartzell</u>), *cert. denied*, 146 S. Ct. 298 (2025).

A right is clearly established "when, at the time of the challenged conduct, the contours of the right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) (cleaned up) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). "Although the Supreme Court 'does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'" <u>Evans v. Skolnik</u>, 997 F.3d 1060, 1066 (9th Cir. 2021) (quoting <u>Kisela v. Hughes</u>, 584 U.S. 100, 104, 138 S. Ct. 1148, 200 L. Ed. 2d 449 (2018)). The question is beyond debate when "there are 'cases of controlling authority' in the plaintiff['s] jurisdiction at the time of the incident 'which clearly established the rule on which [she] seek[s] to rely,' or 'a consensus of cases of

persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'" Id. (quoting Wilson v. Layne, 526 U.S. 603, 617, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999)).

"The Supreme Court has 'repeatedly told courts — and the Ninth Circuit in particular — not to define clearly established law at a high level of generality.'" Id. at 1067 (quoting al-Kidd, 563 U.S. at 742, 131 S. Ct. 2074). In the First Amendment context, "the right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from" a particular type of government action. Reichle v. Howards, 566 U.S. 658, 665, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012) (focusing on the "right to be free from a retaliatory arrest that is otherwise supported by probable cause").

Hartzell, 130 F.4th at 742 (alterations in Hartzell). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." Kisela v. Hughes, 584 U.S. 100, 104 (2018) (per curiam) (quotation marks and citation omitted). "While the plaintiff bears the burden of proof regarding whether the right is clearly established, a defendant must prove that his or her conduct was reasonable." DiRuzza v. Cnty. of Tehama, 206 F.3d 1304, 1313 (9th Cir. 2000) (citation omitted).

Because this Court must examine the personal participation of each Defendant, the instant Order will apply

the foregoing principles to Nelson, Mirkay, and Bruno separately.

## III.  **Nelson**

### A.    **Scope of Nelson's Participation**

Nelson states that her only involvement in the University's investigation was as a witness, and she was not involved in the recommendation or imposition of the disciplinary actions taken against Lawson. See Nelson Decl. at ¶¶ 6-7. Neither of the investigation notices, the Fact-Finding Report, nor the Decision was issued by Nelson. See Bruno Decl., Exh. 1 (Bruno's 2/27/23 Letter), Exh. 2 (Bruno's 3/28/23 Letter), Exh. 3 (Decision), Exh. 4 (Bruno's 3/8/24 Letter); Lawson 1/6/26 Decl., Exh. J (Fact-Finding Report). This Court finds that Nelson has carried her initial "burden of showing that there is no genuine issue of material fact," as to the extent of her personal participation in the alleged violation of Lawson's rights. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

> When, as here, the moving party does not have the burden of proof on an issue at trial, it "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for

26

trial.'" Id. (quoting Anderson, 477 U.S. at 250, 106 S. Ct. 2505).

Lerner & Rowe PC v. Brown Engstrand & Shely LLC, 119 F.4th 711, 717–18 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2732 (2025).

Lawson argues Nelson was more than a witness; she was one of the complainants. [Mem. in Opp. at 23.] He also argues that Nelson gave "materially misleading" statements to the fact finders because Nelson failed to disclose her interaction with Lawson at the 2/18/23 HoMA Event. [Id.]

As to Counts I and II, Lawson's position appears to be that, because Nelson's 2/18/23 Email was one of the complaints that prompted the investigative and decision-making process, Nelson personally participated in the decision to initiate the investigation. Lawson, however, fails to identify any evidence that raises a triable issue of fact as to whether Nelson was involved in the decision to initiate an investigation following the receipt of complaints from Nelson and others.

To the extent that Lawson attempts to argue that the complaint by Nelson – who is the Dean of WSRSL, where Lawson is a professor – was, by itself, an act of viewpoint discrimination or retaliation, this Court rejects that argument. Nelson's 2/18/23 Email mentioned the Event and Lawson's criticism of the WSRSL diversity committee that planned the Event. See Nelson Decl., Exh. 5 (Nelson's 2/18/23 Email) at UH_002286. Nelson's

2/18/23 Email also forwarded Lawson's 2/18/23 Email, which included Lawson's explanation of his criticism of the Event during the 2/17/23 Meeting. See id. at UH_002288-89. However, the concerns that Nelson's 2/18/23 Email raised were not about Lawson's criticism of the Event. Rather, Nelson expressed concerns about Lawson's **behavior**. See id. at UH_002286 ("I am very concerned about [Lawson] and his behavior."); id. at UH_002287 ("I'm also deeply concerned for my own ability to continue to work and be healthy in a space where his hostility towards the institution, his colleagues, and me **manifests in abusive ways**." (emphasis added)).

Even viewing the record in the light most favorable to Lawson as the nonmoving party, Nelson's 2/18/23 Email did not constitute a complaint about Lawson's criticism of the Event. Further, Lawson fails to identify specific facts showing that there is a genuine issue of fact for trial as to whether Nelson's 2/18/23 Email was sent in retaliation for Lawson's statements criticizing the Event.

This Court therefore finds no genuine issues of material fact as to the nature of Nelson's role in the alleged violation of Lawson's First Amendment rights. This Court finds that Nelson's personal participation in the alleged violation of Lawson's First Amendment rights during the investigative and

decision-making process was limited to Nelson's role as a complaining witness.

As to Count VII, Lawson argues Nelson was more than just a witness because she failed to disclose to the fact finders the interaction between Nelson and Lawson at the 2/18/23 HoMA Event. Lawson's position appears to be that the failure to disclose constituted personal participation in the denial of "a fair investigation process before an impartial tribunal." See Amended Complaint at ¶ 333. However, Lawson fails to identify any evidence that raises a genuine issue of fact as to whether Nelson's failure to disclose the interaction at the 2/18/23 HoMA Event affected the fairness of the investigation process or the decisions that were rendered thereafter.

First, Lawson had the opportunity to tell the fact finders about his interaction with Nelson at the 2/18/23 HoMA event when they interviewed him. See Lawson 1/6/26 Decl., Exh. J (Fact-Finding Report) at 12 (stating Lawson was interviewed on 8/8/23); id. at 14 (identifying Exhibit 7.0 to the Fact-Finding Report as the signed summary of Lawson's interview).

Even though Nelson did not disclose the interaction with Lawson at the 2/18/23 HoMA Event to the fact finders, Nelson's 2/18/23 Email stated she was going to a Black History Month event that night. See Nelson Decl., Exh. 5 (Nelson's 2/18/23 Email) at UH_002287. The fact finders had Nelson's

29

2/18/23 Email to consider. See Lawson 1/6/26 Decl., Exh. J (Fact-Finding Report) at 14 (identifying Exhibit 1.0 to the Fact-Finding Report as Nelson's 2/18/23 Email). The statement in Nelson's 2/18/23 Email would have supported a disclosure by Lawson of his interaction with Nelson at the 2/18/23 HoMA Event.

Even viewing the record in the light most favorable to him, Lawson fails to identify evidence that raises a genuine issue of material fact as to Nelson's role in the alleged violation of his due process rights. This Court finds that Nelson's personal participation in the alleged violation of Lawson's due process rights during the investigative and decision-making process was limited to Nelson's role as a witness.

## B. Qualified Immunity Analysis

> Courts have discretion to decide which of the two prongs "should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). "Addressing the second prong before the first is especially appropriate where 'a court will rather quickly and easily decide that there was no violation of clearly established law.'" Jessop [v. City of Fresno], 936 F.3d [937,] 940 [(9th Cir. 2019)] (quoting Pearson, 555 U.S. at 239, 129 S. Ct. 808).

Saved Mag. v. Spokane Police Dep't, 19 F.4th 1193, 1198 (9th Cir. 2021).

### 1.   Counts I and II

This Court, in its discretion, elects to decide the clearly established right prong first in its consideration of Nelson's assertion of qualified immunity as to Lawson's First Amendment claims. Lawson fails to identify any controlling authority from which a reasonable law school administrator would have understood that it would be a violation of the professor's First Amendment rights and/or the professor's due process rights to 1) make a complaint about a professor's conduct and abusive statements made contemporaneously with protected statements during a faculty meeting; and 2) cooperate as a witness in the investigation that followed. See Hartzell, 130 F.4th at 742. The cases cited by Lawson focus upon individual defendants who were involved in the plaintiff's discipline, not a defendant who complained about the statements and/or conduct that was alleged to be protected speech. For example, Lawson relies upon Dodge v. Evergreen School District #114, 56 F.4th 767 (9th Cir. 2022), and Reges v. Cauce, 175 F.4th 1014 (9th Cir. 2026).[8] See Mem. in Opp. at 8-10.

---

[8] Insofar as Reges was decided after the relevant events in this case occurred, the case itself cannot constitute clearly established law at the time of those events. However, because the relevant events in Reges occurred in 2022 and 2023, see 175 F.4th at 1023-26, the Ninth Circuit's analysis of what the clearly established law was at that time is relevant to this Court's analysis of the clearly established law at the time of Defendants' actions.

In Dodge, the plaintiff, Eric Dodge ("Dodge"), wore a "Make America Great Again" ("MAGA") hat when he went to a teachers-only training, but he removed the hat and left it on either the table or his backpack during the training. The individual defendants were Caroline Garrett ("Garrett"), the principal at Dodge's school, and Jenae Gomes ("Gomes"), the school district's chief human resources director. See 56 F.4th at 772-73. The persons who complained about Dodge's hat, including the professor who led the training and other teachers who attended the training, were not named as defendants. See id. at 773-74.

In Reges, the plaintiff, Stuart Reges ("Reges"), was a professor at the University of Washington's ("UW") Paul G. Allen School of Computer Science and Engineering ("Allen School"), 175 F.4th at 1022, and the defendants were the director and vice director of the Allen School, the dean of UW's College of Engineering (which oversees the Allen School), and the president of UW, id. at 1025-26. Reges included a statement in his course syllabus that was a parody of an official UW statement acknowledging the indigenous nations who resided on the land where UW is located ("land acknowledgment"). Reges's statement prompted multiple complaints by students. See id. at 1023-24. None of the students were identified as defendants in the plaintiff's lawsuit. See id. at 1026.

32

Because Dodge, Reges, and the other cases cited by Lawson do not address claims against a defendant who merely made a complaint against the plaintiff and was a witness in the investigation against the plaintiff, they cannot and do not constitute clearly established law as to Nelson. Additionally, this Court has not found any case constituting clearly established law as to Lawson's claims against Nelson.

Although Hartzell itself does not constitute clearly established law as to Nelson because it was decided after the events at issue in this case, it is relevant to this Court's analysis because the facts of that case are similar to the facts of the instant case, and the clearly established law analysis in Hartzell addressed a period that was close in time to the relevant events of this case. For several years, the plaintiff, Rebecca Hartzell ("Hartzell"), repeatedly advocated for improved services within the school district. Following an incident on February 7, 2020 between Hartzell and Andrea Divijak ("Divijak"), the principal of Dove Mountain K-CSTEM school ("Dove Mountain"), a school where five of Hartzell's children were students, Hartzell was banned from school premises. See Hartzell, 130 F.4th at 728-29.

Hartzell and Divijak spoke at an event held at Dove Mountain. The conversation between them began when Hartzell made a comment to Divijak that was related to criticism about the

event that Hartzell had previously expressed in an email to

Divijak. Hartzell allegedly grabbed Divijak's wrist and

attempted to stop her when Divijak attempted to walk away while

Hartzell was speaking. Hartzell denied doing anything to stop

Divijak, but Hartzell acknowledged that she told Divijak to

stop, and she accidentally touched Divijak's arm as Divijak

walked by her. See id. at 729-30.

Later during the event, Hartzell was ordered to leave

and was escorted from the building. Jerry Ysaguirre

("Ysaguirre"), a local police officer, approached Hartzell in

the parking lot and informed Hartzell that there was an

investigation regarding an assault.[9] See id. at 730.

> [Ysaguirre] told [Hartzell] that she was
> "trespassed from" the entire school property and
> that, while her children could continue to attend
> Dove Mountain, Hartzell could not enter school
> property and would have to arrange for someone
> else to drop off and pick up her children.
> Ysaguirre explained that Hartzell could be
> arrested for trespassing if she returned.
> Ysaguirre told Hartzell that the order would
> remain in effect until the District decided
> otherwise.
>
> In an incident report, Ysaguirre wrote that
> "he was advised that the school want[ed Hartzell]
> trespassed from the property." In an e-mail, Greg
> Roehm, the District's Safety and Security

---

[9] The district court's order states that Divijak reported
the incident with Hartzell to the Dove Mountain associate
principal and the school monitor. The school monitor suggested
that Divijak call 911 to have a police officer come to the
school. See Hartzell v. Marana Unified Sch. Dist., No. CV-21-
00062-TUC-SHR, 2023 WL 2425009, at *2 (D. Ariz. Mar. 9, 2023).

> Coordinator, stated that he met with Ysaguirre who "indicated that Ms. Hartzell was given the trespass warning at [Divijak's] request" and that Ysaguirre said it "remains in effect until the district advises him to revoke the trespass alert."

Id. (some alterations in Hartzell). Divijak spoke to Ysaguirre as part of the investigation into the assault. See id.

On February 24, 2020, Hartzell met with the district superintendent and an attorney representing the district. Hartzell was told that the ban was final and would remain in place indefinitely, with a limited exception regarding Hartzell's child who was a preschool student. In June 2023, Hartzell's counsel was informed that the ban from the school property was lifted. See id. at 731.

On February 4, 2021, Hartzell filed an action against the school district and Divijak alleging, among other claims, a First Amendment retaliation claim against both individual defendants. The district court granted summary judgment in favor of Divijak, concluding that Divijak was entitled to qualified immunity as to the First Amendment claim because of an absence of clearly established law that would have given Divijak notice that her conduct violated Hartzell's rights. See id. at 733. On appeal, the Ninth Circuit held that the district court's qualified immunity analysis was not erroneous. Id. at 743.

Hartzell is similar to the instant case because it arose from an incident that involved both unprotected conduct and protected speech. Divijak, like Nelson, was both the complaining witness and a defendant in the Section 1983 action. This Court acknowledges that the instant case involves a graduate-level school at a public university, while Hartzell involved a public school with preschool and kindergarten through eighth grade. See id. at 728-29. In Hartzell, the Ninth Circuit cautioned:

> "[C]ourts must apply the First Amendment 'in light of the special characteristics of the school environment.'" Mahanoy [Area Sch. Dist. v. B.L. ex rel. Levy], 594 U.S. [180,] 187, 141 S. Ct. 2038 [(2021)] (quoting Hazelwood [Sch. Dist. v. Kuhlmeier], 484 U.S. [260,] 266, 108 S. Ct. 562 [(1988)]). As a result, cases arising outside public schools are of limited use in evaluating the scope of Hartzell's First Amendment rights here.

Id. at 743 (some alterations in Hartzell). Similarly, a case addressing a First Amendment claim arising in the public grade school context would generally be of limited use outside of that context. Hartzell, however, did not involve the type of interests that are present in a case arising from an incident at a public grade school that renders the case inapplicable to a case arising from an incident at a college or graduate school. See, e.g., Hartzell, 130 F.4th at 738 ("On these facts, the District does not have a special interest in regulating speech

36

because it is not standing in the place of parents, as sometimes occurs when regulating student speech." (citation and internal quotation marks omitted)); id. (noting that a school's "interest in protecting minors from exposure to vulgar and offensive spoken language" did not apply (citation omitted)); id. (noting "the need to teach students the appropriate form of civil discourse" did not apply because "the speech at issue [wa]s made by a parent to an administrator outside of the presence of students except for the parent's child"). Because Hartzell did not involve the types of school interests that are unique to the grade school context, the First Amendment principles in Hartzell may be applied here.      The district court's qualified immunity ruling that was affirmed on appeal was based on the following analysis:

> [Hartzell] points to no authority that would have put a reasonable official on notice that Divijak's conduct was violating a clearly established right. Instead, [Hartzell] only insufficiently and summarily argues the constitutional right to be free from retaliation is clearly established. See Hirt v. Unified Sch. Dist. No. 287, No. 2:17-CV-02279-HLT, 2019 WL 1866321, at *18 (D. Kan. Apr. 24, 2019) ("[M]erely asserting the existence of a generic constitutional right is not enough to defeat a claim of qualified immunity."), *aff'd sub nom.* Clark v. Unified Sch. Dist. No. 287, 822 F. App'x 706 (10th Cir. 2020); cf. Moran v. Washington, 147 F.3d 839, 847 (9th Cir. 1998) ("Because the underlying determination pursuant to Pickering whether a public employee's speech is constitutionally protected turns on a context-intensive, case-by-case balancing analysis, the

37

> law regarding such claims will rarely, if ever,
> be sufficiently 'clearly established' to preclude
> qualified immunity.") . . .

Hartzell, 2023 WL 2425009, at *6 (some alterations in Hartzell).

The district court in Hartzell concluded that, in 2020, there was no clearly established law that would have put a school administrator on notice that it would be a violation of the parent's First Amendment rights if the administrator made a complaint and participated as a witness in an investigation into a parent's unprotected conduct that occurred contemporaneously with the parent's protected speech. The Ninth Circuit affirmed this ruling on appeal. Any clearly established law that would have applied to Hartzell's First Amendment claim against Divijak would have constituted clearly established law as to Lawson's First Amendment claim against Nelson, and this Court adopts the conclusion that there was no clearly established law through February 7, 2020, the date of the incident at issue in Hartzell. Neither the parties nor this Court has identified any case law constituting or discussing the clearly established law applicable to Nelson that was decided after February 7, 2020, but before the relevant period at issue in this case.

This Court finds no genuine issues of material fact, and Nelson is entitled to qualified immunity as a matter of law because, even if Nelson violated Lawson's First Amendment rights, at the time of the events at issue in this case, Lawson

did not have a clearly established right to be free from an internal complaint and from witness cooperation in an investigation where the complaint and the investigation were based upon unprotected conduct or speech that occurred contemporaneously with protected speech. See Hartzell, 130 F.4th at 742 ("In the First Amendment context, the right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from a particular type of government action." (citation and internal quotation marks omitted)). Summary judgment is granted in favor of Nelson as to Counts I and II of the Amended Complaint.

### 2.   Count VII

As to Lawson's due process claim against Nelson, this Court elects to start with the constitutional violation prong of the qualified immunity analysis. The elements of a Section 1983 procedural due process claim are summarized in the 4/30/26 Order. See 4/30/26 Order at 44-45.

This Court has found that Nelson's personal participation in the alleged violation of Lawson's due process rights was limited to her role as a witness. See *supra* Discussion Section III.A. Lawson has stated that the focus of his due process claim is on: 1) whether Dean Ceria-Ulep actually considered the evidence gathered during the investigation and actually rendered the Decision or whether Bruno was behind the

Decision; see 4/30/26 Order at 45; and 2) the fact that the Decision relied upon terms allegedly used by Lawson during the 2/17/23 Meeting but that were not specifically alleged in the notice letters issued by Bruno, see id. at 46. Lawson fails to identify any evidence suggesting that Nelson participated in any of these alleged violations, nor has Lawson identified any evidence which suggests that Nelson participated in any of the other alleged violations of Lawson's due process rights, such as the failure to provide an opportunity to be heard before or immediately after the imposition of the interim measures that were imposed during the investigation, see Amended Complaint at ¶¶ 330-31, or Bruno's alleged conflicts of interest that impaired his role as decision maker, see id. at ¶¶ 334-35.

Lawson argues that Nelson is "liable under the theory the Court sustained at the pleading stage: [her] complaint[] 'set in motion a series of acts by Bruno that Nelson . . . knew or should have known would result in the violation of Lawson's due process rights.'" [Mem. in Opp. at 27 (some citations omitted) (quoting Order Granting in Part and Denying in Part Defendants' Motion for Partial Dismissal of Plaintiff's First Amended Verified Complaint [Dkt. 43], filed 1/31/25 (dkt. no. 138) ("1/31/25 Order"), at 25).[10]] That theory was sufficient

---

[10] The 1/31/25 Order is also available at 2025 WL 358432.

to allow Count VII to survive a motion to dismiss, but not on a motion for summary judgment because Lawson cannot merely rely on the allegations in the Amended Complaint. Lawson was required to present specific facts showing a triable issue of fact as to that theory, see Lerner, 119 F.4th at 718, and Lawson has failed to do so.

Even viewing the record in the light most favorable to Lawson, he fails to identify sufficient evidence to raise a genuine issue of fact for trial as to whether any of Nelson's actions violated Lawson's due process rights. This Court therefore concludes, as a matter of law, that Nelson did not violate Lawson's due process rights. Because there is no constitutional violation, it is not necessary to address the clearly established law prong of the qualified immunity analysis. Therefore, Nelson is entitled to qualified immunity as to Lawson's due process claim. Summary judgment is granted in favor of Nelson as to Count VII of the Amended Complaint.

## IV.  Mirkay

### A.    Scope of Mirkay's Participation

As with Nelson, Mirkay states that his only involvement in the University's investigation was as a witness, and he was not involved in the recommendation or imposition of the disciplinary actions taken against Lawson. See Mirkay Decl. at ¶¶ 8-10. Neither the investigation notices, the Fact-Finding

Report, nor the Decision was issued by Mirkay. See Bruno Decl., Exh. 1 (Bruno's 2/27/23 Letter), Exh. 2 (Bruno's 3/28/23 Letter), Exh. 3 (Decision), Exh. 4 (Bruno's 3/8/24 Letter); Lawson 1/6/26 Decl., Exh. J (Fact-Finding Report). This Court finds that Mirkay has carried his initial burden to show that there is no triable issue of fact as to whether he personally participated in the alleged violation of Lawson's rights beyond the submission of Mirkay's 2/20/23 Email.

Lawson argues Mirkay was more than a witness because Mirkay was one of the complainants. [Mem. in Opp. at 23.] This argument is rejected for the same reasons that this argument was rejected as to Nelson. See supra Discussion Section III.A. As with his claims against Nelson, Lawson fails to identify any evidence that raises a triable issue as to whether Mirkay was involved in the decision to initiate an investigation. As with Nelson's 2/18/23 Email, Mirkay's 2/20/23 Email did not raise concerns about Lawson's criticism of the Event and was limited to concerns about Lawson's conduct. See Mirkay Decl., Exh. 6 (Mirkay's 2/20/23 Email) at UH_002294.

Lawson also argues Mirkay personally participated in the violation of his First Amendment and due process rights because Mirkay effectuated Lawson's removal from WSRSL's student listserv on February 23, 2023. [Mem. in Opp. at 16.]

42

In connection with Defendants' Motion, Mirkay submitted testimony that the removal of all WSRSL faculty from the student listserv made WSRSL student listserv policy consistent with the policies of the other professional schools at the University that required approval from the administration before a faculty member used the student listserv. See Mirkay Decl. at ¶¶ 6-7. In connection with an earlier motion, Mirkay gave the following testimony:

> 33. On February 22 and 23, 2023, I had Zoom meetings with members of [the Office of Vice Provost for Academic Affairs ("OVPAE")] and [the Office of General Counsel ("OGC")] to discuss steps to address the February 17, 2023, incident in light of the stated concerns of an unsafe workplace.
>
> . . . .
>
> 35. During these meetings, OVPAE contacted the Deans of other professional schools at the University of Hawai`i to ask if faculty had the ability to directly send an email to all students through an established school listserv. It was determined that faculty at other professional schools must go through whomever moderates the listserv that includes all the students in the school.
>
> 36. Furthermore, University Information Technology Services ("ITS") has a policy that listservs are to be used only for administrative or academic purposes and not for the furtherance of a person's self-interest.

[Opp. to TRO Motion, Declaration of Nicholas A. Mirkay III at PageID.539-40.] Mirkay stated that, after he learned about these

policies, on February 23, 2023, he directed the removal of all WSRSL faculty from the WSRSL student listserv. [Id. at ¶ 37.]

Lawson cites no evidence which contradicts Mirkay's testimony. Lawson does not contest the fact that the removal from the student listserv applied to all WSRSL faculty, but he argues that the preapproval requirement before a faculty member used the student listserv was implemented in retaliation for his protected speech. See Mem. in Opp. at 16. However, the only evidence that he identifies to support this position is the temporal proximity to the 2/21/23 Boycott Email. This, standing alone, fails to establish a specific fact showing that there is a genuine issue of material fact as to whether Mirkay took adverse action against Lawson because of Lawson's protected speech. See Lerner, 119 F.4th at 718.

Even viewing the record in the light most favorable to him, Lawson fails to identify evidence that raises a genuine issue of material fact as to the extent of Mirkay's participation in the alleged violation of Lawson's First Amendment and due process rights. This Court finds that Mirkay's personal participation in the alleged violation of Lawson's rights during the investigative and decision-making process was limited to Mirkay's role as a complaining witness.

B.     **Qualified Immunity Analysis**

This Court concludes that Mirkay is entitled to qualified immunity as to Counts I and II for the same reasons set forth as to Nelson. See *supra* Discussion Section III.B.1. At the time of the relevant events, there was no clearly established law that would have put Mirkay on notice that it would be a violation of Lawson's First Amendment rights if Mirkay made a complaint and participated as a witness in an investigation into Lawson's unprotected conduct that occurred contemporaneously with Lawson's protected speech.

This Court also concludes that Mirkay is entitled to qualified immunity as to Count VII for the same reasons set forth as to Nelson. See *supra* Discussion Section III.B.2. Lawson fails to identify any evidence which suggests that Mirkay participated in the alleged due process violations that occurred during the course of the investigative and decision-making process, and Lawson has not presented any specific facts showing that there is a triable issue of fact as to the theory that Mirkay set in motion a series of acts by Bruno that Mirkay knew or should have known would have resulted in a violation of Lawson's due process rights.

This Court finds no genuine issues of material fact, and Mirkay is entitled to qualified immunity as a matter of law because, even if Mirkay violated Lawson's First Amendment rights

45

and/or Lawson's due process rights, Lawson's right to be free from an internal complaint and from witness cooperation was not clearly established at the time of the events at issue in this case. Summary judgment is granted in favor of Mirkay as to Counts I, II, and VII of the Amended Complaint.

## V.    Bruno

### A.    Scope of Bruno's Participation

Bruno argues that he was not the decision maker, and he merely adopted the corrective actions that Dean Ceria-Ulep recommended in the Decision. [Motion, Mem. in Supp. at 22.] It is undisputed that Bruno: received complaints about Lawson's conduct at the 2/17/23 Meeting and Lawson's subsequent related emails; [Bruno Decl. at ¶ 4;] determined that it was necessary for the University to initiate an investigation; [id. at ¶¶ 5-6, 9;] imposed what Bruno believed were necessary interim disciplinary measures; [id. at ¶¶ 10-11;] and ultimately made the decision on the appropriate corrective action to be taken against Lawson, based on the results of the investigative and decision-making process, [id. at ¶ 18].

Further, Bruno issued Lawson the notices setting forth the allegations at issue in the investigation, [id. at ¶¶ 5, 12,] and Bruno appointed the fact finders and the decision maker, [id. at ¶ 7]. It is also undisputed that, after Lawson

asserted Dean Osorio had a conflict of interest, Bruno replaced Dean Osorio with Dean Ceria-Ulep. [Id. at ¶ 15.]

Lawson argues Bruno influenced the Decision by having someone from his office, Voong, complete Dean Ceria-Ulep's draft decision. See Lawson Decl. at ¶ 3.f; Lawson 1/6/26 Decl., Exh. O. Defendants state "Voong worked in the Office of the Vice Provost for Academic Excellence and did not work under Provost Bruno." [Defendants' Response to Plaintiff's Concise Statement of Facts in Opposition ("Reply CSOF"), filed 6/9/26 (dkt. no. 221), at ¶ 5.] However, because Defendants cite no evidence to support this representation,[11] this Court will not consider Defendants' representation.

Viewing the record in the light most favorable to Lawson, this Court finds, for purposes of the instant Motion, that Bruno must be considered to be at least one of the decision makers in the events at issue.

B.    **Qualified Immunity Analysis**

1.    **Counts I and II**

This Court, in its discretion, elects to decide the clearly established right prong first in its consideration of Bruno's assertion of qualified immunity as to Lawson's First

---

[11] Paragraph 5 of the Reply CSOF cites Exhibits O and P to the Lawson 1/6/26 Declaration. Neither document identifies the University office that Voong works in.

Amendment claims. The cases that Lawson relies upon are more relevant to his claims against Bruno than they were to his claims against Nelson and Mirkay because the cases focused upon individuals who were involved in the adverse actions taken against the respective plaintiffs. As previously noted, the individual defendants in Dodge included Garrett, the principal at Dodge's school. See 56 F.4th at 772-73. Garrett spoke to Dodge twice about his MAGA hat, and during the second conversation, Garrett allegedly said: "'[N]ext time I see you with that hat, you need to have your union rep. Bring your rep because I'll have mine.'" See id. at 774. The Ninth Circuit noted that Garrett "had authority over [Dodge's] employment," and the Ninth Circuit held that, "[a]t a minimum, there is a genuine issue of fact regarding whether Dodge reasonably interpreted Principal Garrett's statement as a threat against his employment." Id. at 780. The Ninth Circuit reversed the district court's grant of summary judgment ruling that Garrett was entitled to qualified immunity because "Garrett's asserted administrative interest in preventing disruption among staff d[id] not outweigh Dodge's right to free speech," id. at 783, and Dodge had a clearly established right to express political views, id. at 787. See id. at 788 (reversing the district court's grant of summary judgment in favor of Garrett).

48

Dodge does not constitute clearly established law as to Lawson's First Amendment claim against Bruno because, in Dodge, "[t]here [wa]s no allegation that Dodge did anything with his hat during the training other than place it near him with his other things, nor is there any allegation that he did anything to interfere with or disrupt the training." See id. at 773. In the instant case, Lawson did not merely display a message during the 2/17/23 Meeting; he made numerous statements during the meeting that were directed at specific persons, including Nelson. See 4/30/26 Order at 16-17 (describing Nelson's testimony in her declaration). Further, unlike the instant case, there was no investigation into complaints about conduct that Dodge engaged in contemporaneously with his protected speech. The investigation in Dodge was initiated in response to a harassment, intimidation, and bullying complaint by Dodge against Garrett based upon statements she made when she confronted him about wearing the MAGA hat. See 56 F.4th at 774-75.

As previously noted, the individual defendants in Reges included the director of the Allen School, Magdalena Balazinska ("Balazinska"), who initiated a disciplinary process against Reges, and the dean of the College of Engineering, Nancy Allbritton ("Allbritton"), who convened a special faculty committee to investigate whether Reges violated UW policy. Id.

49

at 1024-25. Allbritton ultimately declined to impose sanctions against Reges. Allbritton's letter informing Reges of the decision noted that Reges had other options besides his course syllabus to share his version of the land acknowledgment and warned Reges against future inclusion of his land acknowledgment in his syllabus. Id. at 1026. The district court granted summary judgment in favor of the defendants as to Reges's First Amendment retaliation and viewpoint discrimination claims and denied Reges's cross-motion for summary judgment, finding that UW's interest in mitigating the disruption to its functioning outweighed Reges's First Amendment interests. See id. at 1026-27. The Ninth Circuit held that the district court erred in its Pickering analysis, reversed the grant of summary judgment in favor of the defendants, and directed that summary judgment be entered in favor of Reges. Id. at 1039, 1041. Many of the controlling authorities that the Ninth Circuit cited in Reges were available at the time of the relevant events in this case, but this Court concludes that they do not constitute clearly established law as to Lawson's claims against Bruno because those cases did not involve an investigatory and disciplinary process addressing unprotected speech or conduct that occurred contemporaneously with protected speech.

Lawson argues Rodriguez v. Maricopa County Community College District, 605 F.3d 703 (9th Cir. 2010) is "[t]he nearest

authority," and it constitutes "clearly established law [that] warned Defendants that punishing the speech, not declining to, was the constitutional risk." [Mem. in Opp. at 12.] Rodriguez involved a math professor who "sent three racially-charged emails over a distribution list maintained by" the defendant school district. 605 F.3d at 705. Although the emails were not sent to students, many learned about them, and the student body president sent an email to the faculty about the professor, and there were press reports about student protests against the professor. There were also complaints by district employees that the professor's statements created a hostile work environment, but the professor was not disciplined, and there was no attempt to enforce the district's anti-harassment policy. Id. at 706.

The plaintiffs were a certified class of Hispanic employees in the community college district, and the defendants were the district, the district governing board, the chancellor, and the president. Id. at 705. The plaintiffs alleged the defendants "'failed to take immediate or appropriate steps to prevent [the professor] from sending Plaintiffs harassing emails' and from disseminating harassing speech via his district-hosted website." Id. at 706. The district court denied the defendants' motion for summary judgment as to the plaintiffs' constitutional claims. The president and chancellor

51

brought an interlocutory appeal challenging the ruling that they were not entitled to qualified immunity. Id. at 707.

The Ninth Circuit reversed the denial of summary judgment and held that the president and the chancellor were entitled to qualified immunity because they did not violate the plaintiffs' right to be free of workplace harassment. The Ninth Circuit did not reach the clearly established prong of the qualified immunity analysis. Id. at 711.

Rodriguez addressed "the interplay between the First Amendment and the right to be free of workplace harassment on the basis of protected status," id. at 705, and the claims in that case did not arise from the professor's First Amendment rights. Rodriguez addressed whether the college administrators were constitutionally required to respond to the professor's speech. What Rodriguez does not address is the issue of whether, if the defendants had investigated and disciplined the professor, the process would have violated the professor's First Amendment rights. Further, although the professor's emails were racially charged, the professor did not make hostile statements directed at specific people. Nor did the professor, as Lawson did here, make personal grievances or state opinions that were not of public concern. Thus, Rodriguez did not clearly establish law as to the analysis of whether Bruno is entitled to qualified immunity.

Although this Court concluded that the qualified immunity analysis in Hartzell was relevant to the analysis of Nelson and Mirkay's assertion of qualified immunity as to Lawson's First Amendment claims, see *supra* Discussion Sections III.B.1, IV.B, the same cannot be said as to Bruno's assertion of qualified immunity because there was no individual defendant who was involved in either the investigation into Hartzell's conduct or the imposition of adverse action against Hartzell.

Thus, the parties have not identified, nor has this Court found any clearly established law that would put a university administrator on notice that it would be a violation of a professor's First Amendment rights if the administrator initiated an investigation and a decision-making process regarding a professor's unprotected conduct that occurred contemporaneously with the professor's protected speech. Even viewing the record in the light most favorable to Lawson, there are no genuine issues of material fact, and Bruno is entitled to qualified immunity as a matter of law because, even if Bruno violated Lawson's First Amendment rights, at the time of the events at issue in this case, Lawson did not have a clearly established right to be free from an investigation and decision-making process based on unprotected speech or conduct that occurred contemporaneously with protected speech. Summary

judgment is granted in favor of Bruno as to Counts I and II of the Amended Complaint.

### 2.    Count VII

This Court, in its discretion, elects to decide the clearly established right prong first in its consideration of Bruno's assertion of qualified immunity as to Lawson's due process claim. Lawson argues that, in response to his Motion for Summary Judgment, this Court identified the following issues of fact for trial: "whether the substantiated 'not Black enough' finding was 'similar enough' to the noticed allegations, and whether Ceria-Ulep 'failed to consider all of the relevant evidence' and 'did not ultimately write the Decision.'" [Mem. in Opp. at 25 (quoting 4/30/26 Order at 46-47).]

### a.    Alleged Notice Violation

Lawson argues the failure to include the allegation that Lawson said Nelson was "not Black enough" in either Bruno's 2/27/23 Letter or Bruno's 3/28/23 Letter was a clear violation of his due process right to notice. See id. at 25-26 (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985)). Although it did not contain the "not Black enough" allegation, Bruno's 2/27/23 Letter informed Lawson that the investigation would include the general allegation that Lawson "questioned Dean Nelson's 'black experience' as someone not raised in the United States . . . ." See Bruno Decl., Exh. 1 (Bruno's 2/27/23

Letter) at UH_008468. The allegation of the specific "not Black

enough" statement arguably falls within the scope of that

general allegation.

> In Loudermill, the United States Supreme Court stated:
>
> The tenured public employee is entitled to oral
> or written notice of the charges against him, an
> explanation of the employer's evidence, and an
> opportunity to present his side of the story. See
> Arnett v. Kennedy, 416 U.S.[ 134,] 170-171
> [(1974)] (opinion of POWELL, J.); id., at 195-196
> (opinion of WHITE, J.); see also Goss v. Lopez,
> 419 U.S.[ 565,] 581 [(1975)]. To require more
> than this prior to termination would intrude to
> an unwarranted extent on the government's
> interest in quickly removing an unsatisfactory
> employee.

470 U.S. at 546 (citation omitted). The Supreme Court's holding

about the extent of the requirements for the pretermination

opportunity to respond depended in part upon the available post-

termination procedures. See id. at 546-48. Applying that

principle to the facts of the instant case, the level of detail

required in Bruno's investigation notices must be evaluated in

light of the post-Decision challenge procedures that were

available to Lawson. In the Decision, Dean Ceria-Ulep found that

"Lawson questioned Nelson's black experience as someone not

raised in the United States," based in part on witness

statements "Lawson said Nelson was 'not a Black American' and

'not Black enough' to speak at the event since she was born in

Jamaica, grew up in Canada and did not experience what Lawson

experienced . . . ."[12] [Bruno Decl., Exh. 3 (Decision) at UH_001269-70.] Lawson had the opportunity to appeal the Decision, and an appeals officer denied the appeal on January 30, 2024. See Kono 4/26/24 Decl. at ¶ 16. After the appeal decision, Lawson also had the opportunity to submit a response, asking "the Provost to appoint a Disciplinary Advisory Committee ('DAC') to provide him with an evaluation of the substance of the allegations through a review of the evidence," but Lawson did not do so. See id. at ¶¶ 17-18. Bruno's 3/8/24 Letter was only issued after the time for Lawson to submit a response to the appeal decision expired. See id. at ¶ 20; accord Bruno Decl. at ¶ 19 (stating Bruno's 3/8/24 Letter was issued "[a]fter Lawson had an opportunity to appeal the [D]ecision"). Under Loudermill, the post-Decision review that was available must be considered when evaluating whether the investigation notices that Bruno issued were adequate. Loudermill does not clearly establish the proposition that Lawson asserts – that Bruno's notices violated Lawson's due process rights because they did not expressly allege that Lawson said Nelson was "not Black enough."

---

[12] As previously noted, Nelson was not scheduled to be one of the facilitators at the Event. See supra Discussion Section I.C.

Lawson does not cite any controlling authority, available at the time of the relevant events, that put Bruno on notice that it would be a violation of Lawson's due process rights if the investigation notices failed to include the allegation that Lawson said Nelson was "not Black enough," nor is this Court aware of any such controlling authority.

### b.    Decision Maker

It is well established that "a fair trial in a fair tribunal is a basic requirement of due process," and "a biased decisionmaker constitutionally unacceptable." Withrow v. Larkin, 421 U.S. 35, 46-47 (1975) (quotation marks and citation omitted). However, that high level of generality is not sufficient to constitute clearly established law as to the portion of Lawson's due process claim arising from the Decision. See Hartzell, 130 F.4th at 742. Lawson argues that, because of Bruno's conflicts of interest, he was not a neutral decision maker, and Bruno's involvement in the investigative and decision-making process violated his due process right. See Amended Complaint at ¶¶ 334-35. Lawson asserts that he filed a complaint with the Hawai`i Civil Rights Commission against Nelson and Bruno alleging that the veto of his SSA request was

discriminatory and retaliatory.[13] See id. at ¶ 59; Lawson Decl. at ¶ 4.g. In addition, Lawson submitted a formal grievance against Bruno and the University regarding the denial of his SSA. [Lawson Decl. at ¶ 4.f.] However, Lawson fails to identify any controlling case law that would have put Bruno on notice that it would be a violation of Lawson's due process rights for Bruno to be a decision maker in the investigative and decision-making process while Lawson's unrelated HCRC complaint and unrelated grievance were pending.

Further, even if the assistance with the Decision that Voong provided to Dean Ceria-Ulep can be attributed to Bruno's office, there is no clearly established law that would have put Bruno on notice that having his office assist with the finalization of the Decision would be a violation of Lawson's due process rights.

### c.    Interim Measures

Finally, as to Lawson's allegation that Bruno's imposition of the interim measures violated his due process rights, there is no clearly established law that would have put

---

[13] Although Lawson alleges that he brought his discrimination and retaliation claim against Bruno and Nelson, employment discrimination claims and retaliation claims under Hawai`i Revised Statutes Section 378-2(a)(1) and (2) impose liability upon employers, not individual employees. See Lales v. Wholesale Motors Co., 133 Hawai`i 332, 343, 328 P.3d 341, 352 (2014).

Bruno on notice that the interim measures that Bruno imposed

would violate Lawson's due process rights. The Supreme Court has

stated:

> It is by now well established that "'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 895 (1961). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). This Court has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause. See, e.g., United States v. James Daniel Good Real Property, 510 U.S. 43, 53 (1993); Zinermon v. Burch, 494 U.S. 113, 128 (1990) (collecting cases); Barry v. Barchi, 443 U.S. 55, 64–65 (1979); Dixon v. Love, 431 U.S. 105, 115 (1977); North American Cold Storage Co. v. Chicago, 211 U.S. 306, 314–320 (1908). Indeed, in Parratt v. Taylor, 451 U.S. 527 (1981), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327 (1986), we specifically noted that "we have rejected the proposition that [due process] **always** requires the State to provide a hearing prior to the initial deprivation of property." 451 U.S., at 540. And in FDIC v. Mallen, 486 U.S. 230 (1988), where we unanimously approved the Federal Deposit Insurance Corporation's (FDIC's) suspension, without prior hearing, of an indicted private bank employee, we said: "An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." Id., at 240.

Gilbert v. Homar, 520 U.S. 924, 930–31 (1997) (alterations in Gilbert). Based on the complaints that Bruno received, Bruno could have reasonably believed that the interim measures imposed – including reassigning Lawson to work-from-home-status and the no-contact orders – were necessary to reduce the disruption caused by the incidents reported. See Bruno Decl. at ¶ 11.

### d.    Ruling

Even viewing the record in the light most favorable to Lawson, there are no genuine issues of material fact, and Bruno is entitled to qualified immunity as a matter of law because, even if Bruno violated Lawson's due process rights, at the time of the events at issue in this case, Lawson's right to be free from the specific types of due process violations alleged was not clearly established. Summary judgment is granted in favor of Bruno as to Count VII of the Amended Complaint.

### CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment Re Qualified Immunity, filed May 1, 2026, is GRANTED in its entirety. Summary judgment is granted in favor of Defendants as to all remaining claims against them in their individual capacities, *i.e.*, Counts I, II, and VII of Lawson's First Amended Verified Complaint, [filed 5/30/24 (dkt. no. 43)]. The only claims that remain in this case are Lawson's claims against Defendants in their official capacities.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, June 30, 2026.



/s/ Leslie E. Kobayashi

Leslie E. Kobayashi
Senior U.S. District Judge

**KENNETH L. LAWSON VS. UNIVERSITY OF HAWAII, ET AL; CV 24-00172
LEK-RT; ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
RE QUALIFIED IMMUNITY**